Case: 3:15-cv-00502-jdp   Document #: 84   Filed: 11/04/16   Page 1 of 63

JOHN PETERS, PH.D.                                    October 20, 2016
ROBINSON vs. The CITY OF MADISON                               1–4

**Page 1**

```
 1      IN THE UNITED STATES DISTRICT COURT
 2         WESTERN DISTRICT OF WISCONSIN
 3
 4  The Estate of TONY        )
    ROBINSON, JR. ex. Rel.    ) NO. 3:15-CV-502
 5  Personal Representative   )
    ANDREA IRWIN,             )
 6                            )
               Plaintiff,     )
 7                            )
    vs.                       )
 8                            )
    The CITY OF MADISON,      )
 9  WISCONSIN and MADISON     )
    POLICE OFFICER MATTHEW    )
10  KENNY,                    )
                              )
11             Defendants.    )
                              )
12  _____)
13
14
15
16      DEPOSITION OF JOHN G. PETERS, JR., PH.D.
17     Taken at Esquire Deposition Solutions
             at 2300 West Sahara Avenue
18                  Suite 770
             Las Vegas, Nevada 89102
19
20         On Thursday, October 20, 2016
                  at 9:13 a.m.
21
22
23
24
25  Reported by:  Jualitta Stewart, CCR No. 807, RPR
```

**Page 2**

```
 1  APPEARANCES:
 2  For the Plaintiff:
 3             DAVID B. OWENS, ESQ.
               ANAND SWAMINATHAN, ESQ.
 4             Loevy & Loevy
               311 North Aberdeen
 5             Third Floor
               Chicago, Illinois 60607
 6             (312) 243-5900
 7
    For the Defendant, Matthew Kenny:
 8
               SAMUEL C. HALL, JR., ESQ.
 9             Crivello Carlson
               710 North Plankinton Avenue
10             Suite 500
               Milwaukee, Wisconsin 53203
11             (414) 271-7722
12
    For the Defendant, City of Madison:
13
               KATHRYN HARRELL, ESQ. (via phone)
14             Boardman & Clark
               1 South Pinckney Street
15             Suite 410
               Madison, Wisconsin 53701
16             (608) 283-1744
17
18
19
20             --oOo--
21
22
23
24
25
```

**Page 3**

```
 1              I N D E X
 2
 3  WITNESS                                    PAGE
 4  JOHN G. PETERS, JR., PH.D.
 5   Examination by Mr. Owens                    4
 6   Examination by Mr. Hall                   246
 7   Further Examination by Mr. Owens          249
 8
 9              --oOo--
10
11
12            E X H I B I T S
13
14  PLAINTIFF'S                                PAGE
15   Exhibit 214 - Expert Report of             7
                    John G. Peters, Jr., Ph.D.
16
     Exhibit 215 - "Police and Security News"  35
17                  Article
18   Exhibit 216 - "Police and Security News"  38
                    Article
19
     Exhibit 217 - Handwritten Document        105
20
     Exhibit 218 - "White Paper Report on      106
21                  Excited Delirium Syndrome"
22   Exhibit 219 - Handwritten Document        221
23   Exhibit 220 - Handwritten Notes           221
24   Exhibit 221 - Judicial Decision by IPICD  243
25              --oOo--
```

**Page 4**

```
 1      LAS VEGAS, NEVADA;
 2   Thursday, October 20, 2016; 9:13 A.M.
 3
 4      JOHN G. PETERS, JR., PH.D.,
 5  having been first duly sworn, testified as follows:
 6
 7           EXAMINATION
 8  BY MR. OWENS:
 9      Q.   Good morning, Dr. Peters.
10      A.   Good morning.
11      Q.   Could you please state and spell your
12  name for the record.
13      A.   It's John G. Peters, Jr., P-e-t-e-r-s.
14      Q.   And Mr. -- or Dr. Peters, excuse me,
15  you've been retained as an expert to give opinions
16  in this case, Tony Robinson versus city of Madison;
17  is that right?
18      A.   That's correct.
19      Q.   And you prepared a report in this case?
20      A.   Yes.
21      Q.   And I know from that report and your
22  testimony chart that you've given depositions
23  before?
24      A.   Several times.
25      Q.   And you have testified in court?
```



Page 5

1   A.   Yes.
2   Q.   And if you had to estimate, how many
3 times have you given a deposition?
4   A.   It would be an estimate, probably, I
5 don't know, 150.
6   Q.   What about court, how many times have you
7 testified in court, if you had to estimate?
8   A.   At least probably 75 times, I would
9 estimate.
10   Q.   So I think you know having testified at
11 least, you know, more than 200 times just sort of
12 how this works?
13   A.   Oh, yeah, I know the rules.
14   Q.   We'll go over it and, of course, you know
15 we need out loud answers and that this is your
16 testimony just as if it were in court.  And that
17 unless there's some kind of privilege objection, Sam
18 or Katie object, you still have to answer the
19 question.
20   A.   Correct.
21   Q.   And the -- I want to be clear in your
22 report you have prepared a statement about your
23 right to amend your report.
24      Are you familiar with that?
25   A.   Yes.

Page 6

1   Q.   Is that something you routinely include
2 in all your reports?
3   A.   Yes.
4   Q.   Do you have a basic template that you use
5 in writing your reports?
6   A.   I don't have a basic template so much,
7 the front end of the report where I go through and
8 identify how I do the analysis and some of my
9 background, that pretty much is a cut and paste and
10 then updated depending on the -- on a time frame.
11 But outside of that, no.  For probably the first
12 20 years that I did this, I put the summary of facts
13 first, and then in the last ten years I put it last.
14      And the reason that I changed that, I
15 guess you could call that a formatting procedure.
16 I've done that because I was advised by some counsel
17 that I should report -- go to the court, that the
18 court wants to see your opinions, they should know
19 the history.  So that's why I made that change.
20      So template-wise, I guess we could say
21 formatting, I stick to a style and then within the
22 report, the opinions themselves, I've always done
23 preincident, incident and postincident as
24 categories.
25      So that part would probably be the same,

Page 7

1 but as far as having a template and fill in blocks
2 or something no, I don't have anything like that.
3   Q.   Okay.  And we can go ahead and just mark
4 this as Exhibit 214.
5      (Whereupon, Exhibit 214 was
6       marked for identification.)
7 BY MR. OWENS:
8   Q.   And Dr. Peters, this is the report you
9 prepared in this case; is that correct?
10   A.   Looks like it.  I didn't prepare it back
11 to back pages like this, but I'm sure for saving
12 trees that was the purpose behind it.  But yes, this
13 looks like my report.
14   Q.   Okay.  And all of the opinions you have
15 in this case, are they contained in this report?
16   A.   Yes.
17   Q.   Do you have any new opinions to add?
18   A.   Not at this time.
19   Q.   Have you reviewed any additional
20 information since preparing this report?
21   A.   No.
22   Q.   Okay.  And I want to just make this clear
23 so that we're on the same page, given the statement
24 that you made in your right to amend, my questioning
25 today is limited to exploring what your opinions are

Page 8

1 that are expressed in this report and to clarify
2 what exactly you're saying.  At no point is any
3 question I ask you intended to elicit a new opinion
4 or serve as grounds for a new opinion.
5   A.   Understood.
6      MR. HALL:  Object to form.
7 BY MR. OWENS:
8   Q.   And so just so we can agree, you don't
9 have any new opinions that haven't been disclosed to
10 us, correct?
11   A.   Correct.
12   Q.   Okay.  I want to just clarify a couple
13 things in your report at the outset, just some
14 clarification points.  So forgive me if we're
15 jumping around.
16   A.   That's fine.
17   Q.   I'll use the page numbers on the bottom
18 as you've done it here.
19   A.   Okay.
20   Q.   So on page No. 3 in that right to amend
21 paragraph in which we were describing, you -- here
22 there's a clause in the second line that says "or in
23 response to expert disclosures of the defendants,"
24 should that be plaintiffs?
25   A.   It probably should be plaintiffs or



Case: 3:15-cv-00502-jdp   Document #: 84   Filed: 11/04/16   Page 3 of 63

JOHN PETERS, PH.D.                                      October 20, 2016
ROBINSON vs. The CITY OF MADISON                              9–12

Page 9

1 defendants.  Any expert disclosure, any additional
2 reports -- as you know, I don't run the case file on
3 this, so I don't know who's always been retained and
4 sometimes people get retained at the very last
5 minute, reports come in late so.
6    Q.    So this should say "of the plaintiffs or
7 defendants"?
8    A.    Correct.
9    Q.    So it's just any party?
10    A.    Any party, correct.
11    Q.    Okay.  Are you aware of the -- whether or
12 not the defendants in this case, the City of Madison
13 or Officer Kenny, are intending to produce
14 additional expert reports?
15    A.    I have no idea.
16    Q.    You haven't been told that or learn that
17 through some other means?
18    A.    No.
19    Q.    Okay.  Now, also on page No. 3, you have
20 here this "Opinion Methodology" paragraph.  Now, is
21 this something that's part of the template that you
22 include in all of your reports?
23    A.    For the most part, yes.
24    Q.    Okay.  And I just have a question.  You
25 say in the Opinion Standards, "Expressed opinions

Page 10

1 are to a reasonable degree of scientific certainty
2 and/or to a reasonable degree of professional
3 certainty," right?
4    A.    Correct.
5    Q.    Now, is there a difference between
6 scientific certainty and professional certainty?
7    A.    Yes.
8    Q.    And what are the differences between
9 those?
10    A.    Scientific certainty would have as its
11 framework some type of statistical analysis
12 generally.  In some cases it could be reliability,
13 coefficients, correlation coefficients, sample size,
14 depending on the type of statistical test that may
15 have been administered, whether it was appropriate,
16 whether the sampling was appropriate.
17         So answers that would be -- or findings
18 would be a better way to phrase it.  Findings that
19 would be based on various studies that then would be
20 used or referenced would go to the category of
21 scientific certainty.
22    Q.    Okay.  What about the other side?
23    A.    Professional certainty would include
24 experiential information, behaviors, and it may also
25 include what we would call in the law enforcement

Page 11

1 profession, recommendations, proposed model
2 policies, those types of things that would be
3 referenced as part of the professional certainty or
4 professional side of the law enforcement industry.
5    Q.    Okay.  So given the distinction that you
6 just gave us, are there both scientific and
7 professional opinions expressed in your report or
8 are they just professional?
9    A.    There's a mix.  I believe in one of the
10 opinions I cited a scientific study that was
11 published in one of the journals that had, I
12 believe, a sample side of about 76 on officer memory
13 and recall.  That was referenced as a basis of the
14 opinion, that would be scientific support as a basis
15 for that opinion.
16         And as it was integrated into the
17 situation, it would also help explain or, from my
18 perspective, dilute the plaintiff's expert in police
19 practices opinion.  So you get a little bit of both,
20 but the basis for the opinion would be partially
21 scientific based on the study and then it would be
22 how it would be applied.
23    Q.    Okay.  So other than the last opinion,
24 which you just referenced, concerning the
25 fallibility of Officer Kenny's memory during --

Page 12

1 related to the incident, is there anything that
2 draws upon scientific certainty?
3    A.    Well, it depends how we define, in a
4 sense, scientific certainty.  And I don't mean that
5 to be evasive.  But, if we're looking at
6 quantitative results, for example, looking at
7 Officer Kenny's training record with all the
8 training hours and with all the courses, one could
9 count those and look at the hours, that would be
10 scientifically based from a -- strictly hours and
11 number of courses sort of a cumulative effect.
12         So if we want to look back and say he
13 had, lets say, ten hours of training, that would be
14 a statistical analysis to a degree, which could also
15 be imputed to some type of comparative analysis to
16 other officers maybe in other states.  I don't think
17 it was done that way, I didn't use it that way, but
18 it was a basis for one of the opinions that hey, I
19 looked at this training record and he was trained
20 according to Wisconsin standards.
21    Q.    So it's your opinion that looking at the
22 number of hours that somebody was trained involves
23 expressing opinions to a degree of scientific
24 certainty?
25    A.    No, it's just a quantitative analysis.  I



JOHN PETERS, PH.D.                                    October 20, 2016
ROBINSON vs. The CITY OF MADISON                      13–16

Page 13

1 wouldn't say it's scientific because there wasn't a
2 study done. There wasn't a comparative study done,
3 but it is -- it's still quantitative.
4    Q.   Okay.  So which opinions, just so we're
5 clear, there are I think seven opinions; is that
6 right?
7    A.   Let me check.
8    Q.   No, excuse me.
9    A.   Eight opinions.
10   Q.   There are eight opinions?
11   A.   Correct.
12   Q.   Can you go ahead and highlight the
13 opinions to which you hold to a reasonable degree of
14 scientific certainty as defined in the distinction
15 between professional and scientific certainty that
16 you gave us a minute ago?
17        MR. HALL:  To be clear, you're looking at
18 just the number of the opinion or do you want him to
19 go through all 13 pages of the report or are you
20 just referring to the heading of the opinion, I
21 guess?
22 BY MR. OWENS:
23   Q.   Do you understand the question?
24   A.   As I understand it, you just want me to
25 identify the opinions that are either scientific or

Page 14

1 professional or a combination of both.
2    Q.   No, what I'd like you -- I'll clarify.
3    A.   Okay.
4    Q.   So what I would like you to do is
5 underline, lets just start with the bolded bullet
6 line, the ones that are to a degree of scientific
7 certainty.
8        MR. OWENS:  And for the record, the
9 witness has a orange highlighter which to mark the
10 document.
11 BY MR. OWENS:
12   Q.   Are you done?
13   A.   I think so.
14   Q.   Okay.  So can I see the report, Doctor?
15   A.   Sure.
16   Q.   So just to be sure, you've highlighted
17 Opinion No. 2?
18   A.   Correct.
19   Q.   "No one knew if Mr. Robinson was in a
20 state of excited delirium before or during Officer
21 Kenny's engagement with him in close combat"?
22   A.   Correct.
23   Q.   You highlighted No. 4, which is
24 "Officers, such as Officer Kenny, are trained not to
25 use multiple TASER electronic control weapon

Page 15

1 applications on a human"?
2    A.   Correct.
3    Q.   And you've highlighted -- excuse me,
4 Opinion No. 8, right?
5    A.   Correct.
6    Q.   That stressful events, such as the use of
7 deadly force, do have an impact on witness recall
8 contrary to Mr. Waller's testimony?
9    A.   Correct.
10   Q.   I will slow down.  Sorry.
11        So these are the three opinions to which
12 you hold to a reasonable degree of scientific
13 certainty?
14   A.   Those have the elements of science
15 imputed to those opinions as a basis for the
16 opinions more so than the others.
17   Q.   Okay.  So my question was a little bit
18 different, which is:  Are these opinions you hold to
19 a reasonable degree of scientific certainty?
20   A.   Yes.
21   Q.   Okay.  And now, you hesitated and thought
22 about, it looks, and you can help me understand what
23 you were doing -- excuse me -- with respect to
24 Opinion No. 7?
25   A.   Correct.

Page 16

1    Q.   And we'll spend a lot of time discussing
2 Opinion No. 7, but it looks like you considered
3 highlighting something in -- on paragraph -- excuse
4 me, page 9, the first full paragraph from the
5 bottom; is that right?
6    A.   Yes.
7    Q.   But you ultimately decided not to,
8 correct?
9    A.   Correct.
10   Q.   And you're certain about that decision?
11   A.   Yes.
12   Q.   Okay.  Page 8 of your report, Doctor --
13 as I said, we'll be jumping around for a minute.
14   A.   That's fine.
15   Q.   I want to be clear about what some of
16 this stuff means before we start digging into it.
17        Do you see Opinion No. 6?
18   A.   Yes.
19   Q.   The first full paragraph.  And then
20 there's a sentence that begins, "Plaintiff's expert,
21 Dennis Waller, Mr. Waller, appears to not have" --
22 and then it says, "developed considered Officer
23 Kenny."
24        Do you see that?
25   A.   Yes.



JOHN PETERS, PH.D.                                    October 20, 2016
ROBINSON vs. The CITY OF MADISON                     17—20

Page 17

1    Q.   Am I correct that you meant to put one of
2  those words but probably not both?
3    A.   Good catch.  Correct.  Or I may have had
4  or thought about putting and/or considered, but it's
5  a typo.
6    Q.   Okay.  So what's the final answer?
7    A.   Let's see.  Consider would be the correct
8  word.
9    Q.   Okay.
10   A.   Eliminate developed.
11   Q.   Okay.  Now, if you will go to page 23 of
12 your report.  Now, this is the appendix that
13 summarizes the documents that you reviewed in
14 advance of your deposition today and in preparing
15 this report?
16   A.   Correct.
17   Q.   Okay.  And just to be clear, you haven't
18 received any new additional documents, you haven't
19 looked at anything, correct?
20   A.   No, this is it.
21   Q.   Okay.  And the first question I have for
22 you is No. 2, is DCI investigation, Bates stamped
23 DCI 1 through 1493.
24       Do you see that?
25   A.   Yes.

Page 18

1    Q.   And then No. 3 is Officer Kenny
2  interview, right?
3    A.   Correct.
4    Q.   And am I right that the Officer Kenny
5  interview is included in the documents that are in
6  referenced in No. 2?
7    A.   Yes.
8    Q.   Why did you separate this out?
9    A.   I separated it out because I believe
10 that's how it arrived.  I believe Officer Kenny's
11 interview was also a separate document even though
12 it was contained in the Bates stamp.  So there was
13 some duplicative material there.  So not to be
14 misleading in the list of documents, I just listed
15 everything separately.
16   Q.   Okay.  So you actually just -- the way in
17 which you have things listed here is the manner in
18 which you received them?
19   A.   I won't say it's the manner in which I
20 received them.  They came on flash drives.
21   Q.   Okay.
22   A.   So I've got like five flash drives.
23   Q.   Okay.
24   A.   So when I made the list, I tried to group
25 the depositions together and some of the other

Page 19

1  materials just for ease and reading what the
2  document list was.  So whether Officer Kenny's
3  interview document was on Flash Drive 3 and the DCI
4  investigation was on Flash Drive 1, I don't know.
5    Q.   Okay.
6    A.   I just write a list out and then I type
7  it.
8    Q.   You recall that it was separate and
9  that's why you recorded it separately?
10   A.   Yes.
11   Q.   Okay.  And there's no substantive meaning
12 or significance in listing it separately?
13   A.   No, other than -- even if I get files
14 that are duplicative, I'll still list those as
15 separate files just to be transparent on what I
16 received.
17   Q.   I appreciate it.  And then "Deposition
18 Transcripts With Exhibits," No. 6, it says "Rafael
19 De la Rose"?
20   A.   Yes.
21   Q.   Should that be De la Rosa?
22   A.   I would have to go back and look.  I
23 believe it is Rosa.
24   Q.   R-o-z-a or R-o-s-a?
25   A.   I think R-o-s-a.  You may be right on

Page 20

1  that.
2    Q.   Okay.  So that's just a typo?
3    A.   It could be a typo.  I notice sometimes
4  in the report there are certain names, spellings and
5  then on depositions there's certain names,
6  spellings, and I'm not the arbiter of whose name is
7  spelled correctly.
8    Q.   Got it.
9    A.   That's how it probably came to be.
10   Q.   All right.  Like I said, we're going to
11 jump around a bit for now.
12       Going to page 5 of your report, Doctor.
13   A.   Okay.
14   Q.   Do you see the paragraph that begins
15 with, "Mr. Robinson was described," do you see that?
16   A.   Yes.
17   Q.   And do you see the last -- the second to
18 last line in that paragraph which says, "know they
19 much act quickly to capture and control the
20 individual," should that be must?
21   A.   Yes.
22   Q.   Okay.  So that should be m-u-s-t?
23   A.   Correct.
24   Q.   Okay.
25       MR. OWENS:  Could we just take a



JOHN PETERS, PH.D.                                    October 20, 2016
ROBINSON vs. The CITY OF MADISON                             21—24

Page 21

1  two-minute break.
2          (A recess was taken.)
3  BY MR. OWENS:
4      Q.    On page 5 as well, the last sentence of
5  the first full paragraph, the top, there's a phrase
6  here which says "agitated chaotic events."
7      A.    Correct.
8      Q.    And there's a trademark there.  What does
9  that mean?
10      A.    Agitated chaotic events is a term we
11  developed in our institute to describe events where
12  the subject, the police are trying to capture and
13  control is agitated but the reasons are unknown as
14  to what is causing the agitation.  We coined that
15  term probably five years ago, and since that time
16  some other groups have coined similar terms to
17  describe agitated events and behaviors with unknown
18  origin.
19      Q.    Okay.  And you'll just have to forgive
20  me, this is not my field of expertise.
21      A.    That's okay.
22      Q.    Is there a reason that you want to
23  trademark the particular phrase?  Does that have
24  some particular meaning or importance in your
25  profession?

Page 22

1      A.    Well, at the time we developed it, it
2  didn't have any significance because we had just
3  developed it, but it was the first time that we were
4  aware of in this law enforcement community, and even
5  in the psychiatric community, where the phrase was
6  developed and it was a collaborative development.
7  We wanted to come up with a phrase or a term and the
8  acronym for this is ACE.
9          We needed something that wasn't a
10  psychological diagnosis and we needed something that
11  wasn't a medical diagnosis, but we needed something
12  that was a correct visual description.  And when we
13  developed this, we basically just trademarked it.
14  We're in the process of getting it federally marked,
15  but we wanted to give it a little time for use and
16  also to make sure that it was appropriate for our
17  purposes.
18      Q.    What do you mean by common law trademark?
19      A.    Well, TM is just common law, it's not a
20  federally registered mark.  It's not the R with the
21  circle around it.  So we haven't applied for the
22  federal mark, we only did it under what we call
23  common law trademark, just the TM.
24      Q.    Okay.  So is -- and correct me if I'm
25  wrong, agitated chaotic events, is that a phrase

Page 23

1  that you guys develop because in order to train
2  officers?
3      A.    Yes.
4      Q.    And is that something that you were
5  looking for a term that covered a variety of events
6  where an officer may not know whether or not this is
7  somebody's having a mental health issue, somebody is
8  having a response to some drug type of thing, some
9  combination, some excited delirium or something like
10  that, but a term that didn't apply to specific
11  medical or physiological thing for the training
12  officers consistently in responding to those types
13  of events?
14      A.    No, it wasn't so much in training
15  officers in how to respond to those events because
16  the response would be fairly consistent.
17      Q.    Okay.
18      A.    Our concern was -- we, at that point,
19  were doing a lot of presentations on excited
20  delirium type behavioral cues.  And it occurred to
21  us that if the only thing we were describing was
22  this term "excited delirium," there's multiple
23  causes of delirium-type behavior, which could be
24  postoperative anesthesia.  Somebody hits their head
25  on the windshield at a car accident and goes into --

Page 24

1  some type of delirious state.  There is postictal
2  psychosis following epilepsy.  And one of the
3  problems we identified was that officers were
4  putting this in their report as excited delirium,
5  when, in fact, they didn't know.
6          So we wanted to come up with an umbrella
7  term that would describe a set of behaviors that
8  officers would see but that would not in a sense
9  force them to make a diagnosis which they're not
10  qualified to make.
11      Q.    Got it.  And you said that the response
12  from an officer training perspective would be the
13  same regardless of whether it was excited delirium,
14  which they're not trained to diagnosis, or some
15  other type of delirium or mania?
16      A.    Wouldn't necessarily be the same, but it
17  would be similar.
18      Q.    Okay.  How would it be different?
19      A.    It would depend on the situation.  If you
20  have somebody whose, for example, has postictal
21  psychosis following an epileptic seizure, the
22  behavior may be the same but your approach may be
23  very very different say from someone whose ingested
24  bath salt and is running out in the middle of
25  traffic.  Versus someone who is in a hospital



Case: 3:15-cv-00502-jdp   Document #: 84   Filed: 11/04/16   Page 7 of 63

JOHN PETERS, PH.D.                                    October 20, 2016
ROBINSON vs. The CITY OF MADISON                         25—28

Page 25
1  setting and goes off for some unknown reason.
2       It's going to be events specific for the
3  most part, but kind of go back to a term we used at
4  the beginning, sort of a template. There's sort of
5  a template that you can use to analyze some of these
6  behaviors and say okay, this would be an agitated
7  chaotic event, this may not be, this may be
8  something totally different.
9     Q.  Okay. And when you've got some type of
10 agitated chaotic event, the -- I know that the
11 training and how to respond is event specific, but
12 say let's take the example that you gave which is
13 somebody running in the street acting crazy, right,
14 and the officer doesn't know whether or not this
15 person is having a mental health breakdown or
16 whether or not they took bath salts, as you
17 suggested, or maybe some other combination of, you
18 know, factors that the officer doesn't know. He's
19 been reported on behavior.
20      In that situation, is the agitated
21 chaotic event a term that you developed to describe
22 that because it implies the officer doesn't know for
23 certain what is leading to that behavior?
24    A.  Right, the cause of the behavior is
25 unknown.

Page 26
1     Q.  And the officer's approach would be the
2  same because it's an agitated chaotic event
3  regardless of whether at the end of the day it turns
4  out it was bath salts or diabetes or something like
5  that?
6     A.  Could be. Again, it's going to be event
7  specific. And that's not to sound evasive, but most
8  of our police departments in this country have under
9  50 officers. So it's quite common for a single unit
10 to go to these type of events. A single unit is
11 going to handle things probably differently than
12 somebody in a city that has multiple officers. A
13 rural setting may be different than an urban setting
14 in a house versus out of a house, whether the
15 officer is being assaulted or not assaulted.
16      I mean, there's a lot of variables there
17 at play. The real focus is to identify that there
18 is something going on here and then approach it
19 based on training and policy and that type of thing.
20    Q.  Now, you agree that when assessing, you
21 know, an officer's response to an agitated chaotic
22 event, whether it turns out to be something later
23 called excited delirium or later something called a
24 mental health crisis, that the way to assess whether
25 or not the officer actions were justified and

Page 27
1  consistent with their training is by looking at the
2  information the officer knew at the time, not what
3  we learned from hindsight, right?
4     A.  Correct.
5     Q.  And speaking of hindsight, I want to back
6  up a little bit. Earlier you used the term "law
7  enforcement profession."
8     A.  Right.
9     Q.  Do you recall that?
10      And would you say that your profession is
11 law enforcement?
12    A.  I would say -- I would say my vocation is
13 law enforcement training and instructional design,
14 and my advocation would be in law enforcement
15 consulting.
16    Q.  When was the last time that you were an
17 active police officer?
18    A.  Last time I was sworn was 1978.
19    Q.  And where was that?
20    A.  Braintree, Massachusetts.
21    Q.  Are you a Patriots fan? Don't have to
22 answer.
23    A.  You have to be up there. They'll string
24 you up otherwise.
25    Q.  And currently where are you employed?

Page 28
1     A.  I'm employed by the Institute for the
2  Prevention of In-Custody Deaths, which is a training
3  firm. And I'm also in the consulting business, John
4  G. Peters, Jr., & Associates.
5     Q.  And so is your work here today part of
6  your consulting business or with the institute?
7     A.  Consulting.
8     Q.  And what percentage of your income do you
9  derive from consulting?
10    A.  Consulting probably about a third.
11    Q.  And is the other two-thirds from the
12 institute -- we'll just call it the institute or the
13 IP?
14    A.  IPICD.
15    Q.  IPICD?
16    A.  Yes.
17    Q.  Now, I know that I noticed in your CV
18 there are a number of things that are currently
19 listed, you know, to present as in you're still
20 actively involved in them.
21      Have you ever been retained as a
22 consultant by TASER?
23    A.  Define consultant.
24    Q.  Have you --
25    A.  The only reason I ask that there's



JOHN PETERS, PH.D.                                    October 20, 2016
ROBINSON vs. The CITY OF MADISON                              29—32

Page 29

1  consulting and then there's expert witness work, and
2  I -- sometimes those are different.  I just want to
3  make sure I understand what your question is.
4     Q.   Okay.  So your expert witness work is
5  different than your consulting work?
6     A.   Many times, yes.
7     Q.   Okay.  How many times have you served as
8  an expert witness for TASER?
9     A.   I served -- for TASER International,
10  being hired directly by TASER International maybe
11  once or twice.  Generally it was through counsel
12  representing TASER International.
13     Q.   Okay.  How many times would it have been
14  through counsel representing TASER International?
15     A.   This would be an estimate, maybe 20.
16     Q.   Were you ever employed by TASER
17  International?
18     A.   No.
19     Q.   In the 20 or 22 times that you were
20  retained to give opinions on behalf of TASER,
21  whether directly or through counsel, how much income
22  would you estimate that you derived from giving that
23  testimony?
24     A.   Well, for the record, I don't charge for
25  my testimony, I charge for time.  And it would vary.

Page 30

1  I use a flat rate.  Sometimes the flat rate varied
2  because counsel would say, you know, the file is
3  only an inch thick or what have you.  And that was
4  over a period of about five or six years.  I
5  probably have to go back and look.  I'm not even
6  sure I could estimate it.
7     Q.   Okay.  More or less than a hundred
8  thousand dollars?
9     A.   Might be right around it.  I'm just not
10  sure because deposition opposing parties pay your
11  deposition fee and I don't -- I don't recall ever
12  going to trial on those cases.
13     Q.   Okay.
14     A.   So I just don't know.
15     Q.   Okay.  So is it fair to say that you're a
16  defender of law enforcement officers using Tasers
17  and electronic controlled devices?
18     A.   No, not at all.
19     Q.   Okay.
20     A.   I've testified several times on the
21  plaintiff side on what I consider abuse of the
22  device.  My work that I had done with -- or in
23  association with TASER's attorneys was 99 percent
24  warnings, it had nothing to do with force.
25     Q.   Okay.

Page 31

1     A.   I was a warnings expert on products
2  warnings.
3     Q.   Okay.  So articles that you've previously
4  written about electronic control devices and dangers
5  and how they should be used, have you -- in do you have
6  different opinions now than you had say in 2006 or
7  2007?
8     A.   Yes.
9     Q.   Okay.  And what was the -- what caused
10  those opinions to change?
11     A.   I think scientific research in part.  I
12  think there were some studies that came out
13  initially that suggested potential medical issues
14  with the device and then later there were some other
15  studies that came out.  I think as the use of the
16  device matured, we learned a lot from the evidence
17  based practices that were out there, and I think
18  that certainly has changed the industry.
19          And then there were other input such as
20  the police executive research firm, and I think -- I
21  think when the industry goes from say 2005 in
22  warnings where there was no scientific evidence or
23  suggestion that the device could be harmful, I mean
24  other than shooting in the eyes or something like
25  that, until 2009 when the target zone was changed

Page 32

1  and then we get to 2013 and then warnings have
2  changed to now where it could cause cardiac arrest
3  in some people.  I think that science changed just
4  like the science changes in the medical field.
5     Q.   Okay.  On page 15 of your report, and in
6  your report itself, you cite 2006 paperwork that you
7  wrote, sudden death, excited delirium and issues of
8  force part 2, and do you see that reference on top
9  of page 15?
10     A.   Top of page 15?
11     Q.   It's the first line, sir.
12     A.   First line says WCRP, so your 15 must be
13  different than my 15.  Of the report or the CV?
14     Q.   Of the report.
15     A.   I'm sorry.  That's why we -- there we go.
16     Q.   Right here, sir.
17     A.   Oh, on 15.  Sorry.
18     Q.   You cited this article in your report in
19  this case, correct?
20     A.   Yes.
21     Q.   And do you still hold the opinions
22  expressed in this article which you cited in the
23  report in this case?
24     A.   For the most part.  I mean, there's been
25  some change obviously because this report is a



Case: 3:15-cv-00502-jdp   Document #: 84   Filed: 11/04/16   Page 9 of 63

JOHN PETERS, PH.D.                                    October 20, 2016
ROBINSON vs. The CITY OF MADISON                          33–36

Page 33

1  decade old, or this article is a decade old, so
2  there's been changes to it since then.
3      Q.   Well, you cited it in this report which
4  you prepared in 2016, correct?
5      A.   Correct.
6      Q.   And is there anywhere in the report where
7  you mention that some of the opinions expressed in
8  that 2006 article you no longer hold?
9      A.   No.
10     Q.   Okay.  And what are the opinions, if you
11  can recall, from that article which you think are no
12  longer applicable and which are the ones that still
13  apply?
14     A.   I think the biggest change is this
15  article focused on excited delirium.  Today we call
16  it agitated chaotic events which excited delirium
17  may be a part of that.  So the umbrella has greatly
18  enlarged in that.  And I don't recall this article
19  in its totality while I'm sitting here, but if there
20  was reference that the Tasers were totally safe or
21  electronic control devices were totally safe in
22  2006, that would have been true.  In 2016 that would
23  not have necessarily been applicable.
24     Q.   Okay.  So other than now believing that
25  Tasers are less safe than you previously thought

Page 34

1  they were, do you have any different opinions about
2  the use of Tasers in force incidents?
3      MR. HALL:  Objection to form.
4      Go ahead.
5      THE WITNESS:  I'm not sure I can answer
6  it the way you asked, in force incidents.
7      Q.   Sure.  I guess what I want to know is, is
8  that you've suggested that -- excuse me.  Let me
9  back up.
10      You've testified here today that some of
11  your opinions with respect to electronic control
12  devices have changed over time, and it's my
13  understanding that the change that you identified
14  earlier in your testimony was that they are now --
15  there are additional warnings and they are less safe
16  than previously thought; is that correct?
17     A.   For some people they can be less safe.
18     Q.   Okay.  And other than issues with respect
19  to them being less safe, do you have any differences
20  in opinion between 2006 and now about when or how
21  Tasers or electronic control devices should be
22  employed?
23     A.   No.  I think that's pretty much
24  consistent.  Whether it was 2006 or 2016, I think
25  the decision to deploy those have pretty much

Page 35

1  remained the same.
2      Q.   Okay.  And do you recall the five part
3  series of which this is part 2 of the article we've
4  been referring to at the top of page 15 in the
5  references of your report?
6      A.   I remember some of it.  I think part 5
7  was on evidence.  One of them was on evidence; one
8  of them was on suicide; one of them was on excited
9  delirium; one was on, I believe, electronic control
10  devices; and I think one was maybe an overview.
11     Q.   Okay.
12     A.   Its been a while.
13     Q.   Sure.
14     MR. OWENS:  Why don't we mark this as
15  Exhibit 215.
16      (Whereupon, Exhibit 215 was
17      marked for identification.)
18  BY MR. OWENS:
19     Q.   Doctor, now this is the article that's
20  referenced in your report, correct?
21     A.   Correct.
22     Q.   And the --
23     A.   No, this is not the article referenced in
24  my report.  I'm sorry.
25     Q.   This is not it?

Page 36

1      A.   No.
2      Q.   So if -- this is not it?
3      A.   I don't believe so.  Let me look.  It
4  should have been.
5      MR. HALL:  Can we go off the record for a
6  second.
7      MR. OWENS:  H'm-h'm.
8      (A discussion was held off the record.)
9      THE WITNESS:  On page 5 of my report, it
10  cites Peters 2006 in the second full paragraph at
11  the end.  That is making reference to the article
12  that was on excited delirium.
13  BY MR. OWENS:
14     Q.   Au-huh.
15     A.   This article that you gave me, which is
16  Exhibit 215, is on electronic control devices.
17     Q.   So is this not --
18     A.   This would not be the same article, it
19  would be the -- it may be the article.
20     Q.   So let's -- just going from the top of
21  page 15 of your report, the articles from 2006, the
22  citation, correct?
23     A.   Correct.
24     Q.   And it's sudden death, excited delirium,
25  and issues of force; part 2, correct?



JOHN PETERS, PH.D.                                    October 20, 2016
ROBINSON vs. The CITY OF MADISON                      37—40

Page 37

1    A.    Correct.
2    Q.    Exhibit 214 is sudden death, excited
3  delirium, and issues of force, colon, part 2.
4    A.    It's Exhibit 215, not 214.
5    Q.    Excuse me.  Exhibit 215.  Thank you.
6        Is that correct?
7    A.    That's correct.  But at the end it's 22,
8  and then in parentheses 2.  And this is 22, 3.
9    Q.    Okay.  So this is a different article?
10   A.    It would be a different article.
11   Q.    So this is not the article you cited in
12  your report, sir?
13   A.    Well, there's a typo somewhere and it may
14  be it should say part 3 or part 1.  I'd have to see
15  the article.
16   Q.    I just want to know whether this is what
17  you were citing in your report or not?
18   A.    No.
19   Q.    So this is not?
20   A.    This is not.
21   Q.    So there is a different article?
22   A.    Correct.
23   Q.    That you wrote that you meant to cite
24  that has the same title of this one, but you think
25  there's a problem with the part?

Page 38

1    A.    Yes.
2    Q.    Okay.  Could it be part 3?
3    A.    If you have it, I'll be glad to look at
4  them for you.
5    Q.    Here you go.
6        MR. OWENS:  We can mark this as
7  Exhibit 216.
8        THE WITNESS:  It would be part 3.
9        (Whereupon, Exhibit 216 was
10        marked for identification.)
11        THE WITNESS:  Yeah, my apologies on this.
12  It's part 3, not part 2.
13  BY MR. OWENS:
14   Q.    Okay.  So this should be part 3 --
15   A.    Correct.
16   Q.    -- for the record, and Exhibit 216 is the
17  article which you cited in your report?
18   A.    Yes.
19   Q.    Okay.  And the -- can you show me -- let
20  me back up.
21        You've referenced this article in your
22  report, and were you referring to the entire article
23  or just a portion of it?
24   A.    Just a portion of it.
25   Q.    Okay.  And are any of the opinions you

Page 39

1  expressed in this article different now or you
2  walked away from any of them or changed over time?
3    A.    Well, for clarity in the record, I
4  haven't expressed any opinions in this article.
5  What I've written about were behavioral cues and
6  physical characteristics and the steps that someone
7  may be able to take.  I wouldn't call these
8  opinions, I would just call this information.
9    Q.    Okay.
10   A.    Versus the opinions in my report.  I just
11  don't want to get those confused.
12   Q.    Absolutely.  So the information that you
13  wrote in Police and Security News in this article,
14  is all of this information that you hold to a degree
15  of professional -- reasonable professional
16  responsibility?
17        MR. HALL:  Objection to form and
18  foundation.
19        Go ahead.
20        THE WITNESS:  For the most part, yes.  I
21  think the addition to this would be possibly the use
22  of the carotid restraint as a suggested capturing in
23  controlling.
24  BY MR. OWENS:
25   Q.    Got it.

Page 40

1        When I asked that question, am I right
2  that you thought I meant reasonable degree of
3  professional certainty?  I think I said professional
4  responsibility.
5        Did you understand me to say professional
6  certainty?
7    A.    Yes.
8    Q.    Okay.  Thank you.
9        This article from 2006 discusses excited
10  delirium and issues of force; is that right?
11   A.    Mostly excited delirium.  Some
12  suggestions on force, yes.
13   Q.    Okay.  So, are any of the opinions or
14  information contained in this writing inaccurate?
15   A.    Inaccurate to what period of time?
16   Q.    Do you believe that they're inaccurate
17  now?
18   A.    Inaccurate, I wouldn't use that term.  In
19  the Fourth Circuit based on the Armstrong case, we
20  wouldn't start out capturing and controlling people
21  maybe in this way, in 2016.  In 2006, in the context
22  within which this was written, it was accurate.
23   Q.    Okay.
24   A.    But because of the changes in some of the
25  circuit courts and some of the training



JOHN PETERS, PH.D.                                      October 20, 2016
ROBINSON vs. The CITY OF MADISON                        41—44

Page 41

1 methodologies that have taken place over the last
2 decade, the behavioral cues are the same, not making
3 a diagnosis is the same, but the approach by the
4 officers may have changed depending on the circuit,
5 depending on the training and depending on the
6 device. Because we've had several new TASER devices
7 with several new platforms come out since then and
8 we've had some devices that have gone away.
9    Q.   Okay.
10   A.   So to say this was inaccurate, no, it was
11 accurate at the time it was written. Have things
12 changed, yes.
13   Q.   Okay. And can you just be a little bit
14 more specific for me. What aspects of this -- and
15 you can highlight them in the exhibit if you'd
16 like -- have changed?
17   A.   Well, starting with page 1 of the article
18 of Exhibit 216, probably -- it's mostly a
19 hypothetical. Page 2, as described in the
20 hypothetical, that was a medical emergency or could
21 be considered a medical emergency, and then we have
22 some predisposing factors. The predisposing factors
23 are pretty much the same today as they were in 2006.
24 The physical characteristics pretty much the same.
25        The behavioral cues on page 3, basically

Page 42

1 the same. Not making the diagnosis would be the
2 same. The action steps using a Taser or pepper
3 spray may or may not be the first choice today,
4 depending on the situation. Sedation we still
5 recommend. Everything else is pretty much I would
6 say the same.
7    Q.   Okay. So we -- I asked you a few
8 questions earlier about the scope of your opinions,
9 and you -- we talked about you don't have any new
10 opinions, correct?
11   A.   Correct.
12   Q.   And so you don't have any opinions about
13 the City of Madison's investigation into the
14 shooting of Tony Robinson by Officer Kenny?
15   A.   I wasn't asked to do anything on -- on
16 the City side, so I did not look at that.
17   Q.   You don't have any opinions about the
18 Department of Criminal Investigation's investigation
19 of the shooting, correct?
20   A.   Other than they did one, no.
21   Q.   Right. And you don't have any
22 professional opinions about whether or not they did
23 a good job or a bad job, right?
24   A.   Wasn't asked to review that.
25   Q.   Okay. And you don't have any expert

Page 43

1 opinions that you're offering in this case about the
2 work done by Mr. Prenz, whose report I know you
3 read, but you're not offering any expert opinions
4 about whether he was right or wrong, correct?
5    A.   Correct.
6    Q.   And you're not offering any opinions
7 about David McKay's work or report in this case,
8 correct?
9    A.   Correct.
10   Q.   And you're not offering any opinions
11 about Jonathan Arden's work or report in this case,
12 correct?
13   A.   Correct.
14   Q.   And you're not offering any opinions
15 about Special Agent Flessert's synchronization of
16 the audio and the video, correct?
17   A.   Correct.
18   Q.   You're not offering any opinions about
19 the quality of the autopsy or trajectories found in
20 Dr. Tranchida's examination and report, correct?
21   A.   Correct.
22   Q.   You're not offering any opinions on the
23 adequacy of the City of Madison's policy or
24 training, correct?
25   A.   Correct.

Page 44

1    Q.   And you're not offering any opinions
2 about the sequencing or ordering of the gunshots,
3 wounds or anything like that, correct?
4    A.   Correct.
5    Q.   And you're not offering any opinions
6 about where in the stairwell the shots were fired;
7 is that right?
8    A.   Other than what was referenced in my
9 summary of facts.
10   Q.   So your summary of facts is an opinion
11 about where the shooting happened?
12   A.   No, it's just a description of what
13 various people have said.
14   Q.   Got it. But you're not offering any
15 expert opinions about where the shooting happened,
16 correct?
17   A.   Correct. I wasn't there.
18   Q.   Okay. And you're not being asked to
19 opine about where the shooting happened, right?
20   A.   Right. I wasn't there.
21   Q.   And there's nothing in your report that
22 says, Well, I think it happened at the top of the
23 stairs, bottom of the stairs, middle of the stairs
24 or anything like that, right?
25   A.   No.



Case: 3:15-cv-00502-jdp   Document #: 84   Filed: 11/04/16   Page 12 of 63

JOHN PETERS, PH.D.                                    October 20, 2016
ROBINSON vs. The CITY OF MADISON                            45—48

Page 45

1   Q.   How many times have you spoken with
2 Officer Matt Kenny?
3   A.   None.
4   Q.   Have you ever met him personally?
5   A.   No.
6   Q.   Do you know him personally at all?
7   A.   No.
8   Q.   Did you ever have any conversations with
9 Officer Kenny about what he discussed with his
10 attorneys before he gave his interview to
11 investigators?
12   A.   I never met Officer Kenny, so the answer
13 would be no.
14       MR. HALL:  Object to form.
15 BY MR. OWENS:
16   Q.   Right.  I just got to make my record.
17   A.   I understand.
18   Q.   Did you ever have any conversations with
19 Officer Kenny about what he discussed with his
20 attorney before, during or after the walkthrough of
21 the scene?
22       MR. HALL:  Object to form.
23       THE WITNESS:  No.
24       MR. OWENS:  What is the problem with the
25 form?

Page 46

1       MR. HALL:  He just said he's never talked
2 to Officer Kenny.
3       MR. OWENS:  So why isn't the answer just
4 no?
5       MR. HALL:  Well, it's a repetitive
6 question.  In my mind, it's an attempt to harass the
7 witness.  If he said he's never talked to him, you
8 can ask him about an infinite number of things that
9 he may have asked or not asked.  But if he's never
10 spoke to him, we all know the answer to those
11 questions.
12       MR. OWENS:  Okay.  So the objection is
13 form and the basis is that it's harassment and
14 argumentative?
15       MR. HALL:  I just stated the objection.
16 BY MR. OWENS:
17   Q.   Have you ever talked to any Madison
18 police department officers about this shooting
19 incident?
20   A.   No.
21   Q.   Did you ever talk to any of the
22 Department of Criminal Investigation's agents about
23 the shooting?
24   A.   No.
25   Q.   Do you know Denny Waller?

Page 47

1   A.   I know of him.  I don't know if we've
2 ever met or if we did, maybe once.
3   Q.   Okay.  And how do you know of him?
4   A.   He's been in other cases over the years
5 that I've been retained in Wisconsin.
6   Q.   Do you recall how many times?
7   A.   Very few.  I wouldn't even give an
8 estimate, but I would -- I would probably say under
9 five.
10   Q.   And I have to ask, can you remember any
11 of the specific cases?
12   A.   That, I don't.
13   Q.   Okay.
14   A.   Just over the years.
15   Q.   So in those very few less than five
16 cases, were your opinions always opposing
17 Mr. Waller's?
18   A.   Yes.
19   Q.   Okay.  Now, I know there's some
20 criticisms you've made of Mr. Waller, were there any
21 opinions that he gave in those other cases that you
22 agree with?
23   A.   I would have to go back and read his
24 opinions in those cases.  I couldn't tell you.
25   Q.   Okay.  Are there any opinions in this

Page 48

1 case that he gave that you agree with?
2   A.   Again, I would have to read his report.
3 I cited the ones I certainly didn't agree with.
4   Q.   Okay.
5   A.   And I think he opined in areas that I
6 wasn't asked to review.  So if he opined in those, I
7 didn't worry about them.
8   Q.   Right.  So you don't have any new
9 opinions about areas that were brought on the things
10 that you reviewed?
11   A.   I focussed on what I was asked to do.
12   Q.   And nothing in you mind sticks out right
13 now about things that you agree with him about; is
14 that right?
15   A.   Well, the implication is that I do agree
16 with him, and I can't answer that.  I would have to
17 look at each one of his opinions.  And as I said,
18 some of those I think went to Monell issues that I
19 wasn't asked to deal with.
20   Q.   So do you have -- so there is some
21 criticisms you made of Mr. Waller in your report,
22 are they personal disagreements or are they just
23 sort of you think he got the analysis wrong?
24   A.   It's just professional.  There's nothing
25 personal here.



Case: 3:15-cv-00502-jdp   Document #: 84   Filed: 11/04/16   Page 13 of 63

JOHN PETERS, PH.D.                                    October 20, 2016
ROBINSON vs. The CITY OF MADISON                            49–52

Page 49

1    Q.   It's not like you don't respect him as a
2  law enforcement officer or expert, you just disagree
3  with the opinions you reached here to the extent you
4  have identified them in your report?
5    A.   First of all, I don't know -- I didn't
6  know Mr. Waller when he was a police officer, so I
7  really have no way to form any opinion about that.
8    Q.   Sure.
9    A.   He put down what he thinks is his
10 opinion, and I disagreed with it and cited the
11 reasons why.  So.
12   Q.   Okay.
13   A.   Strictly professional.  There's nothing
14 personal involved in this.
15   Q.   Okay.  As regards to Officer Kenny's
16 conduct, are there any opinions that you disagree
17 with that are not -- of Mr. Waller's that are not
18 described in your report?
19        (Interruption on phone.)
20        MR. SWAMINATHAN:  I'm sorry, Kate, did
21 you say something?
22        MR. HALL:  Can we go off the record for
23 one second.
24     (A discussion was held off the record.)
25        THE WITNESS:  I think my report speaks

Page 50

1 for itself.
2 BY MR. OWENS:
3    Q.   Got it.
4        So as concerns Officer Kenny's conduct
5  specifically, the disagreements you have with
6  Mr. Waller are contained in your report; is that
7  correct?
8    A.   Correct.
9    Q.   Okay.  Now, I asked you a moment ago a
10 number of questions about whether you personally
11 interviewed or spoke with individuals involved in
12 this case.
13   A.   Correct.
14   Q.   And you did not, correct?
15   A.   Correct.
16   Q.   And now am I right that that's consistent
17 with your methodology here what you described as
18 archival research?
19   A.   That would be consistent with that, yes.
20   Q.   Now, I just had a question.  You
21 mentioned phenomenology as part of the methodology,
22 how does that play a role in this report?
23   A.   Phenomenology means lived experience.
24 Police reports are lived experiences.
25   Q.   So -- sorry.

Page 51

1    A.   In research there's two categories of
2  research.  There are quantitative and qualitative.
3  And the qualitative side of research is this
4  research category called phenomenology.  And
5  phenomenology simply means lived experience.  So if
6  I wrote about our deposition today, that would be
7  considered a phenomenological report because I lived
8  it, you could write about it, you lived it, so that
9  goes to the issue of police report.
10   Q.   Okay.  So that's sort of like your
11 interpretation of phenomenology.  I mean, again are
12 you drawing on Heidegger, Sartre, Searle, like,
13 philosophers in the tradition of phenomenology or
14 are you just meaning it in the sense in which you
15 described?
16   A.   First of all, philosophers -- well, let
17 me back up.  I taught research methods for five
18 years.
19   Q.   Sure.
20   A.   I understand research pretty well.  I
21 taught statistics for that long and longer.  Basic,
22 advanced and intermediate.  We're not talking
23 necessarily about Heidegger or Popper or any of the
24 great philosophers.  What we're talking about is
25 categories of research.

Page 52

1        Same as quantitative research versus
2  qualitative research.  It's just a category under
3  that big umbrella, so that's where it comes from.
4  The philosophical underpinning and the
5  interpretations, I don't point to a particular
6  philosopher, I point to the categories.  And
7  phenomenology is one of those categories.
8    Q.   So I'm just, you know, in terms of I'm
9  just -- so where I'm coming from so maybe we can get
10 on the same pages is, I'm trying to understand your
11 methodology.  I'm looking at page 3 of your report.
12   A.   Right.
13   Q.   And you discuss archival records and
14 doing that type of research.  And then you say above
15 that these research methods -- methodologies may
16 have included historiography, content analysis,
17 phenomenology, ethnography, disclosure analysis and
18 case study.
19   A.   Correct.
20   Q.   And I'm trying to figure out where in
21 those -- each one of those plays a part or whether
22 or not some of them don't play a part at all because
23 I'm not sure how each of them influences your
24 opinions here.
25   A.   Okay.  That's fair.  I guess the best way



JOHN PETERS, PH.D.                                          October 20, 2016
ROBINSON vs. The CITY OF MADISON                                  53–56

Page 53

1  to describe that is starting with Dalbert.  I think
2  we're probably all familiar with the Supreme Court
3  case on Dalbert and the criteria for Dalbert and we
4  try to rely on a scientific methodology in our
5  approach.  So a case study as defined by Yang and
6  others is basically defined in time.
7        There is a boundary.  This incident
8  involving Mr. Robinson is a case study.  It started
9  and it stopped.  It's bounded in time.  It's bounded
10  in space.  It meets the definition of a case study.
11  Just like if you went to the business school and you
12  studied a case about that company, it's bounded in
13  time.  It took place between April 1st and
14  April 30th.  So that's where case study comes in.
15        So part of the analysis from a research
16  point of view is that this is a separate case study
17  meeting all the criteria of a case study and
18  research.
19    Q.    Okay.
20    A.    When it comes to historiography, we're
21  looking back in time because this happened before
22  any of us got involved in the incident.  So it's a
23  historical event by definition.
24        Discourse analysis focuses on what was
25  said and that would apply to depositions, that may

Page 54

1  apply to interviews.  So discourse analysis is where
2  you look at and analyze what was said and compare
3  and contrast it to other persons or other people or
4  other viewpoints, that type of thing.
5        Archival records that you mentioned
6  earlier is not a research methodology.  What that
7  archival records refer to is that under research
8  definition, records such as this that we looked at
9  are considered archival records because they're
10  already in place.
11        For example, Officer Kenny's training
12  records, they're archival records.  They're kept,
13  they're historical.  So these move in and out
14  depending on what's being reviewed and it forms a
15  scientific basis, even in some cases a qualitative
16  versus a quantitative research basis, which I use to
17  form that basis that Dalbert talks about.
18        So I try to start from a research
19  perspective.  I try to pull in, for example, police
20  reports from a phenomenological perspective because
21  they meet the definition of that.  So all of the
22  methodologies that I've cited are legitimate
23  consistent research methodologies that are taught
24  to, generally, graduate students or people doing
25  research.

Page 55

1    Q.    Okay.  So case study -- I just want to be
2  clear about that answer, I appreciate it -- involves
3  examining just this case.  Are we doing an
4  examination of this particular event and not doing
5  some type of comparative analysis across all events
6  or a sample event or something like that?
7        Do I understand that correctly?
8    A.    In part.  You look at this event -- you
9  look at this situation as a separate case study.
10  That does not preclude anyone from doing a
11  comparative analysis.  But by definition the case
12  study is the case.  These are the facts that go with
13  this case.  So when I read all the depositions and
14  the investigative reports and Officer Kenny's
15  statements and the training records, autopsy
16  reports, that applies to this case.  Period.
17        Now, there's nothing in the definition of
18  a case study that puts up walls that say okay, I
19  looked at this, I can't reach over here and compare
20  it to something.  But the facts, if we're looking at
21  just understanding the facts, it's to this case
22  study.
23    Q.    Okay.  And to -- you know, when we're
24  looking at the facts of this case and connecting a
25  case study here, that doesn't require any

Page 56

1  specialized training or skill, that requires just
2  looking at the facts of this case, right?
3        MR. HALL:  Objection to form.
4        Go ahead.
5        THE WITNESS:  Well, if it didn't require
6  a skill or special training you wouldn't have asked
7  me the last three questions.
8  BY MR. OWENS:
9    Q.    So is that a yes or a no?
10    A.    Yeah, it does require training.  It does
11  require training and case analysis.
12    Q.    Okay.  Now, the discourse analysis, I
13  think you mentioned was reading prior statements
14  from individuals?
15    A.    It could be statements, it could be
16  deposition testimony, any discourse, any
17  communication that was interactive.
18    Q.    Okay.  Are there any additional steps
19  beyond the sort of reading the prior discourse that
20  that involves?
21    A.    Well, discourse analysis would involve
22  looking at what was said and comparing and
23  contrasting it to other statements that have been
24  made as well.  So you're looking at that analysis.
25  You're looking at okay, let's say Witness A said the



Case: 3:15-cv-00502-jdp   Document #: 84   Filed: 11/04/16   Page 15 of 63

JOHN PETERS, PH.D.                                    October 20, 2016
ROBINSON vs. The CITY OF MADISON                          57—60

Page 57

1  tree was green, Witness B said the tree was yellow,
2  and Witness C said it was purple.  Well, you're
3  going to have to analyze that, identify what that is
4  and then possibly reach out and either through
5  triangulation or some other methodology come up
6  with, you know, what color was the tree.
7        You may find out as you go through that
8  that Witness A was colorblind and Witness B, the sun
9  was shining in a particular way.  That's part of
10  that analysis.  You look at what was said and you
11  look for inconsistencies or consistencies or
12  absences where somebody doesn't have a piece of the
13  information.
14        In other words, they showed up but nobody
15  ever asked them where were you coming from.  And
16  that may not be important either, that's part of
17  that analysis.
18     Q.   Okay.  So discourse analysis involves
19  comparing statements between, you know, individuals.
20  Can it also involve comparing or looking for
21  inconsistencies or consistencies between multiple
22  statements by the same individual?
23     A.   Sure, that's all part of discourse
24  analysis.
25     Q.   Okay.  And is part of discourse analysis

Page 58

1  also comparing statements of witnesses or
2  individuals with other evidence like forensic
3  evidence?
4     A.   You look at the statements made and you
5  could compare it to objective or scientific
6  evidence.  And you would do that, at some point you
7  would do that whether that would be exclusive part
8  of discourse analysis or that would just be part of
9  the analysis overall.  Yes, you would do that.
10     Q.   And that's really my question.  Where
11  does that type of comparison come into your
12  methodology?
13     A.   I think it comes in after you've done
14  most of this.  I mean, you look at the archival
15  information.  We have quite a bit of quantitative
16  data in this case.  I don't do the measurements.  I
17  don't do autopsies obviously.  Toxicology
18  information is something I don't do, but I can read
19  what the results are.  So there's some comparison
20  that's done there and all that is in the form of
21  written word for the most part.
22        Now, what I don't do and you asked it
23  earlier, you know, trajectories and that -- that's
24  outside my box, I don't do that.  So that part of
25  the analysis, I may or may not even consider because

Page 59

1  I don't have a background in that.  I stick to what
2  my background is.
3     Q.   Okay.  And in this case, I'm right that
4  you didn't review the deposition or any deposition
5  testimony of Edward Greengrass, correct?
6     A.   Yes.
7     Q.   Or Kathleen Bufton; is that right?
8     A.   Correct.
9     Q.   Okay.  Now, am I -- I'm just trying to
10  understand from a methodological place where the
11  comparison comes in to, you know, statements and I
12  think what you referred to objective evidence?
13     A.   The discourse analysis is where you read
14  everything.  I don't make credibility assessments,
15  that's up to the trier of fact.  If somebody says "I
16  don't think that that is correct," somebody else is
17  going to make that determination.  What I'm looking
18  at is okay, here's what's been said about this
19  incident.  This is what the officer said, here's
20  what the witnesses have said, here's what the
21  investigation -- or the investigators have pulled
22  together.
23        And I look at that and I do compare and
24  contrast that to see if it comports.  And in some
25  respects it can be as simple as there's a dispatch

Page 60

1  call to go to a certain location.  We know that that
2  happened and at the end we had the shooting.  So
3  there are some things that --
4     Q.   So --
5     A.   You don't really need to compare very
6  much.
7     Q.   Sure.  How do you in, your methodology,
8  resolve discrepancies between different witness
9  accounts?
10     A.   Generally, I try to incorporate those in
11  my report and say, you know, Witness A said this,
12  but in contrast Witness B said this.  Or, you know,
13  Mr. Limon, for example, may have said this, where
14  his girlfriend said that.  I will identify those.
15        And in some cases if Mr. Limon, for
16  example, didn't know about or didn't see
17  Mr. Robinson pulled his girlfriend in and tried to
18  grab her or do something, I may note that, but in
19  the overall analysis it may or may not be an
20  important issue.
21     Q.   Okay.  In your report here, did you note
22  any conflicting witness accounts between or versions
23  of events between that which Kenny gave and other
24  witnesses?
25     A.   There may be a couple, but I don't think



JOHN PETERS, PH.D.                                    October 20, 2016
ROBINSON vs. The CITY OF MADISON                           61—64

Page 61

1 there were a lot because I was primarily asked about
2 Officer Kenny, issues on policy, issues on training,
3 that type of thing. I didn't get into.
4     Q.    Let me back up.
5          So are there any places in your report
6 where you identify something a witness has said that
7 would contrast or even conflict with Officer Kenny's
8 reporting of the events?
9     A.    Just let me take a moment.
10     Q.    Absolutely.
11     A.    Well, I guess there's been some
12 discussion in the record about this excited delirium
13 possibility being thought of by different officers
14 and what have you. I looked at that, obviously. I
15 don't know if I gave specific reference to, you
16 know, a couple of people may have thought in terms
17 of it may have been or may not have been. But most
18 of my opinions have focused on Officer Kenny's
19 behavior, specifically his behavior and also on what
20 Mr. Waller talked about.
21          Most of officers -- Officer Kenny's
22 behavior occurred in what I would categorize as an
23 isolation. There was no one else with him except
24 Mr. Robinson; therefore, when you look at the grand
25 scheme of things, most of the discussion that was

Page 62

1 made and where a lot of the discrepancies were in
2 that reporting took place prior to Officer Kenny's
3 arrival on the scene.
4          Mr. Limon may have said one thing and
5 somebody else may have said something else. But as
6 far as going into the building and describing what
7 took place, basically Officer Kenny was the only
8 person who could describe that because no one else
9 was there.
10     Q.    Okay. So am I right that there's no
11 place in your report where you identify any possible
12 discrepancy between what Officer Kenny said and what
13 another witness said?
14     A.    That would probably be a fair statement.
15     Q.    Okay. Now, am I right that there is no
16 place in your report where you identify any
17 discrepancy between anything Officer Kenny said and
18 any other objective evidence?
19     A.    Objective evidence is pretty broad.
20     Q.    Do you recall using the term earlier?
21     A.    Yes.
22     Q.    Okay. What did you mean by it, then?
23     A.    Well, objective evidence would be
24 something, for example, if say you and I got into a
25 confrontation and I ripped your shirt and your

Page 63

1 buttons came off, that would be objective evidence,
2 something happened to your shirt. That would be how
3 I would use it. As far as the trajectories or the
4 autopsy or that type of thing, that would be
5 objective evidence but that would be for somebody
6 else's field, not mine.
7     Q.    Okay. And you didn't note any type of
8 discrepancies between the objective evidence and
9 Officer Kenny's account; is that right?
10     A.    I think the only thing I noted was some
11 second. Mr. Waller talked about seconds of his
12 interpretation and then my seconds that I came up
13 with. I think that was basically about it.
14     Q.    Right. But there you were disagreeing
15 with Mr. Waller's interpretation. What I'm asking
16 is different is, are there any instances where you
17 identified a disagreement between Officer Kenny's
18 account and any of the other evidence?
19     A.    Again, I would have to refer back to what
20 I just said because you framed it that I disagree
21 with Mr. Waller. Take Mr. Waller out of the
22 equation for just a moment.
23     Q.    Sure.
24     A.    He said seconds over here and I have a
25 different amount of seconds, to me that is objective

Page 64

1 evidence. Seconds are seconds looking at the video.
2 Now, I don't know anything really about syncing
3 video or anything else, I'm just going by what I
4 saw.
5     Q.    Sure.
6     A.    So I have a difference of seconds than he
7 does.
8     Q.    Right.
9     A.    It has nothing to necessarily do with
10 anything but just numbers.
11     Q.    Absolutely. Putting all of that to the
12 side, I'm just focused on -- maybe we're talking
13 past each other. I'm focused on a different moment
14 or a different type of inconsistency.
15          Am I right that there's no point in your
16 report in which you identify any inconsistency
17 between the account Officer Kenny gave and any other
18 evidence?
19     A.    Let me just look. I would say that's
20 correct.
21     Q.    Okay. And I want to actually want to
22 make sure I understand sort of the structure of your
23 report, and I meant to cover this earlier. And I
24 want to understand the relationship between your
25 report itself and the opinion you gave and the



JOHN PETERS, PH.D.                                    October 20, 2016
ROBINSON vs. The CITY OF MADISON                                65–68

Page 65

1 summary of facts.
2       Am I correct in the summary of facts that
3 you're not saying that those are part of your
4 opinions, but those sort of form the basis for your
5 opinions; is that right?
6    A.   I would say it as they're not -- my
7 summary of facts isn't necessarily a hundred percent
8 complete.  And I gave that and my disclaimer at the
9 front of that.  It's basically my understanding in
10 summary form of what took place.
11    Q.   And do you have the disclaimer that your
12 statement of facts is not intended as nor should it
13 be considered as a complete or accurate statement of
14 the actual occurrence, correct?
15    A.   Correct.
16    Q.   And you would agree with me that facts
17 unknown to Officer Kenny are not irrelevant to
18 analysis of his use of force, correct?
19    A.   Say that again.
20    Q.   Sorry.  I throw a lot of double
21 negatives.
22       You would agree with me that the only
23 relative facts to analyzing offer Kenny's use of
24 force are the facts that he actually knew at the
25 time?

Page 66

1    A.   Yes.
2    Q.   Okay.  So let's look in -- this is
3 Appendix A, page 16 of your report.
4    A.   Okay.
5    Q.   Okay.  So you would agree with me that
6 the information, the evidence base history of
7 Mr. Robinson that the information that Officer Kenny
8 knew about Tony Robinson, that he was biracial and
9 19 years of age, is the only information Officer
10 Kenny knew before this incident; is that right?
11    A.   I would say he would know approximately
12 his height and he may know he was biracial.  Whether
13 he knew he was 19, I'm not sure.
14    Q.   And you would agree that the universe of
15 information Officer Kenny had before he arrived at
16 the scene was that from dispatch, right?
17    A.   Correct.
18    Q.   And it's important for Officer Kenny to
19 carefully listen to dispatch, right?
20    A.   I would agree with that.
21    Q.   You have given presentations before where
22 you have indicated that, right?
23    A.   Yeah.
24    Q.   And you would agree that it would have
25 been important in addition to dispatch on the radio,

Page 67

1 information on Officer Kenny's computer notes would
2 have been information that he would have had as
3 well?
4    A.   Yes.
5    Q.   And then it would have been important for
6 Officer Kenny to look at that information before
7 engaging the suspect?
8    A.   If he had time and if it was appropriate.
9    Q.   So is there anything that you saw in your
10 analysis that indicated it would have been not
11 appropriate for Officer Kenny to review the notes on
12 his computer in this situation?
13    A.   Well, if he's driving and he's responding
14 Code 3 to a situation, it may be difficult to read
15 and drive at the same time.
16    Q.   Sure.
17    A.   And when he arrived, my recollection is
18 that he was told, you know, the guy is over there,
19 and he had the information from dispatch.
20    Q.   Okay.  So he should have -- you know,
21 while he's driving it's more reasonable for him to
22 be focusing on the information that's being reported
23 to him over the radio so he's not looking down at
24 the camera -- or the computer, excuse me?
25    A.   Yeah.  I don't know what kind of MDT they

Page 68

1 have in the cars.  Some cars have larger screens,
2 some have smaller screens.
3    Q.   Yeah.
4    A.   But I think safety of the public and the
5 officer himself are paramount over reading the
6 screen while you're driving.
7    Q.   Sure.  And you would agree, from a
8 general proposition, an officer should pay attention
9 and observe the information given to him about a
10 situation as he's arriving?
11    A.   If he has the time to do that, sure.
12    Q.   Okay.  Now let's go to the Appendix A,
13 March 6th, 2015, do you see the 3 p.m.?
14    A.   Yes.
15    Q.   Now, you will agree with me the
16 information under that headline is not relevant to
17 Officer Kenny's use of force, correct?
18    A.   Correct.
19    Q.   Cuddling in the bedroom, also not
20 relevant to Officer Kenny's use of force, correct?
21    A.   Correct.
22    Q.   4 p.m., Robinson lying on the bed in
23 another room, also not relevant to Officer Kenny's
24 use of force, correct?
25    A.   Correct.



Case: 3:15-cv-00502-jdp   Document #: 84   Filed: 11/04/16   Page 18 of 63

JOHN PETERS, PH.D.                                    October 20, 2016
ROBINSON vs. The CITY OF MADISON                          69–72

Page 69

1    Q.    Same thing with Mr. Robinson began
2  shouting?
3    A.    Correct.
4    Q.    Same thing with -- now we're on to page
5  17, all of the information on page 17, correct?
6    A.    Correct.
7        MR. SWAMINATHAN:  You want to go off the
8  record?
9        MR. OWENS:  No, I'm fine.  I'm back.  I'm
10  back.
11  BY MR. OWENS:
12    Q.    So the same is true with page 18,
13  correct?
14    A.    I would agree.
15    Q.    And then -- now on page 19, you'll agree
16  with the information of what the caller actually
17  told to the 911 operator is not relevant to Officer
18  Kenny's use of force because it wasn't communicated
19  to him directly, right?
20    A.    Correct.
21    Q.    It's just the information that he got
22  from the 911 folks or dispatch?
23    A.    We got a slice that a little bit.  What
24  Officer Kenny got from dispatch didn't necessarily
25  make his decision to use force.  You're combining

Page 70

1  that.  I want to separate that out a little bit
2  because the decision to use force at the time Kenny
3  used it is based on the facts and circumstances at
4  that moment in time, not based on a dispatch that
5  occurred five or ten minutes earlier.
6        So I just want to make that clear.  Did
7  that information -- or was that information
8  provided?  Yes, it was.
9    Q.    But the background -- my point -- we
10  don't need to quibble.  My point is, the only
11  information that's in the universe of things that
12  are relevant to the use of force is the information
13  that Officer Kenny was given, not things that he
14  didn't know, right?
15    A.    I would agree that he didn't know any of
16  the other information we just said he didn't know.
17    Q.    Right.  But you would agree that dispatch
18  information is relevant to his analysis of his use
19  of force, right?
20    A.    No.  Dispatch gets it wrong.  Dispatch
21  doesn't tell you everything all the time.  What
22  dispatch does is tell you here's what we've been
23  told.  What if the caller was wrong?  When the
24  officer gets to the scene, the officer has to make
25  his or her own assessment.

Page 71

1        Now, does this lay somewhat of a
2  generalized description of what the officer may
3  find, sure.  But just like the two officers who were
4  killed in Palm Springs, they responded to a domestic
5  call and got ambushed, so I don't think the logic
6  holds true.
7    Q.    Okay.  So you think that officers should
8  pay attention to the information that they're given
9  via dispatch, correct?
10    A.    Yes.
11    Q.    And you would agree that that informs the
12  objective reasonableness of their actions and how
13  they view it without the benefit of hindsight,
14  correct?
15        MR. HALL:  Objection to form.
16        THE WITNESS:  Well, there's no -- I'm
17  sorry.  There's no -- there's no hindsight and
18  there's no force used.  There can't be objectively
19  reasonable force used, he's driving.  All he's
20  getting is information, whether that information is
21  valid or not would happen at the scene.
22  BY MR. OWENS:
23    Q.    You would agree, though, if Officer Kenny
24  or an officer is told that there's a suspect running
25  around wielding an assault rifle that that would

Page 72

1  affect his analysis in thinking about the use of
2  force as he encounters the situation, right?
3    A.    That would affect the analysis on officer
4  safety.
5    Q.    And it would be appropriate to look at
6  that dispatch information, right?
7    A.    Sure.  You would factor that into your
8  response from an officer safety viewpoint, not
9  necessarily a use of force viewpoint.  I certainly
10  wouldn't use force based on a dispatch call.
11    Q.    Sure.  And my only point is that it's
12  relevant to the overall totality?
13    A.    It's a variable that needs to be
14  considered.
15    Q.    Okay.  Now, the -- your summary of the
16  facts doesn't include any information about the
17  video, right?
18    A.    I think that is probably correct.
19    Q.    Is it fair to say that you didn't rely on
20  the video in reaching any -- the opinions you gave
21  here?
22    A.    Well, let's not confuse apples and
23  oranges here.  Okay.  The summary of facts is the
24  summary of facts.  That's not my opinion.  I think I
25  did reference the video or photographs in the



JOHN PETERS, PH.D.
ROBINSON vs. The CITY OF MADISON

October 20, 2016
73–76

Page 73

1 opinions.

2    Q.   Okay.  Show me where in your opinions
3 that you reference the video.

4    A.   Well, the time gap in seconds would
5 certainly have relied in part on that.

6    Q.   When you're discussing Mr. Waller's
7 testimony?

8    A.   Right.

9    Q.   Okay.  Aside from that, tell me any other
10 reference in which you reference the video or form a
11 basis for your opinion.

12    A.   I don't think I referenced the video in
13 the opinions mostly because what I discussed in the
14 opinions isn't shown in the video.

15    Q.   Okay.

16        MS. REPORTER:  Is it all right if we take
17 a break?

18        MR. OWENS:  Absolutely.

19        (Lunch recess.)

20 BY MR. OWENS:

21    Q.   We were discussing your summary of facts,
22 and I just wanted to make sure I understood the
23 summary of facts, and I think I have a good picture
24 of that.

25        One question I have is that the opinions

Page 74

1 in your report on the -- reference specific facts,
2 are those the ones that you relied upon in reaching
3 those opinions?

4    A.   I guess it depends a little bit on
5 interpretation or definition of relied upon.  Facts,
6 the way I use facts it sets the framework, and I
7 develop the opinion based on either standards in the
8 industry, practice of the industry or what have you.

9    Q.   Yeah.

10    A.   So it's probably akin to a VENN diagram
11 where you have the industry standards and then you
12 have the facts and in the center they overlap.

13    Q.   Okay.

14    A.   So that would be my best answer for that.

15        MR. HALL:  Kate, are you on?

16        MS. HARRELL:  I'm here.

17        MR. OWENS:  Okay.  Thanks.  Sorry.  My
18 apologies.

19        MS. HARRELL:  No, you're okay.

20        MR. OWENS:  Did you want to weigh in on
21 phenomenology?

22        MR. SWAMINATHAN:  Keep going.

23 BY MR. OWENS:

24    Q.   In our discussion earlier, the facts that
25 you relied upon, I guess I'm wondering -- you know,

Page 75

1 so I know in your report, is it fair to say that in
2 the report itself, as opposed to the summary of
3 facts, the facts that you mentioned are the ones
4 that you found to be important?

5    A.   To that opinion, yes.

6    Q.   Yeah.  And that it's not that other
7 facts, you know, don't have anything to do with it,
8 but they're more the background and the ones that
9 were really the more specific things that you had in
10 mind, are those the ones you included in your
11 report?

12    A.   I think the facts that I've included in
13 not every opinion but some of the opinions, yes.  So
14 it was germane to that opinion.

15    Q.   Okay.  And earlier we had a little bit of
16 a discussion about objective evidence, and I know a
17 lot of that is outside of your realm of expertise.

18        So Officer Kenny's statements are not
19 objective evidence, correct?

20    A.   I would say they're just statements.  I
21 looked at them as statements.

22    Q.   Okay.  So in the methodology of discourse
23 analysis that you gave earlier, statements and the
24 statements of Officer Kenny, are statements, they're
25 not objective evidence as we discussed that term

Page 76

1 earlier?

2    A.   I would say that they're statements.  The
3 investigation may sit on the fence a little bit
4 because it was done by, you know, someone else.  But
5 you know, it kind of goes back to the -- his
6 statements are basically that phenomenological
7 approach again.  How they're used and when they're
8 used, I considered it just his statements.

9    Q.   Got it.

10        And his statement is not objective
11 evidence because it's based upon his reporting about
12 things that he experienced or believed he
13 experienced, right?

14    A.   Right.  If I'm writing a report that
15 would be a subjective variable.

16    Q.   Right.  And that's because your reporting
17 is subjective from your perspective?

18    A.   Correct.

19    Q.   And that's the same thing with respect to
20 Officer Kenny's statement he made in the course of
21 this investigation?

22    A.   Correct.

23    Q.   Okay.  Now, let's sort of begin our train
24 going from top to bottom here.

25    A.   Okay.



JOHN PETERS, PH.D.                                       October 20, 2016
ROBINSON vs. The CITY OF MADISON                              77—80

1      Q.   I'll warn you in advance we're just going
2  to go front to back.  That's something I normally
3  do.
4          So let's start at the beginning where the
5  focus of your analysis because I really need to know
6  what your focus was here.
7          In the first paragraph of -- on page 2
8  you say here that you were asked to review documents
9  produced in discovery, certain pleadings, other
10 publically available documents.  And this is where I
11 want to start focusing in this sentence.
12         "Then analyze his use of force and
13 tactics, in addition to related issues, and then
14 offer opinions about the same."
15     A.   Correct.
16     Q.   Okay.  And I know this may seem
17 redundant.  The only thing that you have been asked
18 to analyze and you have opinions on are those
19 contained in this report?
20     A.   Correct.
21     Q.   Okay.  Now, I wanted to get a little bit
22 of clarification to the extent I could about the
23 level at which you're analyzing Officer Kenny's use
24 of force.  And what I mean by that is, you
25 understand that use of force for police officers is

1  governed by a number of things, the United States
2  Constitution, Wisconsin law, agency policy and then
3  officer training, right?
4      A.   Correct.
5      Q.   And that's in the, you know, use of force
6  training manual which you reviewed, right?
7      A.   Right.
8      Q.   And so what I'm wondering is, are your
9  opinions expressed at any particular level or are
10 they expressed across all of them or does it vary by
11 opinion?
12     A.   That's a good question.  Some of it may
13 vary by opinion.  Most of it's at the -- what I
14 would call the 10,000-foot level looking at it from
15 the Graham versus Connor viewpoint.  What officers
16 are trained in.  I mean, I looked at what officers
17 are trained in in Wisconsin, I looked at obviously
18 the Graham versus Connor criteria that officers are
19 trained in.
20         And I guess this would be an appropriate
21 time to qualify that, that my analysis is not a
22 legal analysis, it's from a training analysis.  What
23 they were trained in and how they applied that
24 training to the situation.  So that's just for
25 clarification.

1      Q.   I do appreciate that clarification.  So
2  you're not offering a conclusion about whether or
3  not Officer Kenny's conduct was in violation of the
4  fourth amendment, right?
5      A.   Correct.
6      Q.   That's a question for the trier of fact?
7      A.   Correct.
8      Q.   And so your discussion of Graham against
9  Connor and other legal things relate solely to
10 Officer Kenny's -- the relationship between his
11 behavior as indicated in the statements which you
12 relied upon and the factors that you know he was
13 trained on?
14     A.   I would even go and add one more
15 component to that.  It would be his statements, his
16 training -- first his training because that came
17 first.
18     Q.   Sure.
19     A.   Then the situation and then his
20 statements.  Because the situation I think is
21 important because we look at was it tense, was it
22 rapidly involving, what were the behaviors that he
23 saw.  That obviously goes back to applying his
24 training to what he saw and perceived and knew at
25 the time and then what he said afterwards.

1      Q.   Right.  And the basis for your opinions
2  about what he saw and perceived and knew at the
3  time, rely upon the account provided by Officer
4  Kenny, correct?
5      A.   Yes.
6      Q.   Now, did you assume his account was
7  correct and accurate?
8      A.   I didn't make any credibility assessments
9  at all.  The only -- the only thing that would come
10 close to accepting or rejecting is if there's
11 deposition testimony.  I assume that when people say
12 they're going to tell the truth that they honor
13 that.  But it's up to the trier of fact to determine
14 whether or not the person is, you know -- has the
15 veracity that he or she may or may not have, that's
16 not my job.
17     Q.   Okay.  And I understand that's not your
18 job.  What I'm asking is, did you just assume that
19 Officer Kenny's account was truthful and accurate?
20     A.   I assume that what he said is what he
21 said, and I had nothing to refute that.  I mean, if
22 he said he got punched and there's only two people
23 and one of them is now deceased, it's really kind of
24 hard for me to say there's a third version out there
25 somewhere.  And I think I mentioned earlier that a



JOHN PETERS, PH.D.
ROBINSON vs. The CITY OF MADISON

October 20, 2016
81–84

Page 81

1 lot of this happened in kind of isolation, if you
2 will.
3        MR. OWENS:  Can you read that question
4 back to me?
5        (Record read.)
6 BY MR. OWENS:
7    Q.   So am I right that you assumed that what
8 Officer Kenny said is what happened?
9    A.   Not necessarily what he said.  Part of it
10 is what he said.  Part of it is what the dispatch
11 told him and part of it, a small piece, is the video
12 because the video only captured, in my opinion, sort
13 of the end of the event.
14    Q.   And let me narrow my question.
15    A.   Okay.
16    Q.   Am I right that you're assuming that what
17 he said about his interaction with Tony Robinson is
18 what happened?
19    A.   Because that's the only person who
20 discussed it, sure.
21    Q.   Okay.  Do you have an approach that's
22 different for use of force incidents than other
23 cases that you analyze in terms of your methodology?
24    A.   No.  I would say the approach is pretty
25 consistent.

Page 82

1    Q.   Okay.  And following up is -- you assumed
2 that what Officer Kenny said is accurate, right,
3 about what happened?
4    A.   Yeah, the statements and the
5 investigation report, yes.
6    Q.   And that his statements were accurate
7 reporting of what happened in his interactions with
8 Officer Kenny?
9        MR. HALL:  Objection.
10        THE WITNESS:  You mean Mr. Robinson?
11 BY MR. OWENS:
12    Q.   Let me ask that again.
13    A.   Okay.
14    Q.   That Officer Kenny's statements were
15 accurate with respect to his interaction with Tony
16 Robinson?
17    A.   Yes.
18    Q.   Okay.  And now, I think you said this
19 earlier, but let's just get this a little cleaner.
20        Is that it's your usual practice to
21 divide in your expert witness work and analysis of
22 an incident into preincident -- preincident
23 opinions, incident opinions and postincident
24 opinions, right?
25    A.   Correct.

Page 83

1    Q.   And that is your statement of practice?
2    A.   That is standard.  Sometimes there's no
3 postincident and sometimes there is no preincident,
4 but there's always incidents.
5    Q.   Okay.  So Opinion No. 1 is that Officer
6 Kenny was trained and certified as a Wisconsin
7 police officer, correct?
8    A.   Correct.
9    Q.   And you have this opinion because based
10 upon the documents that you've cited here; is that
11 right?
12    A.   Correct.
13    Q.   And do you have any specific expert
14 knowledge that was necessary to reach this opinion?
15    A.   I'm not sure what you mean by expert
16 knowledge.
17    Q.   Right.  So is this -- now, I could look
18 at the documents that you cited here and know that
19 Officer Kenny graduated from the police academy in
20 2002 and went solo in Spring of 2003, right?
21    A.   Right.
22    Q.   Me knowing that fact doesn't require any
23 special expertise or anything like that, right?
24    A.   Well, no, I would disagree with you.
25 Because in the state of Wisconsin you can be a peace

Page 84

1 officer without graduating from the academy.
2 There's a window of time, and I believe it's at
3 least a year where you could be hired and working
4 without having graduated from the academy under
5 state law.
6        So I think the knowledge with that
7 coupled with you have to be certified or should be
8 certified and an understanding of the curricula that
9 he went through, I don't think that goes to common
10 sense or lay opinion.  I think you have to know
11 that.  I've taught in the state of Wisconsin, I've
12 taught across the state of Wisconsin and that's
13 something I don't think a layperson would have.
14    Q.   So a layperson wouldn't know that he
15 graduated from the police academy in 2002 and went
16 solo in the spring of 2003, you're not able to
17 understand that?
18    A.   Oh, I think somebody could read it, a
19 diploma hanging on a wall and say okay, he
20 graduated.
21    Q.   Okay.
22    A.   That's the same thing as you went to law
23 school and graduated, that doesn't mean you passed
24 the bar, that just meant you graduated from law
25 school.



JOHN PETERS, PH.D.
ROBINSON vs. The CITY OF MADISON

October 20, 2016
85–88

Page 85

1   Q.   Sure.
2   A.   Same thing here, he's certified.  Yeah,
3  somebody could look at that diploma, but it's the
4  interpretation what's that mean.  To me this is very
5  important because he was certified, he went through
6  the field training officer program, he did go solo,
7  he took advance training.  I'm not sure the average
8  person knows what special weapons and tactics
9  training is all about.  And the last sentence that
10  he got his undergraduate degree, again somebody
11  could look at a diploma and see that.
12   Q.   Okay.
13   A.   I think it's what's behind this that's
14  important.
15   Q.   So can we agree that the first sentence
16  about Officer Kenny going to the police academy,
17  that's not something that required expert knowledge,
18  right?
19   A.   No, I think that requires expert
20  knowledge because you can have officers in that
21  state who didn't go to the police academy.
22   Q.   Okay.
23   A.   And I think the police academy is
24  different than the correctional training.  And
25  correctional training is different than other

Page 86

1  training.  So I think there's a lot to this.  It may
2  look simple on paper, but there's a lot of back
3  story to it.
4   Q.   So does this say anything about Officer
5  Kenny being certified, the first sentence?
6   A.   Well, the absolute first sentence is
7  No. 1, it says Officer Kenny was trained and
8  certified as a Wisconsin police officer.  And then
9  underneath that is the support for that opinion.
10   Q.   Sure.  The first sentence for the support
11  for that opinion, does that say anything about being
12  certified?
13   A.   No.
14   Q.   Okay.  Does the last sentence, the
15  support for that opinion say anything about Officer
16  Kenny being certified?
17   A.   No.
18   Q.   Okay.  Does the second sentence of that
19  paragraph say anything about Officer Kenny being
20  certified?
21   A.   He was trained in accordance with
22  Wisconsin training standards.
23   Q.   Does that -- I'm sorry.
24   A.   If you combine the second sentence with
25  the first, that he graduated, he met the criteria to

Page 87

1  be certified.
2   Q.   Okay.  Does the word "certified" appear
3  in this paragraph?
4   A.   Only in the opinion.
5   Q.   In the paragraph of support?
6   A.   No, because the support is for the word
7  certified.
8   Q.   Now, is there a reason that you left out
9  the fact that Officer Kenny was trained as an
10  instructor in use of Tasers or electronic control
11  devices?
12   A.   I didn't really think it was that
13  relevant because a Taser wasn't used.
14   Q.   Now, you have some opinions about
15  Mr. Waller's opinions about his -- about a Taser,
16  correct?
17   A.   Correct.
18   Q.   Okay.  And despite that you didn't think
19  that Officer Kenny's training about using a --
20  training and being a TASER instructor was relevant;
21  is that right?
22   A.   I didn't say it wasn't relevant.  He had
23  it, but at some point I just didn't put it in there
24  because a Taser wasn't used and I just didn't put it
25  in.  I mean, a special weapons tactics qualified.

Page 88

1   Q.   Okay.  Now, I just want to make sure
2  about this.  Now, you -- I didn't see this in here.
3  You don't have an opinion that Officer Kenny
4  departed from his training in any way, do you?
5       MR. HALL:  Objection to form.
6       THE WITNESS:  No.
7  BY MR. OWENS:
8   Q.   And you don't have an opinion that
9  Officer Kenny misanalyzed anything based upon the
10  training that he had?
11   A.   Correct.
12   Q.   And you haven't offered an opinion
13  indicating that offer Kenny should be faulted for
14  departing from his training in any way, right?
15   A.   I have not offered an opinion that he
16  departed from his training, correct.
17   Q.   Okay.  Now, you mentioned this earlier.
18  You recall that Officer Kenny, in his statement,
19  indicated that he was considering whether or not he
20  was approaching an excited delirium event, correct?
21   A.   Correct.
22   Q.   And you're aware of that?
23   A.   Correct.
24   Q.   And you haven't faulted him for
25  considering that, correct?



JOHN PETERS, PH.D.                                          October 20, 2016
ROBINSON vs. The CITY OF MADISON                                  89—92

Page 89

1    A.   No, that's a consideration.
2    Q.   And you recall in that same statement
3 Officer Kenny discussed the fact that his training
4 would -- in encountering excited delirium events was
5 to use electronic controlled devices, correct?
6    A.   Correct.
7    Q.   You haven't faulted him for that, right?
8    A.   Correct.
9    Q.   Now, let's talk about excited delirium.
10 We talked a little bit earlier about agitated
11 control events.
12    A.   Chaotic events.  Chaotic.
13    Q.   Agitated chaotic events.
14    A.   There we go.
15    Q.   Now, your opinion here is that no one
16 knew if Mr. Robinson was in a state of excited
17 delirium before or during Officer Kenny's engagement
18 with him in close combat, right?
19    A.   Correct.
20    Q.   Now, I within to break this sentence
21 apart.  Now, during Officer Kenny's engagement with
22 him in close combat, now you're assuming here that
23 Officer Kenny was engaged in close combat with Tony
24 Robinson, correct?
25    A.   Correct.

Page 90

1    Q.   And you're assuming that based upon
2 Officer Kenny's account of what happened, correct?
3    A.   Correct.
4    Q.   Okay.  And you're not basing that on
5 anything outside of Officer Kenny's account, right?
6    A.   Correct.
7    Q.   Now, lets just focus on the first part.
8 No one knew if Mr. Robinson was in a state of
9 excited delirium before or during their engagement?
10    A.   Correct.
11    Q.   Now, can you please define to me what you
12 mean by excited delirium?
13    A.   Excited delirium is a descriptive phrase
14 that historically has been associated with the use
15 of cocaine, but over time has been enlarged to
16 include four categorical causes which include:
17 Psychological issues, metabolic issues, infections
18 and drugs, prescription or illicit.
19    Q.   And I want to make sure that I understand
20 this correctly.  Because excite delirium is a
21 descriptive phrase that means it's not something
22 that can be diagnosed; is that right?
23    A.   No, that's not correct.  Medical
24 examiners historically make that diagnosis, but most
25 excited delirium, most, and I can't give you a

Page 91

1 percentage, but I'm going to estimate probably
2 90 percent, maybe 95 percent of all excited delirium
3 diagnoses are made postmortem.  There can be a
4 premortem diagnosis at the emergency department
5 after the doctors do what's called a differential
6 diagnosis and they rule out almost everything else
7 and this is what's left.
8         Now, the American College of Emergency
9 Physicians wrote a paper on that, went through it.
10 Excited delirium is accepted generally in the
11 medical community.  The ACEP paper was designed to
12 educate emergency room physicians about the
13 phenomenon, but mostly it's been limited to medical
14 examiners and postmortem.
15    Q.   Okay.  In terms of police training, I
16 think that you said this early, police officers are
17 not trained to make a diagnosis?
18    A.   That's correct.
19    Q.   And instead they're trained to respond to
20 behaviors, correct?
21    A.   Correct.
22    Q.   And whether it's an agitated chaotic
23 event or whether it's excited delirium or whether
24 it's some other type of mania, officers are trained
25 to respond to those type of events?

Page 92

1    A.   Generally they're trained to respond to
2 some of those events, maybe not all of them.  If you
3 have postictal psychosis following epilepsy and the
4 officer's never been trained in epilepsy, they're
5 going to respond to the behaviors they see, but they
6 may not be able to apply the epileptic template to
7 it.
8    Q.   But officers are trained to respond to
9 mental health crises and crisis management, right?
10    A.   It depends on the state, depends on the
11 department.
12    Q.   Sure.  Let's just talk about Officer
13 Kenny here in Wisconsin.  He was given training in
14 responding to crisis management and mental health
15 crisis, right?
16    A.   Correct.
17    Q.   And the opinion that you've expressed
18 here is that there's not enough known about
19 Mr. Officers [sic] to predict whether or not he was
20 in a state of excited delirium and not in an
21 agitated state that may have been triggered by other
22 underlying causes such as infection, diabetes, et
23 cetera, right?
24         MR. HALL:  Object to form.  You meant
25 Mr. Robinson.



Case: 3:15-cv-00502-jdp   Document #: 84   Filed: 11/04/16   Page 24 of 63

JOHN PETERS, PH.D.                                    October 20, 2016
ROBINSON vs. The CITY OF MADISON                              93–96

Page 93

1       THE WITNESS:  Correct.
2       MR. HALL:  Object to form.
3       MR. OWENS:  I'll read it again.
4  BY MR. OWENS:
5       Q.   Your opinion, the support for your
6  opinion in the second paragraph under No. 2 is that
7  there is not enough known about Mr. Robinson for
8  officers to predict whether or not he was in a state
9  of excited delirium and not in an agitated state
10 that may have been triggered by other underlying
11 causes such as infection, diabetes, et cetera?
12      A.   Correct.
13      Q.   Okay.  What I would like some help with
14 is distinguishing between excited delirium instance
15 and agitated state as you refer to it here.
16      A.   Well, on the front end, I'm not sure you
17 can make much of a distinction in some cases,
18 depending on the situation.  This is generally a
19 hindsight evaluation.
20      Whether the person has low blood sugar
21 and is acting out, whether the person, as in this
22 case, ingested mushrooms or took cocaine, the
23 officer can't make that diagnosis.  All the officer
24 can say is, I've got these behaviors in front of me
25 and I've got to try to manage those behaviors to the

Page 94

1  best of my ability.  Now, part of that equation
2  comes on the officer's side and the other part comes
3  on the subject's side.
4       Q.   Okay.  Now, one of the causes of excited
5  delirium is drug induced, right?
6       A.   Can be.
7       Q.   Right.  One of the causes, it's not the
8  only cause, right?
9       A.   Right.
10      Q.   It can be pharmacologic, psychological,
11 metabolic and infection, right?  That's what you've
12 listed.
13      A.   Correct.
14      Q.   And so let's talk about the
15 pharmacologic, which you put here "e.g., ingesting
16 illicit or licit drugs," right?
17      A.   Correct.
18      Q.   Now, if an individual is, I think as you
19 described earlier, running through the streets after
20 eating some bath salts, they're likely to be in an
21 agitated state, right?
22      A.   It could be more than likely.
23      Q.   And there's no way on the front end to
24 distinguish between whether or not that person is
25 having a state -- is in a state of agitated --

Page 95

1  excuse me, is in a state of excited delirium or
2  whether they're having some type of response just to
3  the drugs or whether or not it's both?
4       A.   That's a fair statement.
5       Q.   And does the fact that illicit drugs can
6  trigger excited delirium make it impossible to
7  disaggregate on the front end whether or not
8  somebody is having drug related response or
9  something else?
10      A.   I don't think the officers would be
11 capable of distinguishing that.
12      Q.   Okay.  So in this opinion, you are -- I
13 want to just clarify your criticisms of Mr. Waller.
14      Is your criticism of Mr. Waller that it
15 was improper for him to make a diagnosis of excited
16 delirium?
17      A.   Well, if in fact Mr. Waller did make a
18 diagnosis, he's not qualified.
19      Q.   Sure.
20      A.   If Mr. Waller wanted the offer to make
21 the diagnosis, that, too, is outside the scope of
22 the officer's training and background.
23      Q.   Okay.
24      A.   I think what I have said here, and
25 Mr. Waller referenced the Tim incident over in

Page 96

1  Greenbay.  I'm very familiar with that incident and
2  it was somewhat identical to this in the fact that
3  Tim had ingested mushrooms, hallucinogenic
4  mushrooms.
5       Most of the medical community we've
6  talked to in our institute after that took place did
7  not describe that as excited delirium.  Mr. Waller
8  seems to try to make that connection.  And I didn't
9  find in his report any basis for that connection,
10 any medical basis, any other basis other than he
11 probably looked at the video and said that looks
12 like excited delirium.
13      So that -- that's a criticism.  Again, as
14 my report says, excited delirium is usually a
15 postmortem diagnosis and it's done by the medical
16 examiners after they collect all the evidence that
17 they're going to collect on the case.
18      Also, Mr. Waller said that Officer Kenny
19 should have waited until there were four or six
20 officers --
21      Q.   I don't want to interrupt, but I want to
22 focus on this point.
23      A.   Your question was what was my criticism
24 of Waller and I'm answering it, Counsel.  If you
25 want me to stop, I'll be glad to.  But as I



JOHN PETERS, PH.D.                                    October 20, 2016
ROBINSON vs. The CITY OF MADISON                           97—100

Page 97

1  understood your question, you said what was I
2  critical of Mr. Waller, and that's part of my
3  critical component.
4        MR. HALL:  You're cutting him off in the
5  middle of a substantive answer.
6  BY MR. OWENS:
7    Q.   I think -- I will give you all the time
8  in the world to continue.
9        MR. HALL:  That's not fair to the witness
10  if he's in a stream of thought.
11  BY MR. OWENS:
12    Q.   Go ahead.
13    A.   I thought I was answering your question
14  and if I went way out, I apologize.
15    Q.   Sure.
16    A.   But this is in this opinion, and Waller
17  was critical.  He says basically he thinks the guy
18  is in excited delirium.  We don't know that.
19    Q.   Would it be improper for Officer Kenny to
20  have considered Tony Robinson to be in a state of
21  excited delirium?
22    A.   I think officer Robinson -- I'm sorry,
23  Officer Kenny.
24    Q.   It's my fault.
25    A.   That's okay.  All the names going back

Page 98

1  and forth.
2        I think Officer Kenny's response you have
3  to look at the totality of the circumstances.  And
4  we discussed earlier, and in some detail, that in my
5  summary of facts, we went over several pages that
6  you said well, the officer didn't know that, he
7  didn't know that he took mushrooms, he didn't know
8  this, that and the other.
9        Well, if that's true and we agreed or I
10  agreed that the officer didn't know necessarily that
11  all these behaviors took place, if that's the fact
12  for me, then that has to be the fact for Waller.
13  But Waller ignored those, but he's looking back at
14  this whole case with hindsight.  I'm looking at this
15  in the moment that it was taking place.
16        The fact that Robinson took mushrooms
17  supports some of the behavior Robinson demonstrated
18  and supports a number of things that this Officer
19  Kenny did at the scene.  But we cannot avoid the
20  fact that Kenny said, "I thought somebody was being
21  assaulted or beaten up upstairs and that's why I
22  went in there."
23        We can piecemeal this all day long, but I
24  think we have to tie it together at some point.  I
25  think Waller is looking back with 20/20 hindsight.

Page 99

1  I'm not.  And this statement that, you know, this
2  happened over in Appleton or I think it was
3  Appleton.  I think I said another city earlier, but
4  it was Appleton, that's a separate case study,
5  separate set of facts.
6        This is a different case study.  And I
7  think the analysis has to be according to the
8  standards that experts go by, and we can't look back
9  with 20/20 hindsight.  And I think Waller is doing
10  that.  That's my opinion.  The trier of fact may
11  come up to a totally different conclusion.
12        MR. SWAMINATHAN:  Can you read back the
13  question, please.
14        (Record read.)
15  BY MR. OWENS:
16    Q.   Do you mind answering that question?
17        MR. HALL:  Objection to form.
18        Go ahead.
19        THE WITNESS:  He can consider it.
20  BY MR. OWENS:
21    Q.   Would it have been improper?
22    A.   To consider it?
23    Q.   Yes.
24    A.   I don't think it would have been
25  improper.

Page 100

1    Q.   Was it improper given that he did
2  consider it?
3    A.   No, I don't think it was improper.
4    Q.   Okay.  And would it be improper for Denny
5  Waller to take Officer Kenny at his word?
6    A.   No, it wouldn't be improper.
7    Q.   Now, the -- and this is in your report,
8  and we can mention this again.  There's VENN
9  diagrams, right, that there's a number of behaviors
10  which could have multiple causes and that would be
11  in the middle of the circle, right?
12        So you can have a drug related mania
13  agitation on one hand.  You can have a mental health
14  mania agitation on the other.  And then there could
15  be a combination where a mental health issue and a
16  drug related issue combined in the middle, right, it
17  can be multiple causes to a state of agitation?
18    A.   Theoretically, yes.
19    Q.   Right?  And it's possible that for
20  illicit drugs to contribute to some type of agitated
21  event, and it's also possible for drugs to
22  contribute to an event that may be later classified
23  as excited delirium, right?
24    A.   Sure.
25    Q.   And, you know, that's the implication



Case: 3:15-cv-00502-jdp   Document #: 84   Filed: 11/04/16   Page 26 of 63

JOHN PETERS, PH.D.                                                    October 20, 2016
ROBINSON vs. The CITY OF MADISON                                        101—104

Page 101

1 between what you said here at the top of page 5, the
2 paper you quoted, "The difficulty surrounding the
3 clinical identification of excited delirium is that
4 the spectrum of behavior and signs overlap with many
5 other clinical disease processes"?
6   A.  Right.
7   Q.  And you still hold that opinion, correct?
8   A.  Yes.
9   Q.  Now, the paragraph here, I'm on page 5,
10 Dr. Peters.
11   A.  Okay.
12   Q.  In the second full paragraph.
13   A.  Okay.
14   Q.  And you've got sort of physical
15 characteristics and behavioral cues that are
16 generally present in a person who is in an excited
17 delirium state.
18        Do you see that?
19   A.  Right.
20   Q.  And am I right that these are things that
21 show up sometimes but not in every single case?
22   A.  Correct.
23   Q.  I think you previously written that
24 sweating is not going to happen in every single
25 case, right?

Page 102

1   A.  Correct.
2   Q.  And that's not something that's changed?
3   A.  That's correct.
4   Q.  Okay.  And this is the paragraph in which
5 we talked about your article earlier that once we
6 found the right one, Exhibit 216, and where you sort
7 of go through a number of these characteristics,
8 right?
9   A.  Correct.
10   Q.  And you say that there are only a couple
11 of the behavioral cues present here which make it
12 impossible to conclude that he was in a state of
13 excited delirium, right?
14   A.  Correct.
15   Q.  Okay.  Which are the couple of these
16 behavioral cues that are present?
17   A.  There were some mention of him stripping
18 off some clothing, and I think it was monkey
19 walking, which I guess taken in and of itself might
20 be somewhat of a bizarre behavior given the context
21 in which it was described.
22   Q.  Okay.  Anything else?
23   A.  I think those were the two primary ones.
24   Q.  So let's go through your list and as in
25 this paragraph.  And I'm going to make an exhibit

Page 103

1 that says "here" on one side of the column and "not
2 here" on the other, okay?  And let's just go through
3 and you tell me which ones you believe were present
4 here and which ones were not.  Okay?
5        Extreme agitation?
6   A.  I don't think the record's clear on that
7 for the officer arriving.
8   Q.  Okay.  So not here?
9   A.  Not here.
10   Q.  Violent or bizarre behavior?
11   A.  Yes.
12   Q.  Running wildly?
13   A.  No.
14   Q.  Screaming?
15   A.  I don't believe so when the officer got
16 there.
17   Q.  Incoherent speech?
18   A.  No.
19   Q.  Naked or stripping off clothing?
20   A.  Stripping off clothing was reported.
21   Q.  Okay.  Disorientation about place, time,
22 purpose and even him-herself?
23   A.  I don't think the offer had any knowledge
24 of that.
25   Q.  Superhuman strength?

Page 104

1   A.  No.
2   Q.  Diminished sense of pain?
3   A.  No.
4   Q.  Violent resistance during control and
5 restraint?
6   A.  No.
7   Q.  Delusions of grandeur?
8   A.  No.
9   Q.  Easily distracted?
10   A.  I don't think the officer would have
11 known that, so no.
12   Q.  Lack of focus?
13   A.  No.
14   Q.  Scattered ideas about things?
15   A.  No.
16   Q.  Acute onset?
17   A.  Officer wouldn't have known about it, no.
18   Q.  Makes people feel uncomfortable?
19   A.  I'd say yes.
20   Q.  Now, we made sort of a list here based
21 upon the list in your report, and I want to just
22 make sure that we're clear about the classification.
23        You were doing this based upon the
24 information that Officer Kenny would have had at the
25 time that he encountered Tony Robinson?



Case: 3:15-cv-00502-jdp   Document #: 84   Filed: 11/04/16   Page 27 of 63

JOHN PETERS, PH.D.                                        October 20, 2016
ROBINSON vs. The CITY OF MADISON                              105–108

Page 105

1    A.   Correct.
2    Q.   Okay.  And that would have included
3  things that he observed once he got to the scene?
4    A.   Yes.
5    Q.   And that would have included things that
6  he was told from dispatch or his computer?
7    A.   Correct.
8    Q.   Okay.  And so is this -- is this -- did I
9  get that correct?
10    A.   I think that's correct.
11    MR. OWENS:  Can we mark this as
12  Exhibit 217, please.
13       (Whereupon, Exhibit 217 was
14       marked for identification.)
15  BY MR. OWENS:
16    Q.   Now, what is water intoxication?
17    A.   Water intoxication is known as
18  hyponatremia where you drink too much water and it
19  flushes the sodium out of your system and you go
20  into an excited state or a wild state.  You
21  ultimately lead -- most cases -- not maybe in most
22  cases, but in many cases it leads to death.
23    Q.   How much water does somebody have to
24  drink to have that type of condition?
25    A.   Well, it depends.  In Detroit they ran a

Page 106

1  radio contest and a woman drank a couple liters of
2  water and died.  In Tennessee or Kentucky about two
3  years ago, I think it was a seven year old girl, the
4  father made her drink a liter and a half of grape
5  soda and she died.
6    Q.   So it varies based upon the individuals
7  that --
8    A.   Yes.
9    MR. OWENS:  Now, can we mark this as
10  Exhibit 218.  Kate, this is the paper, I believe,
11  that --
12       (Whereupon, Exhibit 218 was
13       marked for identification.)
14  BY MR. OWENS:
15    Q.   So on the bottom of page 4 to the top of
16  page 5, you referred to the American College of
17  Emergency Physicians, Excited Delirium Task Force
18  and their discussion of excited delirium.
19       Is this the paper in which you were
20  relying on?
21    A.   Yes.
22    Q.   Okay.  I'm done with the exhibit.
23       How does the fact that Mister -- that
24  Officer Kenny was told that, you know, Mr. Robinson
25  might have been on drugs or intoxicated in some

Page 107

1  sense, does that -- should that be another factor on
2  Exhibit 217 that is here or not here or do you think
3  that that doesn't apply at all?
4    A.   Well, if he was told that's certainly a
5  variable to consider.
6    Q.   And would you agree that there can be
7  pharmacological or, you know, drug induced instances
8  of excited delirium, right?
9    A.   Sure.
10    Q.   And that's what this paper says?
11    A.   This paper says a lot more than that.
12    Q.   Sure.  Okay.  Let's be really clear.  I'm
13  just trying to move quickly.
14       If you'll look at -- there's no page
15  numbers.  It's the third paper -- or the third page,
16  excuse me.
17    A.   Okay.  Thank you.  Got it.
18    Q.   Okay.  Now, I'm looking at the second
19  full paragraph on the left-hand column.
20    A.   Okay.
21    Q.   And this indicates, "The typical course
22  of a published excited delirium patient involves
23  acute drug intoxication, often a history of mental
24  illness, especially those conditions involving
25  paranoia, a struggle with law enforcement, physical

Page 108

1  or noxious chemical control measures or electrical
2  control device application," and it goes on from
3  there.
4       And my question is:  You agree with me
5  that a typical excited delirium instance can have a
6  relationship to somebody being intoxicated or having
7  taking drugs, right?
8    A.   I wouldn't say intoxicated because that
9  may include alcohol.
10    Q.   Okay.
11    A.   Drug intoxication, yes.
12    Q.   Okay.  And so should we add that to the
13  chart "here" and "not here"?
14    A.   I don't think we can add it definitively,
15  but I think we could certainly say the officer was
16  told about it or had information about it.
17    Q.   So should there be another category for
18  things where the officer's just told, he's suppose
19  to consider those, right?
20    A.   That would be part of your calculus, yes.
21    Q.   Okay.  So do you have any objection to
22  putting possible drug usage in the "here" column on
23  Exhibit 217?
24    A.   Well, I don't have any objection listing
25  of something the officer was told, but I don't think



JOHN PETERS, PH.D.                                    October 20, 2016
ROBINSON vs. The CITY OF MADISON                      109–112

Page 109

1 we can have it both ways here. We spent a
2 considerable amount of time in the beginning saying
3 that the officer didn't know about any of these
4 things and now we're going to force fit that piece
5 in here. So I would say that rather than say here
6 and not here, we should have a third category of
7 maybe just information being told or something that
8 the officer was told something.
9     Q.   Okay. So when you're saying -- when you
10 have this sentence on page 5 of your report where
11 you say Mr. Robinson was described as exhibiting
12 only a couple of these behavioral cues --
13     A.   Right.
14     Q.   -- here you're just talking about the
15 account provided by Officer Kenny and not the
16 information that he was given by dispatch?
17     A.   No, the information that was provided by
18 dispatch is a variable, but wasn't confirmed. When
19 you see the behaviors you can confirm those
20 behaviors, but when you have a layperson who -- and
21 I'll just use the term layperson.
22     Q.   Sure.
23     A.   If an unidentified caller says look, I
24 think the guy, you know, may have taken something,
25 that's something you put into your bag of knowledge,

Page 110

1 but it's not necessarily something I'd rely on too
2 heavily until I actually saw something that would
3 confirm that.
4     Q.   Okay. Now, as promised, you criticized
5 Mr. Waller's reference to the Tim incident, correct?
6     A.   Correct.
7     Q.   And what I heard from you earlier was
8 that part of the problem was doing a comparative
9 analysis between that case and this case; is that
10 part of your criticism?
11     A.   I think we're looking at two separate
12 case studies with two separate outcomes with two
13 separate set of facts. And I'm not sure we can
14 compare the two.
15     Q.   Okay. You don't think they're similar
16 enough; is that right?
17     A.   I don't think they're similar enough.
18 Tim didn't fight anybody. Tim wasn't running around
19 in public. Tim was home. Tim was with his mother.
20 Tim was docile until he was strapped in the gurney.
21     Q.   Any other reasons?
22     A.   That's basically it.
23     Q.   Okay. Now, you have this statement here,
24 which you repeated a variant of today, that many
25 medical professionals have told you it was delirium

Page 111

1 caused by mushrooms similar to what we have in the
2 toxicology found in Mr. Robinson's postmortem blood.
3        Now, can you identify by name the medical
4 professionals you're referring to here?
5     A.   Michael Curtis, Jeff Ho.
6     Q.   How do you spell Ho?
7     A.   H-o. That would probably be the two I
8 spoke to.
9     Q.   Okay. Any others?
10     A.   There may have been at our conference.
11 That was so long ago, it was like 2010. I don't
12 know. I may have spoken to some others.
13     Q.   Okay. Was either Mr. Curtis or Mr. Ho,
14 are they both doctors?
15     A.   Yes.
16     Q.   Did either of them treat Tim?
17     A.   No.
18     Q.   Okay. Did either of them give you any
19 formal medical reports from the case?
20     A.   No.
21     Q.   Did you see any toxicology analysis for
22 Tim?
23     A.   No.
24     Q.   Okay. Were you ever retained to examine
25 the Tim incident?

Page 112

1     A.   No.
2        MR. OWENS: Are you doing all right?
3        MS. REPORTER: Yes.
4        MR. OWENS: Sorry, I feel like I'm
5 talking fast.
6 BY MR. OWENS:
7     Q.   Okay. So, now the second major category
8 of opinions you have in this case is the incident
9 opinions.
10     A.   Okay.
11     Q.   And we can start discussing, you know, a
12 few hours into this, finally the incident.
13        And your opinion here is, "In this
14 situation, it was appropriate for Officer Kenny to
15 enter the building because he believed there were
16 exigent circumstances that required such action,"
17 correct?
18     A.   Correct.
19     Q.   And so the -- am I right that the
20 structure of your opinion is that if Officer Kenny
21 did not believe that there were exigent
22 circumstances that required such action, he would
23 have not -- it would have not been appropriate for
24 him to enter the building?
25     A.   I think absent exigent circumstances as



1 described by the officer, it would have been
2 reasonable to wait for backup.
3    Q.   Why is that?
4    A.   Well, I think if you had backup on the
5 way and it wasn't long away and there's nothing
6 exigent that would cause you to really go into that
7 building, it's always better to have some support.
8    Q.   Are there any other reasons?
9    A.   No.  I just think it's -- it would
10 probably short of that absence -- the problem in a
11 sense is this is a very narrow staircase.  You're
12 not going to put a lot of people going up the
13 stairs, that's not going to happen.  So, you know,
14 if there's nothing going on, you know, you might
15 wait him out, but that didn't happen.  But if it
16 were a hypothetical, I mean, that's a possibility of
17 happening.
18    Q.   Sure.  And if there were no exigent
19 circumstances, you agree that the general training
20 that Officer Kenny had in this case would have been
21 to wait for that backup to operate from a -- excuse
22 me, operate from a situation of control?
23    A.   No, I don't think it's a situation of
24 control, I think it's a situation of having backup.
25 I don't think in this case the officers control the

1 situation.  The suspect controls the situation.
2    Q.   Sure.
3    A.   The officers will react to it.
4    Q.   Well, officers and Officer Kenny in
5 particular, they're trained to not put themselves in
6 situations where they are putting their lives at
7 risk or where they could be overtaken, right?
8    A.   Well, that statement that you gave would
9 be incorrect because every time an officer makes a
10 traffic stop, he or she is putting themselves at
11 risk.
12    Q.   Sure.
13    A.   Every time you run into a burning
14 building you're putting yourself at risk.
15    Q.   Sure.  But officers are trained to avoid
16 take unnecessary risks, correct?
17    A.   As a general rule, I would agree with
18 that.
19    Q.   Okay.  And officers are trained in
20 responding to mental health incidents that subjects
21 may be out of control and require multiple officers
22 to subdue?
23    A.   In some situations that may be correct.
24    Q.   And you agree that the paradigm when
25 responding to suspected excited delirium or mental

1 health incidences that this is a medical emergency,
2 not necessarily a criminal one first, right?
3    A.   It depends on the situation.
4    Q.   Well, I mean, that's what you've written
5 before, right?
6    A.   It also depends on the situation.  If you
7 can clearly establish that it is a medical
8 emergency, yes.  If you're being attacked, the
9 medical emergency paradigm goes out the window
10 because you got to defend yourself.
11    Q.   Okay.  But if you're not being attacked,
12 you would agree with proposition that regardless of
13 whether an officer determined whether it's an
14 agitated chaotic event or excited delirium, that
15 it's a medical emergency that should be responded
16 to, correct?
17    A.   It will probably be a medical emergency,
18 but your hypothetical is too limited because I can
19 have somebody who's in that state, whatever that
20 state is --
21    Q.   Sure.
22    A.   -- we'll call it delirium, who's running
23 in traffic and I've got to get him out of traffic or
24 somebody's got to get him out of traffic.  Or he's
25 cut himself by punching glass and he's bleeding.

1 Yeah, that's a medical emergency.  But I first have
2 to capture, control or restrain him because the
3 paramedics aren't going to do anything unless he's
4 captured, control and restrained.
5    Q.   Right.
6    A.   So it's not a black and white answer.
7    Q.   Right.  And officers are trained to, you
8 know, in those situations often use electronic
9 control devices to capture, control and restrain,
10 correct?
11    A.   In some cases that's correct.
12    Q.   We've been assuming or discussing, you
13 know, the absence of exigent circumstances.
14         Can you define for me what you consider
15 exigent circumstance?
16    A.   An exigent circumstance is something
17 that's immediate, that is occurring at the moment in
18 front of you forcing you to take action that you
19 might not otherwise take for the safety of a
20 subject, for the safety of a third party or for your
21 own safety.
22    Q.   Now, I'm right -- am I right that the
23 exigent circumstances that have been identified here
24 all came from Officer Kenny?
25    A.   Yes.



JOHN PETERS, PH.D.
ROBINSON vs. The CITY OF MADISON

October 20, 2016
117–120

Page 117

1    Q.   And I just want to make sure because this
2  is not in your opinion here, and I want to make sure
3  you're not offering opinion about this.
4         You offer no opinion about whether or not
5  it was appropriate for Officer Kenny to enter the
6  residence with a gun drawn as opposed to a baton
7  drawn or as opposed to a Taser drawn, correct?
8    A.   I think I mentioned that in my Opinion 3.
9  The last sentence in the first paragraph says, "And
10  if an officer believed there to be an exigent
11  circumstance, it is okay to draw a firearm as
12  Officer Kenny did prior to entering the residence."
13        So I think I did cover that.
14    Q.   Okay.  So that's part of your opinion
15  here in Opinion 3?
16    A.   Yes.
17    Q.   So if we're just looking at the bullet
18  point summary, we should -- that it was appropriate
19  for Officer Kenny to enter the building with his
20  firearm drawn?
21    A.   Yes.
22    Q.   Now, earlier you -- excuse me.  Earlier I
23  think in one of your answers you indicated we can't
24  judge a situation from hindsight, correct?
25    A.   Correct.

Page 118

1    Q.   And that would apply to the exigent
2  circumstances as well, right?
3    A.   I'm confused.
4    Q.   So, you know, if the exigent
5  circumstances that are on the table analyzing the
6  use of force are only the exigent circumstances
7  known or believed to be known to the officer when
8  he's making the decision, right?
9    A.   Right, what he knows at that time.
10    Q.   Right.  And things that are later learned
11  through the investigation, those don't constitute
12  somehow a retroactive exigency, right?
13        MR. HALL:  Objection.  Form.
14        Go ahead.
15        THE WITNESS:  That would make sense, I
16  think, for the most part if I'm following your
17  hypothetical.
18  BY MR. OWENS:
19    Q.   Sure.  There's information learned later
20  on that the officer didn't know, that -- that cannot
21  somehow be retroactively applied as part of the
22  exigency of the situation, right?
23    A.   Well, if he didn't know it, it wouldn't
24  be part of the calculus of the exigency nor what's
25  learned later would it discount the exigency, it's

Page 119

1  what the officer believed at the time.
2    Q.   Got it.  It goes both ways.
3    A.   Correct.
4    Q.   So if you learn some information later
5  that suggests the officer was right, that doesn't
6  count.  If you learn some information later that the
7  officer was wrong, that doesn't count; is that
8  right?
9    A.   That's what the officer believed at the
10  time, that's the standard.
11    Q.   Okay.  Now, you agree that Officer Kenny
12  didn't know whether there was a large knife or sword
13  upstairs in the residence, right?
14    A.   He didn't know that at that time.
15    Q.   So that's not something that could have
16  contributed to the exigency which would have
17  justified entering the home, correct?
18    A.   Well, he didn't know about it so
19  obviously no.
20    Q.   Okay.  Why is that included here?
21    A.   It's included because that's what it --
22  was later found and the officer believed that
23  somebody was being assaulted upstairs, that's why
24  it's there.  It was found and there it is.
25    Q.   Okay.  But you agree it couldn't have

Page 120

1  contributed to the exigency, right?
2    A.   Well, he didn't know about it, you're
3  right.
4    Q.   Okay.  And the shotgun also wasn't known
5  located in the apartment, that wasn't known to
6  Officer Kenny at the time, right?
7    A.   As far as I know it wasn't known,
8  correct.
9    Q.   Okay.  And so does the fact that the -- a
10  shotgun with shells was located in the search of the
11  apartment, is that part of your analysis in terms of
12  believing that there was exigent circumstances?
13    A.   No, the officer said he believed somebody
14  was being attacked.  And as I recall, somebody --
15  there were something -- some words that were said
16  that led him to further believe there was an
17  assault.
18    Q.   Got it.  On Opinion 3 on the exhibit, is
19  it fair to say that the first three sentences there
20  are not facts that you relied upon in -- that would
21  have applied to whether or not there was an exigency
22  here?
23    A.   No.  Most of -- most of that paragraph
24  goes to Mr. Waller.  Mr. Waller said that
25  Mr. Robinson could have been armed and then we --



JOHN PETERS, PH.D.                                   October 20, 2016
ROBINSON vs. The CITY OF MADISON                     121–124

Page 121

1 and then it was found later these weapons. So in a
2 sense, Mr. Waller is making an assumption that
3 Mr. Robinson could have been armed, and evidence
4 basically supported that supposition.
5       Then later Mr. Waller says in the last
6 sentence, "Also testified officers must always plan
7 for the worst." So you do plan for the worst. And
8 if you have that circumstance and you plan for the
9 worst, you would go in with your gun drawn.
10    Q.   Okay. So Officer Kenny didn't know that
11 there was a large knife or sword upstairs or a
12 shotgun?
13    A.   Right.
14    Q.   And the information here about the large
15 knife or sword or the shotgun, that's not part of
16 your -- the basis for your opinion?
17    A.   Right. Because the focus here is on
18 Waller saying it's common sense not to enter. Well,
19 if you don't know that there's a shotgun up there
20 and you don't know these other things but you still
21 are planning for the worst, you can't have it both
22 ways. The officer showed up, he believed there was
23 something immediate that he had to attend to and he
24 went in.
25    Q.   Okay. So part of your criticism of

Page 122

1 Mr. Waller was that you found that Officer Kenny had
2 the types of specifics to believe there was an
3 exigency to enter the residence, correct? That is
4 the first paragraph -- excuse me, the first sentence
5 of the next paragraph.
6    A.   Yeah, in the second paragraph.
7    Q.   Right.
8    A.   We have the specifics.
9    Q.   Right. I'm just trying to be pretty
10 narrow. Which is in the second paragraph you say
11 that Officer Kenny had, quote, specifics, end quote,
12 to believe there was an exigency to enter the
13 residence.
14    A.   Correct.
15    Q.   And all of those quote specifics are
16 based upon the account given by Officer Kenny,
17 right?
18    A.   Right.
19    Q.   Now, going on to the top of page 7 in
20 your report, there are two paragraphs here, and I
21 believe you referenced them earlier, they concern
22 the stairwell and you refer to Mr. Waller's
23 testimony saying that there's 15 to 20 seconds on
24 the stairs and then you refer to the Dane County
25 incident reports which suggest 48 seconds, right?

Page 123

1    A.   Correct.
2    Q.   And so Waller testifies it's 15 to
3 20 seconds, and you're saying that there's 48
4 seconds reported in something in the Dane County
5 incident reports which you consider objective
6 evidence, right?
7    A.   They're a part of it, yes.
8    Q.   Okay. And the video itself is also
9 objective evidence, right?
10    A.   Correct.
11    Q.   I just want to be clear you're not in any
12 way here disputing the video, right?
13    A.   No, I'm not.
14    Q.   Okay. And you're not -- well, let me
15 withdraw that.
16       So it's your opinion here in these two
17 paragraphs is that it could have taken more time
18 for -- between when Officer Kenny entered the home
19 and shots were fired than Mr. Waller was giving him
20 credit for?
21    A.   I'm not sure Mr. Waller is giving credit.
22 I'm not sure that's the appropriate term. I'm just
23 saying that Waller said X and I looked at it and
24 found Y, that's all.
25    Q.   Let me ask it just a cleaner way.

Page 124

1       So am I right that the thrust of your
2 criticism here that officer -- excuse me.
3       Am I right that the thrust of your
4 criticism here is that Mr. Waller considered a
5 shorter time frame and you've identified objective
6 evidence with a longer time frame between when
7 Officer Kenny entered the house and when shots were
8 fired?
9    A.   Yes.
10    Q.   Okay. And do you have an opinion about
11 the time it takes to ascend the stairway?
12    A.   I don't have an opinion because ascending
13 the stairway is going to be a function of the speed
14 you ascend.
15    Q.   Right. And how long does it take to
16 ascend this particular stairway?
17    A.   I don't know. I haven't ascended it.
18    Q.   Okay.
19    A.   And I don't know -- if you want to give
20 me a rate of speed, we could probably calculate it
21 but short of that, I don't know.
22    Q.   And did you have -- rely on any facts
23 about how fast Officer Kenny said he was going up
24 the stairs?
25    A.   I think he went in and he went up and he



JOHN PETERS, PH.D.                                          October 20, 2016
ROBINSON vs. The CITY OF MADISON                            125–128

Page 125
1  confronted Mr. Robinson.  I'm not sure that his
2  perception of speed may be accurate or inaccurate, I
3  don't know.  I didn't look at that, I just looked at
4  the time frames as being different.
5      Q.   Right.  And do you recall the number of
6  stairs?
7      A.   I don't independently.  I could look it
8  up.
9      Q.   And is the reason that you're saying that
10 there's a different time frame in the Dane County
11 incident reports because shows that Officer Kenny
12 was being more cautious going up the stairs?
13     A.   I'm not sure what he was being because I
14 wasn't there.  I'm just showing that there's an
15 inconsistency.  Now, it could be that he was more
16 cautious going up the stairs.  It could be that he
17 was punched and was coming down the stairs, that
18 would take up some time, or it could be that this
19 incident unfolded very rapidly right at the top of
20 the stairs.  I'm just saying that in my analysis, I
21 found something different than what Mr. Waller
22 reported.
23     Q.   Okay.  And in your analysis you also
24 relied on the idea that Officer Kenny was being
25 cautious, correct?

Page 126
1      A.   Yes.
2      Q.   It's in your report.  "Yet he is critical
3  of Officer Kenny being cautious," right?
4      A.   Right.
5      Q.   And what's your basis for the opinion
6  that Officer Kenny was being cautious while
7  proceeding up or down or while in the stairwell?
8      A.   I think there was reference made in the
9  documents that he proceeded cautiously, encountered
10 the person at the top, took that punch, according to
11 the officer.  Started, I think he said maybe back
12 stepping, or words to that effect, coming down those
13 stairs.  I don't think it was -- this is a tough --
14 a tough design of how -- where you open a door and
15 there's the stairs.  It's not like you're in the
16 basement you're coming up stairs.  I mean, it's like
17 there you are and he went up.
18     Q.   I take it these are common in that area?
19     A.   I'm familiar with those types of homes.
20 I'm just saying from a perspective of having a lot
21 of options, there's not a lot of options here.
22     Q.   Okay.  So am I right that the two
23 paragraphs here at the top of page 7 are primarily
24 designed criticizing Mr. Waller?
25     A.   Well, in a sense, I guess we can -- yeah,

Page 127
1  it is because Mr. Waller's primary criticism, as I
2  said there, he doesn't think there was an exigency
3  for the officer to go up there, and he uses 15 to 27
4  seconds.  And I looked at it that it takes time to
5  go up the steps, it takes time to get punched in the
6  head, it takes time to come back down the steps, and
7  I just found a different time frame.
8      Q.   Okay.  So your Opinion No. 3 opinion is
9  that it was appropriate for Officer Kenny to enter
10 the building because he believed there were exigent
11 circumstance that required such action, correct?
12     A.   Correct.
13     Q.   Now, how is the period of time that he
14 was in the stairwell relevant to whether or not he
15 was justified entering in the first place?
16     A.   I don't think the period in a stairwell
17 does that.
18     Q.   So you agree with me, then, that the
19 period of time in the stairwell is not determined
20 whether it was appropriate for him to enter or to
21 not enter?
22     A.   Well, he wouldn't have -- again, we can't
23 start at the end and come forward.  He wouldn't
24 have -- he wasn't in the stairwell when he entered
25 in the sense of he wasn't in that time mode.  He was

Page 128
1  at the beginning of all that.  He entered that
2  stairwell because he thought there was an exigent
3  circumstance.  This is in response to your expert's
4  opinion.
5      Q.   Got it.
6           So this right here is a responsive
7  opinion, not necessarily the same thing as your
8  opinion expressed on the page before; is that fair
9  to say?
10     A.   No, I think -- I think it goes somewhat
11 hand in hand in that Mr. Waller was -- Mr. Waller
12 said there wasn't an exigency and then he cited the
13 second.  I'm responding to that.  This opinion goes
14 to the exigency belief as to why the officer entered
15 it.  In my opinion, Waller is using the seconds to
16 discount the exigency, I'm countering that with my
17 analysis.
18     Q.   Okay.  But there was more seconds and
19 more time in the stairwell likely?
20     A.   Correct.
21     Q.   Okay.  And that would help illustrate an
22 exigency, is that your opinion?
23     A.   No, it helps to, I think, counter what
24 Waller said about the exigency.
25     Q.   Okay.



JOHN PETERS, PH.D.
ROBINSON vs. The CITY OF MADISON

October 20, 2016
129–132

Page 129

1    A.   I'm a little -- as it says here,
2  confusing and convoluted, wasn't quite sure what
3  Waller was saying there.
4    Q.   Okay.
5    A.   But, not to just leave it on the table.
6    Q.   Yeah.
7    A.   I came back because obviously he thinks
8  the seconds in the stairwell had something to do
9  with the exigency.
10   Q.   Okay.  And I can't speak for Mr. Waller
11 and I'm not going to ask you to, I just want to make
12 sure our conversation is not confusing.
13        And so the opinion you reached, based
14 upon the incident reports, that there could have
15 been a longer period and an even longer period of
16 time than the one that -- excuse me, Mr. Waller
17 relied on.  And that was in response to his opinion,
18 correct?
19   A.   Correct.
20   Q.   Okay.
21        MS. REPORTER:  Can we take a break?
22        MR. OWENS:  Sure.
23        (A recess was taken.)
24 BY MR. OWENS:
25   Q.   So the -- backing up a little bit.  We

Page 130

1  talked about what you've been asked to do in this
2  case and what your opinions are.
3        So I understand you're analyzing Officer
4  Kenny's use of force and it seems like, you know, in
5  looking at the report, a big thrust is also to
6  specifically respond to issues that you had with
7  Mr. Waller; is that right?
8    A.   That's a fair statement.
9    Q.   Okay.  And you haven't been asked to do
10 anything more than that here without, you know,
11 getting into issues of privilege?
12        MR. HALL:  I'm going to object to form
13 because I'm confused.
14        THE WITNESS:  I was -- I was never really
15 directed which way to go.  My only instruction from
16 Mr. Hall was there's no Monell claims for you to
17 analyze.  You're only being retained on Officer
18 Kenny's --
19 BY MR. OWENS:
20   Q.   Sure.
21   A.   Other than that, I looked at his tactics
22 and I looked at his forms and that's what I put into
23 the front of it.  I didn't get a correspondence or
24 instructions look at this, look at that, the only
25 thing was there's no Monell issues.

Page 131

1    Q.   Okay.  We were just discussing page 7 in
2  your report about the first two paragraphs, and I
3  think we've, you know, fairly much exhausted this,
4  but I just want to be clear.
5        Your only criticism of Waller here is
6  that the period of time between when Officer Kenny
7  entered the stairwell and when shots were fired may
8  be longer than that which he assumed; is that right?
9    A.   I think -- yeah, I think that's part of
10 it.  It goes back to that first sentence, the second
11 half of that first sentence at the top of page 7,
12 that Mr. Waller's, in my opinion anyway, primary
13 criticism why he believes there was not an exigent
14 circumstance, if you will, is based on the seconds.
15 And I -- my calculation is there's more seconds.
16        And I don't think Mr. Waller was overly
17 clear on this, but you don't throw care to the wind
18 going in the front door whether there's an exigent
19 circumstance or not.  There's still officer safety
20 issues you have to consider.  And his time frame and
21 what he wrote would suggest that because things
22 happened so quickly that there wasn't an exigent
23 circumstance.
24        I'm saying I found it was a little
25 slower.  I don't know because I wasn't there, but I

Page 132

1  don't think you throw caution to the wind.
2    Q.   My question is -- I'm sorry, were you
3  done?
4    A.   You're good.
5    Q.   My question was a little bit narrower.
6        Your only criticism of Mr. Waller in this
7  section of the report is about the period of time
8  being longer than he reported; is that right?
9    A.   Yeah, as it relates to the exigency
10 argument by Mr. Waller.
11   Q.   Okay.  So I want to talk -- move on to
12 your opinion about the prohibition on the use of
13 Tasers from multiple applications.  Okay?
14   A.   Okay.
15   Q.   And it's your opinion that there's a
16 prohibition on the use of multiple applications of
17 Tasers, correct?
18   A.   It's a recommendation not to do that,
19 yes.
20   Q.   Okay.  Is it a prohibition?
21   A.   There's not a prohibition in the sense
22 that you're not allowed to do it.  There's warnings
23 from the manufacturer not to do it.  And as I cited
24 here from the TASER warnings, the cumulative effects
25 are an issue and the multiple cycles are an issue.



JOHN PETERS, PH.D.
ROBINSON vs. The CITY OF MADISON

October 20, 2016
133—136

Page 133

1   So in today's operational environment, if
2 you will, officers are strongly discouraged from
3 using multiple cycles.
4   Q.   Okay.  And so it's so strongly that you
5 would call it a prohibition, right?  You call it a
6 prohibition of multiple applications, right?
7   A.   I would call it that, yes.
8   Q.   Okay.  So the warnings are so strong
9 they're effectively a prohibition; is that right?
10   A.   Unless it was a really extreme
11 circumstance, I would agree with that.
12   Q.   Okay.  Now, the opinion here in Opinion
13 4, you are not offering an opinion about whether or
14 not a Taser is appropriate if an officer suspects
15 excited delirium, correct?
16   A.   I'm not authoring an opinion either way.
17   Q.   And that's my point, you're not opining
18 on that issue?
19   A.   Right.
20   Q.   And you have no opinion about the
21 training given to officers in using OCD devices when
22 they believe they're confronting excited delirium
23 events, correct?
24   A.   I'm not sure I follow that.
25   Q.   Sure.  I'll ask it better.  I apologize.

Page 134

1 Sorry, it's my own handwriting is illegible.
2   Now, you're not offering an opinion about
3 whether or not officers are trained to use Tasers or
4 electronic control devices in situations in which
5 they suspect excited delirium, right?
6   A.   I haven't put that in my report.
7   Q.   Okay.  And you're -- have no opinion
8 about whether or not they're trained to wait for
9 backup when they are -- believe they're encountering
10 an excited delirium or agitated chaotic event,
11 correct?
12   A.   I stuck to the facts of the case.
13   Q.   Okay.  And I just want to make sure that
14 that's not part of your opinions that you intend to
15 offer in this case.
16   A.   Right.
17   Q.   And you have no opinion about whether or
18 not officers are trained to ask for backup when they
19 are confronting a situation where they suspect
20 excited delirium or some other type of agitated
21 chaotic event, correct?
22   A.   Well, it would be based on their policy
23 and procedures.
24   Q.   Right.  And you haven't opined on that
25 here?

Page 135

1   A.   Right.  I haven't looked at that.
2   Q.   And that's not part of your opinions in
3 this case?
4   A.   No, I looked at this question -- Opinion
5 No. 4 about multiple cycles of the Taser, what we
6 call reenergizing, goes to Mr. Waller's opinion.
7 It's safe to say that the training, when you look at
8 the training, you don't use a Taser when somebody's
9 on an elevated platform.  And I didn't put that in
10 here because it wasn't used.
11   Q.   Okay.
12   A.   But part of the reason it may not have
13 been used is because he was on an elevated platform.
14 But it wasn't used, so I opined on what Mr. Waller
15 was saying which is directly opposite of what the
16 training recommendations are.
17   Q.   Okay.  What do you mean by elevated
18 platform, just so we're using the same terminology?
19   A.   If I was standing on this table, I'm on
20 an elevated platform.
21   Q.   It's like somebody above you, you're not
22 talking about a physiological elevated state or
23 something like that?
24   A.   No, no, it's a physical.  I'm on the
25 rafter of the building, I'm on the top of the

Page 136

1 stairs, I'm halfway up the stairs, I'm on a picnic
2 table, standing on a chair, anything.  If I shoot
3 you with a Taser and make connection and get
4 neuromuscular incapacitation that you could fall and
5 be seriously injured or killed.
6   Q.   Got it.
7   So let's look at the opinions -- the
8 quotes in your report which you cite as evidence of
9 the prohibition on multiple uses.
10   So the first -- there's a quote here from
11 the TASER International Handheld Warnings, correct?
12   A.   Correct.
13   Q.   Okay.  Now, what does this say, this
14 paragraph say about the number of Taser deployments?
15   A.   Well, what it says here is that last
16 sentence, "Following the instructions and warnings
17 in this document will reduce the likelihood that the
18 conducted energy weapon will cause death or serious
19 injury."
20   Q.   Okay.  Does this paragraph say anything
21 about the number of deployments?
22   A.   No, it doesn't.  All this does is set up
23 for the second part of cumulative effects.  This is
24 all in the same document.
25   Q.   Okay.  But this doesn't say anything



Case: 3:15-cv-00502-jdp   Document #: 84   Filed: 11/04/16   Page 35 of 63

JOHN PETERS, PH.D.                                    October 20, 2016
ROBINSON vs. The CITY OF MADISON                      137–140

Page 137

1 about -- itself about multiple deployments, right?
2    A.    Right.
3    Q.    Okay.  And I think, as you said, that
4 leads to this cumulative effect here, right?
5    A.    Correct.
6    Q.    And now, can you underline for me in that
7 next paragraph, or use the highlighter, what is the
8 prohibition on multiple deployments contained in the
9 paragraph that I think goes from the bottom of page
10 7 and goes to the top of page 8?
11    A.    Okay.
12    Q.    And you have -- thank you.
13    A.    And some on the next page as well.
14    Q.    Okay.  I will give this back.
15        MR. OWENS:  Do you want to see it?
16        MR. HALL:  Yeah.
17        THE WITNESS:  Thanks.
18 BY MR. OWENS:
19    Q.    Now, I'm just going to read this, and let
20 me know if I've got the portion that you highlighted
21 incorrectly.  You've highlighted, "In some
22 individuals, the risk of death or serious injury may
23 increase with cumulative CEW exposure.  Repeated,
24 prolonged or continuous CEW applications may
25 contribute to cumulative exhaustion, stress,

Page 138

1 cardiac, physiologic, metabolic, respiratory and
2 associated medical risks which could increase the
3 risk of death or serious injury."
4        That's what you highlighted, correct?
5    A.    And then the next sentence as well.
6    Q.    I apologize.  "Minimize repeated,
7 continuous or simultaneous exposures."
8    A.    Right.
9    Q.    And this is the basis for your opinion
10 that there's a prohibition or a warning that's so
11 strong it's effectively a prohibition on the
12 multiple use of Tasers?
13    A.    Yes, from the manufacturer.
14    Q.    Okay.  Now, your opinion here is that
15 officers, such as Officer Kenny, are trained not to
16 use multiple electronic control weapon applications
17 on a human, correct?
18    A.    Correct.
19    Q.    Okay.  Now, in the portion of 4 of your
20 report supporting this opinion, where do you cite
21 Officer Kenny's training?
22    A.    Well, I don't cite his specific training
23 because I didn't have a copy of his specific lesson
24 plan.  But, I did have a copy of this version, of
25 the warnings, which he would have been trained in

Page 139

1 subject to his Taser training.
2    Q.    Okay.  Now, you did have some of his
3 training materials related to his use of force
4 training, correct?
5    A.    Yes.
6    Q.    And you had some of the materials which
7 he has to follow given to him by the procedures of
8 the Madison Police Department, right?
9    A.    Yes.
10    Q.    You didn't put any of that in here
11 either, right?
12    A.    No.
13    Q.    Why not?
14    A.    Well, first of all, the Taser wasn't
15 used.  The only reason this is in here is because
16 your police practices expert who's never been
17 trained on a Taser and is not a TASER instructor,
18 opined that you should multiple exposure someone
19 such as Mr. Robinson.  That's fallacious, it's
20 inaccurate, and I had to address it.
21        But the Taser itself wasn't used.  The
22 Taser is a nonissue in this case because it wasn't
23 used.  Mr. Waller made it an issue, not me.  So I'm
24 not going to go out and cite training when the issue
25 was raised by an unqualified person.

Page 140

1    Q.    Okay.  So you're not going to cite
2 training when your opinion is that Officer Kenny was
3 trained not to use multiple TASER electronic control
4 weapon applications on a human?
5    A.    Instructors sign an agreement with TASER.
6 When they do the training they provide the latest
7 warnings and they follow the latest lesson plan.
8 This was the latest warnings in 2013.
9    Q.    Now, I assume that you will disagree with
10 my characterization on the portion that you have
11 highlighted that goes from pages 7 to 8 of your
12 report that this is a warning.
13        Is it a warning?
14    A.    This is part of the product warnings that
15 are then recited as well in the lesson plan.
16    Q.    Okay.  And then now, you will agree with
17 me that starting from where you highlighted this
18 says that this warning applies to some individuals,
19 not all, correct?
20    A.    I agree with that.
21    Q.    And that the risk of serious death or
22 injury may increase, correct?  It's not saying it
23 definitely will, right?
24    A.    In the set of warnings, that's correct.
25    Q.    Okay.  And as far as repeated



JOHN PETERS, PH.D.                                        October 20, 2016
ROBINSON vs. The CITY OF MADISON                              141–144

Page 141

1 applications, it says it may contribute to
2 cumulative exhaustion, stress and other medical
3 risks, correct?
4     A.    Correct.
5     Q.    And you'll agree by saying "may," it's
6 not saying it necessarily shall, right?
7     A.    That's correct.
8     Q.    Okay.  And it says "minimize repeated,
9 continuous or simultaneous exposures," right?
10    A.    Correct.
11    Q.    It doesn't say never deploy repeatedly,
12 continuously or simultaneously, correct?
13    A.    It doesn't say never, but that sentence
14 also includes multiple officers.  So if the four of
15 us shot the same person, what it's warning against,
16 it's not just multiple exposures from one officer,
17 it could be from several.  That's all this is
18 saying.
19    Q.    Okay.  So that's the simultaneously part
20 of the sentence?
21    A.    Correct.
22    Q.    Okay.  So let's take out the simultaneous
23 and let's take out the continuous because you didn't
24 opine about continuous, right?
25    A.    Right.

Page 142

1     Q.    You only opined about multiple?
2     A.    Correct.
3     Q.    So without those words, it just says
4 minimize repeated exposures, correct?
5     A.    Correct.
6     Q.    By saying minimize repeated exposures,
7 you agree with me, it doesn't say repeated exposures
8 are prohibited, right?
9     A.    I would agree with that.
10    Q.    Now, did you assess or analyze or look at
11 specifically any of the training materials provided
12 to you or the Madison Police Department policies
13 about multiple Taser deployments?
14    A.    I recall looking at, I think, the policy
15 of Madison.
16    Q.    Okay.  And does the policy of Madison
17 prohibit multiple Taser deployments?
18    A.    I don't independently recall.
19    Q.    Okay.  Does the defense arrest tactics
20 manual you reviewed prohibit multiple Taser
21 deployments?
22    A.    I don't think that version of the -- that
23 manual did, but the advisory group in Wisconsin came
24 out and recommended that in a separate document.
25    Q.    Is that a document that you reviewed in

Page 143

1 preparation of your report?
2     A.    Not in this case, no.
3     Q.    Okay.  Is that something that's
4 referenced here?
5     A.    No.
6     Q.    Okay.  Now, as you sit here today, can
7 you identify in any of the materials you reviewed in
8 generating this opinion, any document that would
9 indicate Officer Kenny was prohibited from using
10 multiple Taser or electronic control device
11 deployments?
12    A.    Other than these warnings that strongly
13 encourage not to, that would be it.
14    Q.    Okay.
15    A.    As I independently sit here.  But again,
16 I want to underscore for the record, a Taser was
17 never used.  This is your expert's opinion.  I'm
18 just opining that he's wrong.
19    Q.    I understand that you don't think that
20 opinion is relevant, right?  Is that what you're
21 saying?
22    A.    Well, there's really a couple issues
23 here.  Mr. Waller said that they should have used
24 multiple applications of the Taser.  I don't think
25 you go into an exigent circumstance when you think

Page 144

1 somebody is being assaulted.  You don't bring a
2 Taser to a gun fight.  You don't bring it to a knife
3 fight.
4     Q.    Okay.
5     A.    As your expert said, plan for the worst.
6 You don't plan for the worst holding a Taser.
7     Q.    Okay.
8     A.    So this, to me, is just a fallacious
9 attempt to say well, you should have tased him a
10 bunch of times.  Well, look at the police executive
11 research form.  They recommended several years ago
12 that TASER come out with a unit that stops after
13 five seconds and that unit now exists.
14    Q.    Okay.
15    A.    So this runs in the face of all the
16 industry recommendations, including the product
17 ones.
18    Q.    Now, are these recommendations very
19 recent?
20    A.    Probably two thousand -- well, the first
21 recommendation against multiple applications was in
22 2006.  Then they came with a report, I believe it
23 was -- don't hold me to these days, but around 2010,
24 2012.  And a couple years ago TASER -- the company
25 actually makes what's called the PERF model where



JOHN PETERS, PH.D.                                    October 20, 2016
ROBINSON vs. The CITY OF MADISON                      145–148

Page 145

1 the trigger when you pull it will stop, cycling at
2 five seconds. So that's an option now that people
3 can buy. So it's been around for a while, certainly
4 preceding this event.
5     Q.   Okay. Now, and I just want to be clear
6 about this. None of the training records you looked
7 at, specifically with respect to Officer Kenny,
8 included a prohibition on multiple uses, right?
9     A.   I don't recall reviewing a TASER training
10 lesson plan.
11    Q.   Okay. And you don't recall anything from
12 the Madison Police Department policies that
13 prohibited it, right?
14    A.   Not independently, no.
15    Q.   Okay. So this has been previously
16 identified as Exhibit 22.
17    A.   Okay. Thank you.
18    Q.   And this is one of the policies you
19 reviewed in preparing your report, correct, sir?
20    A.   Correct.
21    Q.   Excuse me, correct, Doctor. I apologize.
22    A.   That's all right.
23    Q.   Now, if you'll go with me to -- you see
24 there's a Bate stamp on the bottom?
25    A.   Yes.

Page 146

1     Q.   To page 4330.
2     A.   I don't have a 43 anything. My last page
3 was 4265.
4         MS. HARRELL: Can you tell me
5 specifically what you're looking at?
6         MR. OWENS: This is exhibit --
7         MS. HARRELL: Twenty-two did you say?
8         MR. OWENS: Yeah, 22, but I may have
9 pulled the wrong exhibit.
10        MR. OWENS: Can we go off the record for
11 a second.
12        (Off the record.)
13 BY MR. OWENS:
14    Q.   So this is Exhibit 23 from officer Gary's
15 deposition. And this is the Madison Police
16 Department policy concerning the use of deadly
17 force. And you reviewed this in advance of your
18 deposition today. And the exhibit also includes
19 6-200, the use of nondeadly force, correct?
20    A.   Correct.
21    Q.   Okay. Now, if you'll go with me to
22 what's Bates stamped as City 4330, you'll see
23 there's the policy here for the electronic and
24 control device use, correct?
25    A.   Correct.

Page 147

1     Q.   Okay. Now, and that continues on to the
2 next page, and then the top of the one after that.
3         Do you see that?
4     A.   Correct.
5     Q.   Now, nothing in the Madison Police
6 Department policy 6-200, the use of nondeadly force,
7 prohibits the use of multiple Taser applications,
8 correct?
9     A.   Just give me a second.
10    Q.   Absolutely.
11    A.   Okay. I've reviewed it.
12    Q.   And the question was nothing in this
13 policy prohibits the use of multiple electronic
14 control device deployments, correct?
15    A.   Well, I can't answer that because it says
16 you'll use it in accordance with departmental
17 training. And if the training -- if the instructor
18 conducted the training according to his contract
19 with putting forth the current warnings, yes, then
20 that would have been covered. This is a policy.
21 This isn't a procedure.
22    Q.   So my question was different, which is:
23 Is there anything in this policy that prohibits the
24 application of multiple Tasers?
25        MR. HALL: Objection to form.

Page 148

1         THE WITNESS: Unless I see the lesson
2 plan because it says it's subject to training. The
3 officer has to do it subject to training. This is a
4 policy, it's not a procedure or a rule.
5 BY MR. OWENS:
6     Q.   So is there anything in this policy that
7 prohibits the use of multiple Taser applications?
8         MR. HALL: Objection to form.
9         THE WITNESS: It could if you rely on the
10 training component that says you will use it in
11 accordance with training.
12 BY MR. OWENS:
13    Q.   Is there anything on the text of this
14 policy that you see in this exhibit that would
15 prohibit the use of multiple Taser applications?
16        MR. HALL: Objection to form. Asked and
17 answered.
18        MS. HARRELL: Objection. Asked and
19 answered.
20        THE WITNESS: If you're asking is there a
21 sentence that says you can't use it multiple times?
22 BY MR. OWENS:
23    Q.   Correct.
24    A.   No.
25    Q.   All right.



JOHN PETERS, PH.D.                                        October 20, 2016
ROBINSON vs. The CITY OF MADISON                              149–152

Page 149
1     A.   If it goes back to training, possibly.
2     Q.   But it's not in the text of the policy?
3          MR. HALL:  Objection to form.
4  Argumentative.
5          THE WITNESS:  It is in the text.  It is
6  in the text.  Counsel, it says on page Bates stamp
7  City 4330.
8  BY MR. OWENS:
9     Q.   Sure.
10    A.   It says, "Deployment and use of the
11  electronic control devices will be in accordance
12  with departmental training and procedure."
13    Q.   Okay.
14    A.   That's a conjunction.  It's not "or,"
15  it's "and."  So if the training says don't do it,
16  then the policy would say don't do it.
17    Q.   Okay.  But that sentence that you just
18  read me, itself, does not say you cannot use a Taser
19  multiple times, right?
20    A.   That's correct.
21    Q.   Okay.  Now, on paragraph 5 in the policy
22  you'll see indicates the use of an ECD under the
23  following circumstances is prohibited unless exigent
24  circumstances are present, correct?
25    A.   Correct.

Page 150
1     Q.   And then it lists A, B, C and D?
2     A.   Correct.
3     Q.   And none of those mention multiple Taser
4  deployments, correct?
5     A.   That's because they're circumstances,
6  they're not applications.  That doesn't even make
7  sense.
8     Q.   Is multiple Taser applications mentioned
9  there, yes or no?
10    A.   No.
11    Q.   Okay.
12    A.   But it wouldn't be.
13    Q.   Now, paragraph 6.  "The ECD will not be
14  used in the following circumstances."
15         Do you see that?
16    A.   Yes.
17    Q.   Okay.  And then it gives A, B, C, D,
18  correct?
19    A.   Correct.
20    Q.   And nothing here prohibits the use of
21  multiple Taser applications, correct?
22    A.   Well, it prohibits the use of it.  So not
23  only does it prohibit multiple applications, it
24  prohibits a single application.
25    Q.   In these circumstances, right?

Page 151
1     A.   Yes.
2     Q.   Okay.
3     A.   So multiple would be prohibited.
4     Q.   "For coercion or intimidation or to
5  escort or prod subjects, to awaken unconscious or
6  intoxicated subjects, against subjects who are
7  offering only passive resistance"?
8     A.   You're not going to use it once let alone
9  multiple.
10    Q.   Right.  But neither paragraph 5 or 6 say
11  anything about single versus multiple, correct?
12    A.   Six does.  It says you're not going to
13  use it.
14    Q.   It says something about between zero and
15  infinite numbers because it can never be used; is
16  that right?
17    A.   That's what it says.
18    Q.   Okay.  Now, do you disagree with me that
19  the policy itself assumes that multiple Taser
20  applications will be appropriate in certain
21  instances?
22         MS. HARRELL:  Objection.  Foundation.
23         THE WITNESS:  I'm sorry?
24  BY MR. OWENS:
25    Q.   Do you agree with me that the policy

Page 152
1  itself, the one that we're looking at, assumes that
2  multiple Taser applications will be appropriate?
3         MS. HARRELL:  Same objection.
4         THE WITNESS:  Will be appropriate?
5         MR. OWENS:  I'll withdraw the question.
6  BY MR. OWENS:
7     Q.   Do you agree with me that the policy that
8  we're looking at here indicates that multiple Taser
9  applications are not prohibited?
10         MR. HALL:  Objection to form.
11         Go ahead.
12         MS. HARRELL:  Join.
13         THE WITNESS:  It doesn't say they're not
14  prohibited, but it does talk about more than three
15  firing cycles.
16  BY MR. OWENS:
17    Q.   Okay.  So you're referring to paragraph
18  8, number D, correct?
19    A.   Correct.
20    Q.   And that indicates, "Officers shall
21  evaluate all subjects against whom an ECD has been
22  deployed.  The subject shall be medically evaluated
23  if" A, B, C.  And we're talking about D, "The
24  subject has been exposed to three or more ECD firing
25  cycles or one continuous firing cycle of 25



JOHN PETERS, PH.D.                                                    October 20, 2016
ROBINSON vs. The CITY OF MADISON                                          153–156

Page 153

1 seconds," right?  More.
2     A.   Correct.
3     Q.   And you'll agree that assumes that there
4 may be circumstances in which a subject could be
5 exposed to three or more ECD firing cycles, correct?
6     A.   As I read that it could be for three or
7 more officers.
8     Q.   Okay.  Could it also include the scenario
9 that I'm -- that I proposed which is three
10 applications?
11    A.   I don't know.
12    Q.   So you're able to say yeah, that could be
13 three officers, but not three applications?
14    A.    Well, as it's worded here, exposed to
15 three or more firing cycles or one continuous.  I
16 guess that could include one person.  I mean, we're
17 talking firing cycles, it doesn't say from whom.  It
18 could be one person, it could be three people, it
19 could be a dozen people.
20    Q.   A dozen people holding a dozen shots, is
21 that what you're assuming?
22    A.    No.  Firing cycle is timestamp, it
23 doesn't mean connection.  So implied in this is
24 there has to be a connection, it has to be a
25 completed circuit.  So a firing cycle is going to be

Page 154

1 time stamped and it's probably going to timestamp
2 five seconds, but we don't know if the circuit's
3 been completed.  So generally when talking like
4 this is done, it's talking about completed circuit
5 cycles.
6     Q.   Now, I'm handing you a copy of what's
7 been previously marked as Exhibit 1.  And this is
8 the "Defense and Arrest Tactics" of 2007.
9          You're familiar with this?
10    A.   Yes.
11    Q.   You reviewed it in advance of your
12 deposition today?
13    A.   Yes.
14    Q.   And in preparing your report?
15    A.   Yes.
16    Q.   Okay.  And do you mind turning to -- it's
17 page 46 if you're looking up the numbers of the
18 manual itself or the Bates stamps 56, 57.
19    A.   Okay.
20    Q.   Okay.  And now page 46 discusses
21 electronic control devices, correct?
22    A.   Correct.
23    Q.   And do you see the second paragraph here,
24 Doctor?
25    A.   Yes.

Page 155

1     Q.   And would you agree with me that this
2 paragraph from this training manual does not
3 prohibit multiple applications of an ECD device?
4     A.   That's correct.
5     Q.   Okay.
6     A.   It discourages them but doesn't prohibit
7 them.
8     Q.   Okay.  And it says, "Before each
9 application of an ECD, as with any other use of
10 force, reassess the situation," correct?
11    A.   Where are you?
12    Q.   I was in the middle of the paragraph.
13    A.   Okay.  I see.  Yes, I think it's the
14 beginning of that paragraph is most important.  Be
15 aware that repeated or prolonged application of an
16 ECD can have an additive effect and could cause
17 injury, especially in someone whose health is
18 already compromised in some way, including by drug
19 use, injury or overexertion, as can happen in people
20 displaying medically significant behavior."
21    Q.   So that's a warning, right?
22    A.   That is a warning.
23    Q.   Okay.  And then the next sentence
24 discusses multiple applications, correct?
25    A.   Correct.

Page 156

1     Q.   And that sentence does not prohibit them,
2 correct?
3     A.   That's correct.
4     Q.   Now, I want to jump back.  Sorry, I
5 accidentally skipped something, so sorry about the
6 false advertising there.
7          Going back to Opinion No. 3, Doctor.
8     A.   Okay.
9     Q.   You say at the bottom of page 6 in your
10 report, "Based on the foregoing testimony, Officer
11 Kenny had several credible reasons to believe that
12 someone was being attacked inside the residence" --
13    A.   Correct.
14    Q.   -- "which necessitated his immediate
15 tactical response."
16    A.   Correct.
17    Q.   Now, you use the phrase here "several
18 credible reasons," correct?
19    A.   Correct.
20    Q.   And now are you saying in this sentence
21 that you're crediting Officer Kenny's version of
22 events?
23    A.   This is the version of the events.
24    Q.   All right.  His is the only version of
25 events in your mind?



JOHN PETERS, PH.D.                                        October 20, 2016
ROBINSON vs. The CITY OF MADISON                              157—160

Page 157

1    A.    Well, he's the one who identified all the
2  reasons for entering that's in paragraph 2.
3    Q.    Okay.  So you're saying if his reasons
4  are to be believed, then those are -- those are
5  legitimate reasons that would cause -- constitute an
6  exigency, right?
7    A.    Yes.
8    Q.    Okay.  You're not saying "I believe this
9  actually happened," correct?
10    A.    Correct.  I'm saying that if what he
11  testified to and what he wrote about is accurate,
12  those are legitimate reasons to enter the building.
13    Q.    Okay.
14    A.    As an exigent circumstance.
15    Q.    Now, we talked a little bit earlier about
16  how you analyze the situations in which there are,
17  you know, multiple accounts.  And now assume here
18  that Tony Robinson survived the shooting, and had a
19  version of events to tell himself, and that there
20  was no noise coming from the house, that he was
21  sitting there.  Okay?
22    A.    Okay.
23    Q.    And how would you reconcile the
24  differences -- different version of events?  How do
25  you account for that in your methodology?

Page 158

1    A.    Okay.  First of all, this is a
2  hypothetical, not the facts as we know.  The way I
3  would handle it is, I would take the officer's
4  version and say if the officer's version is reported
5  and found to be correct, these are legitimate
6  reasons for going in.
7        In contrast, if Mr. Robinson's versions
8  are accurate, then the officer did not have exigent
9  circumstances and I'd just come out and say that.
10  But I would give both sides, I'd put it all in the
11  same report.
12    Q.    Got it.
13    A.    Because it's up to the trier of fact to
14  make that determination, not me.  But I would
15  account for if the officer said this and it's
16  accurate, then here's my opinion.  And if the
17  officer's version is incorrect and Mr. Robinson in
18  your hypothetical is correct, then this would be the
19  opinion.
20    Q.    And why would you do it that way?
21    A.    Well, I think -- first of all, within you
22  do the analysis, you have to look at both sides of
23  that.  And I've done this in the past where if the
24  arrested person's versions are correct, then the
25  officer's use of force would be outside the scope of

Page 159

1  national training standards.  If the officer's
2  version of the facts is correct, then his use of
3  force is consistent with national training
4  standards.
5        I think as a person who's coming at this
6  objectively as possible you have to make that
7  analysis on both sides.
8    Q.    Okay.  Any other reasons you would do it
9  that way?
10    A.    Because you don't want to take sides.
11  That is kind of the underlying premise here.  You
12  don't want to take sides because the minute you take
13  that side when you have two conflicting versions --
14    Q.    Sure.
15    A.    -- is you either deliberately or
16  unintentionally gave credibility to one version and
17  not the other.
18    Q.    Right.  And that's not your role?
19    A.    Exactly.
20    Q.    Okay.  Now, how does that methodology
21  apply when you have a different hypothetical which
22  is there's the officer's version of events and then
23  there's objective evidence that contradicts it?
24        So if in this situation Officer Kenny
25  said that the shooting happened entirely contained

Page 160

1  within the stairwell, right, but the video here
2  shows that at least part of it happened in video
3  that you could see from outside of the stairwell,
4  how would you take that into account?
5    A.    Well, I think the video speaks for
6  itself.  I mean, it's -- the decision to use deadly
7  force is the focal point.  What constituted the
8  decision to make to use deadly force.  As you're
9  using it, I don't think anybody is really paying
10  much attention to where their footsteps are.  But,
11  if the video shows say the last shot was fired
12  outside the doorway and he said I was still in the
13  doorway, the video speaks for itself.
14    Q.    So in a situation like that, do you still
15  analyze it in the same way as if there was a
16  disagreement between two people if the video is
17  correct, then this is what follows, if the officer
18  is correct, this is what follows or do you do
19  something different?
20    A.    It depends on the video.  You could
21  have -- first of all, a video is not three
22  dimensional.  I'm talking a different situation than
23  this.  A video is not three dimensional.  So you can
24  have what appears to be in the video, for example, a
25  knee that's put across the neck where another



JOHN PETERS, PH.D.                                          October 20, 2016
ROBINSON vs. The CITY OF MADISON                              161–164

Page 161

1 officer's BODYCAM shows it's really across the
2 shoulder, so the angle of the video maybe important.
3       So you have to account for all of those
4 things. But even in those situations, you know,
5 generally when I look at video and the officer's
6 report says he pushed me and that's why I hit him
7 and the video doesn't show that, I will write and
8 say the officer's version of the facts is this, in
9 contrast the video is shown showed this which is a
10 discrepancy, and this goes back to the trier of
11 fact.
12       Here where you had the video at the end
13 of that last few seconds where the officer is
14 outside, that goes to my last opinion about recall,
15 but it doesn't change my analysis on the reason he
16 used force.
17    Q.   So in this instance you didn't note a
18 discrepancy between Officer Kenny's account and what
19 you observed in the video, correct?
20    A.   There was a discrepancy -- there was a
21 discrepancy, and I tried to address that in the last
22 opinion.
23    Q.   And so it's your opinion that Officer
24 Kenny is innocently misremembering, correct?
25    A.   My opinion is that there are scientific

Page 162

1 evidence to show that recall is not 100 percent.
2 And I think that the science is clear on that. This
3 is a dynamic situation. There's a lot of stuff
4 going on in a person who's using deadly force. And
5 I think that, you know, the science is pretty clear
6 that officers don't remember everything or maybe
7 remember it differently than what a video might
8 show.
9    Q.   So outside of your last Opinion No. 8, do
10 you address the discrepancy between the video and
11 Officer Kenny's account in any other way in your
12 report?
13    A.   No.
14    Q.   Okay. Why not?
15    A.   The decision to use force was already
16 made, and that decision wasn't on video.
17    Q.   Okay. Now, the -- you agree with me that
18 the video and other reports show that Officer Kenny
19 fired seven shots, correct?
20    A.   That's what was reported, correct.
21    Q.   And that there was three shots and then
22 there was a break, three shots and then there was a
23 final shot, correct?
24    A.   More or less. I would have to look at
25 the video again to --

Page 163

1    Q.   Easy on the details?
2    A.   Yeah. I know there was a little bit of a
3 break in there.
4    Q.   Okay. And am I right that you focused on
5 the assessment of whether or not the force was
6 justified only at one instance and that's when it
7 began?
8    A.   I focused on the officer's description of
9 why he used the deadly force.
10    Q.   Right. And my question is whether or not
11 you analyzed that from only the beginning or whether
12 or not you analyzed that separately along the way?
13    A.   Well, each shot is a separate use of
14 force, so that has to be analyzed and explained.
15    Q.   Yeah.
16    A.   And his explanation was that he was
17 coming down the steps, he had been punched, he was
18 going backwards, he fired, pistol craft today is you
19 shoot until the threat stops.
20    Q.   Okay. But at the same time, you know,
21 the officer had to reassess, you know, to be
22 justified in continuing -- continued firing that the
23 threat hadn't stopped, right?
24    A.   Yes.
25    Q.   And did you say pistol craft?

Page 164

1    A.   Yes.
2    Q.   What do you mean by that?
3    A.   Well, modern training today on handguns
4 is you shoot until the threat is stopped.
5    Q.   And so by pistol craft you just mean the
6 modern training on handguns?
7    A.   Yes, I'm sorry. Pistol craft is a
8 terrible word that's used in that, I'm sorry.
9    Q.   I was just more focussing on -- I haven't
10 heard that before.
11    A.   Yeah.
12    Q.   So where in -- now, let's discuss for a
13 moment your opinion in No. 5, that Mr. Robinson had
14 actively resisted Officer Kenny and engaged in
15 assaulted behavior, correct?
16    A.   Correct.
17    Q.   And that's based entirely on Officer
18 Kenny's account, right?
19    A.   Correct.
20    Q.   And Opinion No. 6, "Mr. Robinson was an
21 imminent threat to Officer Kenny because they were
22 engaged in close combat."
23       That's that opinion, correct?
24    A.   Correct.
25    Q.   And the entire basis for that account is



Case: 3:15-cv-00502-jdp   Document #: 84   Filed: 11/04/16   Page 42 of 63

JOHN PETERS, PH.D.                                          October 20, 2016
ROBINSON vs. The CITY OF MADISON                                 165–168

Page 165

1 Officer Kenny's version of events, right?
2     A.    Well, just for clarification, yes, it is
3 Officer Kenny's version of the events because there
4 is none other, but close combat's defined in the
5 DAAT manual as a solid behavior act or resistance
6 and so forth in the DAAT manual.
7           So, again, going based on this training,
8 the only testimony that's available is his.  So if
9 his testimony is believed by the trier of fact to be
10 true and correct, it matches up with his training.
11 And that was the basis for it.
12    Q.    Okay.  And so you're saying here's
13 Officer Kenny's account, it fits these definitions
14 and these are my opinions; is that correct?
15    A.    Correct.
16    Q.    Okay.  Now, you acknowledged if Officer
17 Kenny and Tony Robinson were not engaged in close
18 combat, then it would be a different force
19 situation, correct?
20    A.    Not necessarily.
21    Q.    Okay.  If you assume that Officer Kenny
22 was not actually hit by Tony Robinson and that
23 Officer Kenny fell on the stairs, would that be a
24 different situation?
25    A.    Could be depending how he fell, depending

Page 166

1 the proximity of the parties.  Now we're into
2 hypotheticals.
3     Q.    Yeah, that's allowed.
4     A.    I understand that's allowed, Counsel.
5 I'm just saying, I want it clear on the record that
6 we're in a hypothetical.
7           If we weren't in close combat by
8 definition but you had a knife and you were eight
9 feet away, which takes it outside the definition,
10 that's still a deadly force encounter in my book.
11 So I just want to make it clear that we get all the
12 variables in place because I don't want the record
13 to be muddied on that, that's all.
14    Q.    Sure.  So the hypothetical is that Tony
15 Robinson still unarmed, Officer Kenny still armed,
16 still a police officer, but now, Officer Kenny falls
17 on the stairs and gets up and starts shooting at
18 Tony Robinson from distance who is also falling down
19 the stairs, that's a different scenario, correct?
20    A.    If everybody is falling down the stairs,
21 I wouldn't consider that a deadly threat.
22    Q.    Okay.  Sorry.  One second.
23          So the last incident opinion that you
24 have in this case -- go off the record for a second.
25          (A recess was taken.)

Page 167

1 BY MR. OWENS:
2     Q.    Doctor, in terms of use of force in
3 analyzing situations involving use of force or
4 deadly force, lets just focus on deadly force, are
5 you familiar with the concept of preclusion?
6     A.    Yes.
7     Q.    And what is that?
8     A.    Preclusion is basically a concept that's
9 taught about using the appropriate force level,
10 trying alternative options if available.  Kind of a
11 summary of that definition.
12    Q.    Trying a different force level or
13 alternative?
14    A.    Alternative force level or alternative
15 force options.
16    Q.    So it's that guiding principal that, you
17 know, deadly force is to be used as a last resort
18 and, you know, where reasonable alternatives are
19 available they should be used rather than deadly
20 force in the first instance; is that fair?
21    A.    Well, deadly force -- deadly force is
22 kind of a misnomer, actually, because under Graham
23 versus Connor, deadly and undeadly force are
24 basically combined.  It's the force used that's
25 reasonable.  In the final analysis and the Court

Page 168

1 will determine whether it's reasonable or not.  The
2 use of force is subjective, the analysis of force is
3 objective.
4     Q.    So you don't believe that there's a
5 concept of deadly force that's different than the
6 use of force generally?
7     A.    No, there's deadly and nondeadly force.
8     Q.    Sure.
9     A.    What I'm saying is, the force standard
10 applies to both.
11    Q.    Okay.  They're both analyzed under the
12 objective reasonableness, is that fair to say?
13    A.    Correct.
14    Q.    But there's a difference between using
15 force that is deadly and using force that is not
16 deadly, right?
17    A.    Generally speaking, that's correct.
18    Q.    Officers are trained and -- that certain
19 circumstances are appropriate for deadly force and
20 certain circumstances are only appropriate for
21 nondeadly force, correct?
22    A.    In large categories, I would agree.
23    Q.    Right, I mean, that's included in the
24 policies of the City of Madison that we were looking
25 at a few minutes ago.  There's use of deadly force



JOHN PETERS, PH.D.
ROBINSON vs. The CITY OF MADISON

October 20, 2016
169–172

Page 169

1  policy which is different than the use of nondeadly
2  force policy?
3      A.    Correct.
4      Q.    And killing somebody is a lot different
5  than, you know, possibly wounding them, right?
6      A.    I think that's a really bad analogy.  But
7  it's the use of deadly force either way, it's just
8  one time they died and one they didn't.
9      Q.    Sure.
10     A.    It's still the use of deadly force.
11     Q.    So the use of deadly force which is more
12  likely to result in somebody's death than the use of
13  nondeadly force is a greater level of intrusion,
14  right?
15         MR. HALL:  Objection.  Foundation.
16         Go ahead.
17         THE WITNESS:  If we're looking at deadly
18  force as forces likely to cause death or serious
19  bodily harm versus something that's not, I would
20  agree with you.
21  BY MR. OWENS:
22     Q.    And your understanding of how does the
23  concept of preclusion apply to analyzing an
24  officer's use of force?
25     A.    Well, we have to start with a distinction

Page 170

1  and that distinction is between force options and
2  use of force.  A lot of people confuse force options
3  as force.  Force options are just that.  There's
4  various things you can do.  So based on when you
5  look at the preclusion concept, you look at what's
6  happening in front of you, what your training is,
7  what equipment you have, what your options are and
8  then the person makes a decision based on what all
9  those variables are.
10     Q.    Okay.  So I want to just be clear, the
11  preclusion principle applies to officers' decision
12  about which force option to use; is that right?
13     A.    Yeah, I would say the force option.
14     Q.    Okay.  And the force option is governed
15  by preclusion whereas the use of force is analyzed
16  separately?
17     A.    No.  I think there -- it's kind of a
18  misnomer here.  Force continuums, which include
19  force options, are not force standards.  They're
20  just options.  Whether I use a wrist lock or I use a
21  handgun, at the end of the day, the analysis will be
22  was my force reasonable.  Using a wrist lock happens
23  to not be, in most cases, a deadly force option but
24  a lot of people confuse outcomes with the force.
25         So if I use the wrist lock which is by

Page 171

1  all definitions a nondeadly force technique, and
2  when I applied it you fell off the edge of a cliff
3  and died, is it still a nondeadly force technique or
4  was it a deadly force technique, and that's where
5  the confusion comes in.  The clarity comes in when
6  we analyze was that reasonable under the
7  circumstances, and that's what the trier of fact has
8  to determine.
9         MR. OWENS:  Can we have the question read
10  back, please.
11         (Record read.)
12  BY MR. OWENS:
13     Q.    So what I'm wondering, and I understand
14  that the force will be used, evaluated under the
15  reasonableness standard, okay, I understand that.
16         My question is just a clarification as to
17  whether or not the concept of preclusion only
18  applies to the election of particular force option
19  or whether it applies to the use of force itself as
20  well.  And it sounds like the answer to your
21  question is no, because the determination is just
22  reasonableness; is that fair?
23     A.    I'm not sure I understand your question.
24     Q.    Okay.  Let me rephrase it.  Let's just do
25  it in smaller chunks.

Page 172

1         Now, I thought it was your testimony the
2  concept of preclusion applies to an officer's
3  decision to elect which force option to use, and
4  that they should avoid using more significant force
5  than necessary in a particular situation; is that
6  right?
7      A.    Correct.
8      Q.    Okay.  And so when you're analyzing the
9  actual use of force once the force options have been
10  made, that's no longer in the picture, does the
11  concept of preclusion do any work in analyzing the
12  use of force or not?
13     A.    Well, you don't make force options, you
14  make force decisions.  So I can't answer your
15  question as asked.
16     Q.    Okay.  So does the election of a
17  particular option influence whether or not the use
18  of force is ultimately reasonable?
19     A.    It could depending on the circumstances.
20     Q.    Right.  So let's get a hypothetical here.
21  An officer responds to a call of disturbance, an
22  unarmed person yelling.  Okay?  Gets out of his car,
23  pulls out his gun and shoots him.  Right?  The
24  election to not try any lower level of force would
25  be unreasonable, right?



JOHN PETERS, PH.D.                                    October 20, 2016
ROBINSON vs. The CITY OF MADISON                                173—176

Page 173

1    A.   Well, I think the force chosen could be
2  determined unreasonable.
3    Q.   Right.  And so in that situation we can
4  agree that the officer's decision to come out, guns
5  blazing, as in my hypothetical, that the election
6  amongst the number of options is what was
7  unreasonable, correct?
8    A.   Well, I think the use of force, the use
9  of deadly force in that situation would more than
10 likely be unreasonable.  We don't know what force
11 options he had available, but the fact that he went
12 to the maximum right off, as you say get out with
13 guns blazing, given no other information about the
14 behavior, I think we could all say that's outside
15 the scope of force training.
16   Q.   Right.  In assessing the situation, you
17 would want to know, I think as you just had
18 indicated, what options the Officer had available to
19 him, right?  Did he have a baton, did he have pepper
20 spray, did he have an electronic control device,
21 were other officers on the way, you would want to
22 know that information, correct?
23   A.   Those would all be important.
24   Q.   And they would all factor into the
25 reasonableness analysis; is that right?

Page 174

1    A.   They would factor into the officer's
2  decision making.
3    Q.   And then whether or not at a later date a
4  trier of fact determines that use of force is
5  reasonable?
6    A.   Correct.
7    Q.   Now, in this -- in your report there's no
8  mention of the concept of preclusion, right?
9    A.   Correct.
10   Q.   Okay.  Now, you did mention a concept of
11 force deficit, right?
12   A.   Correct.
13   Q.   And that's where an officer selects too
14 low of a force option for the particular threat; is
15 that right?
16   A.   Correct.
17   Q.   And so is there a reason that you
18 mentioned force deficit but not preclusion?
19   A.   Force deficit is a concept that was
20 developed after a study looking at force incidents,
21 and Charlie Nessel (Phonetic) on his team looked at
22 that at the University of Florida and published a
23 paper on it.  Preclusion isn't taught everywhere.
24 It's not a mandatory required part of an analysis.
25        The end result is was the force

Page 175

1  reasonable given the totality of the circumstances.
2  And I think we can see the extreme.  If I made an
3  obscene gesture to you and you shot me with a
4  handgun, and that's all we had, I think almost
5  everyone would say that totally unreasonable.
6        If I came at you with a knife from two
7  feet away and you shot and killed me, I think people
8  would say, you know, what else could he have done.
9  But then we get into a gray area.  Ultimately the
10 officer makes the decision and that's a subjective
11 decision that may, in his mind, involve some
12 thoughts about using other alternatives.
13   Q.   Okay.  My question is a little different,
14 which is the -- or let's take a step back.
15        Now, Wisconsin police officers are taught
16 the concept of preclusion, right?
17   A.   Yes.
18   Q.   Officer Kenny was trained in the concept
19 of preclusion, correct?
20   A.   Correct.
21   Q.   And in analyzing Officer Kenny's use of
22 force relative to his training, you didn't mention
23 that concept, correct?
24   A.   Correct.
25   Q.   But you did mention the concept of a

Page 176

1  force deficit, right?
2    A.   Correct.
3    Q.   Am I right that a force deficit considers
4  the idea where an officer underuses force in a
5  situation where more would have been required or
6  even justified?
7    A.   That's correct.  And I just might add to
8  that, it could also mean, as was advanced in that
9  article, that I used the baton which was appropriate
10 for the situation, I just didn't use it hard enough.
11 So I held back when I could have used it at full
12 force.
13   Q.   Sure.
14   A.   So it has to do sometimes even within the
15 force option that's chosen, you can have a force
16 deficit.
17   Q.   Right.  Like the election and the
18 application?
19   A.   Perfect.
20   Q.   Okay.  Now, did you mention force deficit
21 and not preclusion because you were more concerned
22 about officers underusing force than them overusing
23 deadly force?
24   A.   No, I think -- and I have to look at the
25 context in which I used that.  Just let me find it



JOHN PETERS, PH.D.                                          October 20, 2016
ROBINSON vs. The CITY OF MADISON                              177–180

Page 177

1 here.
2        The context in which I used it was
3 referring to injuries to both the officers and
4 suspects, and that the fact that when officers use
5 too little force they could get injured.  And when
6 they recalculated, if you will, the suspects
7 could -- were more likely to get injured as well.
8 That's pretty much the context.  And then from that
9 is when I went and said that in my opinion Officer
10 Kenny used force that was consistent with his
11 training.
12     Q.    Now, in Opinion No. 7, you don't mention
13 any of the Madison Police Department policies,
14 correct?
15     A.    Correct.
16     Q.    Why not?
17     A.    Well, first of all, I wasn't getting into
18 any of the Monell issues that those policies may or
19 may not have overlapped.  I was looking strictly at
20 the force event, the force that was chosen, the
21 force that was used given the variables that Officer
22 Kenny was confronting.
23     Q.    Okay.
24     A.    Policies are guidelines, they're not
25 constitutional standards.

Page 178

1     Q.    So I guess for the question -- my
2 question is:  Your Opinion 7, I thought it had to do
3 with whether or not that Officer Kenny acted
4 consistent with his training and national use of
5 force standards, that wouldn't include whether or
6 not he followed the policies of the City of Madison?
7     A.    His training was on the DAAT manual.
8     Q.    Okay.
9     A.    His training was at the academy and the
10 national force standards apply.
11     Q.    And he was also trained to follow the
12 policies of the City of Madison, right?
13     A.    Correct.
14     Q.    That's what made him a certified officer,
15 right?
16     A.    No, his passing the academy made him a
17 certified officer, had nothing to do with the
18 policies of Madison.
19     Q.    Okay.  So -- fair enough.  Let's talk
20 about this in terms of the DAAT manual.
21        Now, the DAAT manual includes the use of
22 deadly force section, correct?
23     A.    Yes.
24     Q.    And it outlines situations in which use
25 of force -- use of deadly force is appropriate,

Page 179

1 right?
2     A.    It has examples of that, yes.
3     Q.    Sure.  Now, you didn't cite that portion
4 of the DAAT manual in your report, did you?
5     A.    No.
6     Q.    Okay.  Why not?
7     A.    It's not a constitutional standard.
8     Q.    Okay.  So now, is Opinion No. 7 just
9 about the constitutional standard?
10     A.    It's not only about the constitutional
11 standard, but an Officer's force is analyzed based
12 on his training and the Fourth Amendment.
13     Q.    So why not reference his training?
14     A.    Because if he violates training, more
15 than likely that will be a negligent state court
16 issue.  I was looking at what the national standard
17 for the use of force is.
18     Q.    Okay.  So should we just scratch training
19 out of Opinion No. 7, then?
20     A.    No, because he was trained in Graham
21 versus Connor.
22     Q.    Okay.
23     A.    That's part of the DAAT training.
24     Q.    Okay.  So you're saying that part of the
25 DAAT training discusses Graham, but not the part

Page 180

1 that describes deadly force specifically?
2     A.    Well, you'd have to show me specifically
3 what you're referencing.
4     Q.    Well, I'm just wondering why you didn't
5 mention the use of deadly force policy from the DAAT
6 manual?
7        MR. HALL:  Objection to form.  Asked and
8 answered.
9        THE WITNESS:  Well, first of all, the
10 DAAT manual doesn't have a use of force policy.
11 BY MR. OWENS:
12     Q.    Okay.
13     A.    The DAAT manual only has suggestions and
14 guidance on the use of force.
15     Q.    Okay.  Well, you would agree there that
16 the use of deadly force is only justified in certain
17 circumstances, right?
18     A.    I would agree with that.
19     Q.    And the DAAT manual is the training
20 provided to Officer Kenny about what those
21 circumstances are?
22     A.    No.
23     Q.    No?  Why not?
24     A.    DAAT manual doesn't cover every
25 circumstance.



1   Q.   Okay.  It's some of the training Officer
2   Kenny was provided; is that right?
3   A.   Some of the training and some of the
4   circumstances.  He was given the principles, the
5   principles on the use of force.  The application of
6   those principles he put together based on the
7   circumstances.
8   Q.   So in Opinion No. 7, you -- Officer
9   Kenny's use of force was consistent with his
10  training?
11  A.   Correct.
12  Q.   That's a part of your opinion.  Okay.
13       And by training, please identify every
14  document that you are referring to to support your
15  opinion that he was acting consistent with his
16  training, what are you referring to?
17  A.   The DAAT manual.
18  Q.   Okay.  Anything else that you're
19  referring to?
20  A.   It was consistent with -- from a training
21  perspective of the DAAT manual.
22  Q.   Okay.  And you're not referring to the
23  Madison Police Department policies, we can throw
24  those out the window?
25  A.   No, I'm not throwing them out the window,

1   but I haven't seen a lesson plan on what was trained
2   in those policies.
3   Q.   Okay.  So the only document that you're
4   referring to for your opinion about him acting
5   consistent with his training is the DAAT manual?
6   A.   The DAAT manual and Fourth Amendment
7   standards and analysis.
8   Q.   Okay.
9   A.   I cited in here -- maybe this will make
10  it easier, maybe not.  I cited lethal and less
11  lethal force by Judge Plitt.  And Judge Plitt went
12  through and laid out the elements for the use of
13  force, deadly and nondeadly.
14  Q.   Okay.
15  A.   The DAAT manual has similar references,
16  and I cited that as Wisconsin force training
17  standards.  I also went and cited on page 10 of my
18  report that officers may use force legitimately when
19  it's needed to achieve control in specific
20  situations, and cited the city Document 4612.  I
21  don't think I have to recite paragraph by paragraph
22  every word that's in the DAAT manual, by referencing
23  it I think is fine.
24  Q.   Okay.  I'm asking -- just maybe it's so
25  obvious its going by.

1        Other than this, the DAAT manual, is
2   there any other particular training document that
3   you're referring for this opinion?
4   A.   Other than the 4612 document --
5   Q.   Well, that's part of this.
6   A.   Right.  And that would be it.
7   Q.   Okay.  That's all I wanted to know.  The
8   basis for the training part of the opinion is just
9   this manual?
10  A.   Correct.
11  Q.   Clear?
12  A.   Clear.
13  Q.   All right.  Now, you'll agree that the
14  use of deadly force, and I think it's pages 40 --
15  excuse me, it starts on 67 of the manual.
16  A.   Okay.
17  Q.   And so it's your opinion and testimony
18  that this here is sufficiently similar to the other
19  materials that your -- you referenced that they can
20  all be sort of analyzed together without any
21  significant difference?
22  A.   That's a fair statement.
23  Q.   Okay.  Now, if you'll go to page 68, the
24  next page.
25       Did the Wisconsin law, which is mentioned

1   here, play any role in your analysis at all?
2   A.   The only thing it played in is it's part
3   of the training that the officer received.
4   Basically it parallels a lot of what page 67 talked
5   about.
6   Q.   Well, does page 67 say anything that the
7   actor may not intentionally use force which is
8   intended or likely to cause death or great bodily
9   harm unless the actor reasonably believes that such
10  force is necessary to prevent imminent threat or
11  great bodily harm to himself or herself, is that
12  here?
13  A.   Is that here where?
14  Q.   On page 67.
15  A.   No, that's not necessarily on 67.
16  Although, under the U.S. Constitution, the second
17  bullet it says whether the suspect poses immediate
18  threat to the safety of officers and others.  So
19  there's some similarity.
20  Q.   Okay.
21  A.   The Wisconsin statute spells it out that
22  forces necessary to prevent imminent death or great
23  bodily harm to the Officer or somebody else.
24  Q.   So is there a reason that you didn't
25  analyze the use of force under the Wisconsin



Case: 3:15-cv-00502-jdp   Document #: 84   Filed: 11/04/16   Page 47 of 63

JOHN PETERS, PH.D.                                    October 20, 2016
ROBINSON vs. The CITY OF MADISON                          185–188

Page 185
1  standard that would have been applicable here?
2      MR. HALL:  Objection to form.
3      THE WITNESS:  No, I referenced his
4  training and this is part of that training.
5  BY MR. OWENS:
6      Q.   Okay.  So I think this is included in
7  your opinion.  Here was which we've discussed a
8  little bit previously about not looking at the
9  situation, you know, with 20/20 hindsight but from
10 the officer's perspective there at the time the
11 incident is occurring.
12          And you agree that part of the
13 information the officer has is that, you know, which
14 he sees when he arrives at the scene, correct?
15     A.   Correct.
16     Q.   And part of the information that he has
17 is that which is communicated to him over dispatch,
18 correct?
19     A.   Correct.
20     Q.   Part of that information is the
21 information that, you know, is on his computer as
22 well, right?
23     A.   Correct.
24     Q.   And you didn't see anything here that
25 made you think that Officer Kenny didn't have time,

Page 186
1  once he parked his car, to check the notes, right?
2      A.   I don't recall seeing anything like that.
3      Q.   Okay.  And you agree that officers, you
4  know, are trained to pay attention to the details
5  that they're given before they arrive on the scene
6  because it could be important to figuring out what
7  the best way to assess the situation is, right?
8      A.   Generally that's true.
9      Q.   And, I mean, you've given presentations
10 and included in those presentations the importance
11 of paying attention to the dispatch information,
12 right?
13     A.   Yes.
14     Q.   Okay.  Nothing's changed about those
15 opinions?
16     A.   No, if it's -- if you have the time,
17 certainly it's important to do that.
18     Q.   Okay.  The account that you sort of run
19 through it, you got these three factors and then
20 you've got an element, right?  So you got Factor 1,
21 immediate threat to Kenny and/or others.  You've got
22 actively resist arrest, crimes have been committed,
23 and then you have an element.
24          Now, how did the element interact with
25 the other three factors?  I'm just trying to

Page 187
1  understand how to parse this.  And I want to know
2  why it's not a fourth factor as opposed to an
3  element of the third factor because it doesn't
4  really seem to me that the circumstance surrounding
5  the seizure is the same thing as what crime had been
6  committed?
7      A.   That's why it's an element.
8      Q.   Of?
9      A.   Of the analysis.
10     Q.   Where does it fit in the analysis?
11     A.   It's the umbrella.  It's were the
12 circumstances tense, rapidly evolving, uncertain.
13 As it says here, "Were the circumstances surrounding
14 the seizure of Mr. Robinson tense, uncertain and
15 rapidly evolving."
16     Q.   I understand that.  And all I'm trying to
17 do is figure out the difference between what you've
18 identified as factors and then there's an element.
19 So is the element an umbrella in which, you know,
20 the factors fall under or is it like a fourth
21 factor?
22     A.   I guess some people teach it as four
23 factors.  Some people just hang out the tense and
24 rapidly event occurring over here.  The way I was
25 trained in it, it was an element.  It wasn't one of

Page 188
1  the factors, it was -- it was this other piece that
2  kind of goes around it, kind of is -- everything is
3  operating inside that environment.
4          This is more an environmental overall.
5  You could call it a Factor 4, call it whatever you
6  want.  I mean, it's just the way I presented it in
7  here that we have Factor 1, we have Factor 2, we
8  have Factor 3, and then the element is this all
9  encompassing environmental aspect that influences
10 the three factors.
11     Q.   Okay.  Does the availability of backup
12 affect any of that analysis?
13     A.   Depends on the circumstances.
14     Q.   And how could it?
15     A.   Officer Kenny said the reason he didn't
16 wait for backup was because he thought somebody was
17 being assaulted and that created an exigent
18 circumstance that, in his opinion, required him to
19 go inside and handle.  Absent that, I think backup
20 that's within a short time frame away, absent that
21 exigent circumstance, would have been more than
22 likely he would have waited for that backup and then
23 they would have -- maybe he'd still gone in by
24 himself, but there would have at least been backup
25 there.



Case: 3:15-cv-00502-jdp   Document #: 84   Filed: 11/04/16   Page 48 of 63

JOHN PETERS, PH.D.                                    October 20, 2016
ROBINSON vs. The CITY OF MADISON                          189–192

Page 189

1    And I think he testified to that, you
2 know, he went in based on the exigent circumstance
3 that he perceived at the time.  And I think he even
4 explained something about why he didn't wait for
5 backup.
6    Q.    And you don't fault Officer Kenny for,
7 you know, pointing to his training indicating that
8 when you're responding to either what he suspects
9 would be a mental health event or excited delirium
10 or agitated chronic --
11    A.    Chaotic.
12    Q.    An agitated chaotic event that he'd been
13 trained to wait for backup?
14    A.    Well, I think he's been trained to wait
15 for backup, but I think we're confusing something
16 here and for the record, I want to make it clear.
17        The call he was sent on is not the
18 call -- or the event he responded to.  The fact that
19 you get dispatched for some guy who is out here on
20 the street maybe yelling and acting bizarre is far
21 different than when you hear noises and think
22 somebody's being battered and beaten upstairs.
23 That's a totally different incident than the call
24 for service.
25        And I think what happens many times is

Page 190

1 that people get hung up on this call for service oh,
2 it was just kids playing in the park.  Yeah, until
3 one of the kids pointed a gun at a cop, that changed
4 that.  And I think that's what we have here.  Yes,
5 you're called for service over here.
6        As serious as it may have been or is just
7 go check it out, dynamically changed when the
8 officer said, "I heard somebody say something and it
9 sounded like people were getting assaulted," and I
10 believe that was an exigent circumstance.  That's
11 far different than a guy yelling and being partially
12 clothed over here.
13    Q.    So does all the information the officer's
14 been previously told just fall out the window?
15    A.    I think at that point it takes a second
16 seat.
17    Q.    So the officer should just ignore the
18 fact that he's been told that somebody might have
19 ingested drugs or be acting really bizarrely?
20    A.    No, I don't think you should ignore that.
21    Q.    So it's still part of the analysis?
22    A.    It's there, but it doesn't take
23 precedence at this point.  The precedence is it
24 appears to me, sounds to me, I perceive it to me
25 that I have an active problem inside this building

Page 191

1 and I've got to take care of it right now.
2        I'm not saying you flush that and get
3 away from it, but it's not the primary issue right
4 now.  That -- that call changed, that call changed
5 from go check out this bizarre behavior to there's
6 something different than I'm perceiving.
7    Q.    So is there a hierarchy of factors that
8 officers can consider or are they required to sort
9 of consider the totality?
10    A.    You consider the totality of the
11 circumstance.
12    Q.    Okay.
13    A.    And I think that's what he did.
14    Q.    And, again, that's based upon, you know,
15 his statement, his interview and his testimony,
16 right?
17    A.    Yeah.  This is a tragic event, I don't
18 think anybody would deny that, but we don't have
19 Mr. Robinson's testimony.  So that's all I can rely
20 on.
21    Q.    Sure.  But, you know, if you acknowledge
22 that the analysis of the use of force would be
23 different, you know, if Officer Kenny -- excuse me.
24        You acknowledge that the analysis of the
25 use of force would be different if there were an

Page 192

1 alternative account provided by the decedent, right?
2    A.    There could be.  Well, first of all, by
3 the decedent, Mr. Robinson.
4    Q.    Sure.
5    A.    If Mr. Robinson were alive, he may also
6 say, "You know what, everything he said is true."
7 We can't discount that factor either.  I mean,
8 sometimes suspects say, "Yeah, I said what he said,
9 I did what he said I did."
10    Q.    Sure.  That's not really meaningful.
11    A.    It's not meaningful to your hypothetical.
12    Q.    So you agree that if, you know, the
13 person involved in the force incident had not passed
14 away and gave a different account of how it took
15 place, that could change the analysis, right?
16    A.    Yes.
17    Q.    Okay.  And the factors here if there was
18 evidence -- if you remove them, so you got Factor 1,
19 2 and 3, right, you know?
20    A.    Right.
21    Q.    If you take away Factor 2, that would
22 change the analysis.  If the answer goes from a yes
23 to a no, that would be a different situation, right?
24    A.    That's correct.
25    Q.    Okay.  And I want to just be clear about



JOHN PETERS, PH.D.                                          October 20, 2016
ROBINSON vs. The CITY OF MADISON                              193–196

Page 193

1  this.  You include on Factor 3 that there was a
2  resisting arrest.  You believe that he had committed
3  that crime?
4      A.   I'm just going by what the officer said.
5      Q.   Okay.  And what is your understanding of
6  what it would mean to resist arrest?
7      A.   Well, if you punch the officer and
8  knocked him down the stairs and came at him, at that
9  point you would be placed under arrest.  I mean,
10 there's resisting behavior at the top of the stairs,
11 according to the officer's testimony, and that's a
12 battery on the officer, the arrest follows and it
13 would be resisting.
14     Q.   And am I right that maybe this is a VENN
15 diagram in the sense that your opinion is that the
16 battery on the officer is -- or the strike to the
17 officer is both at the same time a battery and a
18 crime of resisting arrest simultaneously?
19     A.   No, not simultaneously but the seizure of
20 the person is certainly a seizure for purposes of
21 the fourth amendment.  So on the first shot goes
22 that's a seizure.
23     Q.   I think we may be confused.  Let's back
24 up.  I was talking about the crimes that had been
25 committed by Mr. Robinson.

Page 194

1      A.   Okay.
2      Q.   And as you have it for Factor 3.  And
3  what I was wondering is whether or not the battery
4  on the officer is the same at the same time, you
5  know, say he hits the officer that at the same time
6  means he's resisting arrest?
7      A.   Well, he would have been under arrest
8  prior to that, so it wouldn't be resisting.  But
9  once he struck the officer, the officer would
10 have -- I mean, the arrest at that point, should
11 have been forthcoming.  And then it would have been
12 resisting.  I mean, he -- the officer said he pushed
13 him down the stairs, punched him and he started -- I
14 forget, stair step or back step or some term he used
15 for that going down the stairs.  So to me that's
16 resisting.  He's resisting the officer at that
17 point.
18     Q.   Okay.  So I guess, and I'm -- I just want
19 to be clear.  Is it like a VENN diagram again where
20 the punch simultaneously means you should be under
21 arrest and then, therefore, once you punch an
22 officer you're also resisting arrest?
23     A.   I don't think it's simultaneously, I
24 think it's shortly thereafter.  But yes, he would be
25 placed under arrest.

Page 195

1      Q.   Okay.  Now, I think that you're
2  mentioning that the seizure begins once the officer
3  begins to use force.  In this case there was only
4  deadly force applied.  And so from the first shot,
5  right?
6      A.   Well, from a force perspective, deadly
7  force was used.  From a force option, there were two
8  other options used, deadly force being the third
9  option chosen.
10     Q.   You mean -- I think you mean, available
11 not used; is that what you meant?
12     A.   No, I chose my words right.
13         MR. OWENS:  Can you read that back,
14 please.
15         (Record read.)
16 BY MR. OWENS:
17     Q.   What other force options were used or did
18 you mean available?
19     A.   These were used.  Kenny was in uniform
20 and he gave a verbal police.
21     Q.   Okay.
22     A.   So those are force options that are
23 taught by Wisconsin.  Officer presence.  He was in
24 uniform.  He was in a marked patrol car.  He said --
25 and again, this is what the officer's testimony is.

Page 196

1  I said police, Madison police or whatever was said,
2  those are two force options.  Then we have the force
3  that's used which would be the deadly force option.
4      Q.   Okay.
5      A.   That's what I was referring to.
6      Q.   Sure.
7      A.   I wasn't trying to be --
8      Q.   No, I --
9         MR. OWENS:  Can we take one second.
10        (Off the record.)
11 BY MR. OWENS:
12     Q.   Let's discuss.  The wearing of a uniform
13 is itself a use of force?
14     A.   No, no.  When you're talking force
15 options, the first level of force option that's
16 discussed is usually officer presence.  And if --
17 and I'll use myself as a suspect.  If I'm doing
18 something that's -- that I know isn't right and the
19 four of you show up in uniform, I'll probably walk
20 away, that's presence.
21     Q.   Got it.
22     A.   Then when I announce police, that's a
23 second option.
24     Q.   Okay.
25     A.   So all of that can be, depending on the



JOHN PETERS, PH.D.
ROBINSON vs. The CITY OF MADISON

October 20, 2016
197–200

Page 197

1 circumstance, a quote, use of force.
2    Q.   Yeah.
3         THE WITNESS:  Is that still --
4         MR. OWENS:  It's pretty bad.  It actually
5 may be worse, if you go up maybe that will help.
6         THE WITNESS:  Is that better?
7         MR. OWENS:  That is much better.  Thank
8 you.  It was actually worse.  It was directly in my
9 eyes.
10         For the record, we are referring to the
11 curtains being adjusted.
12 BY MR. OWENS:
13    Q.   Okay.  So in order for officer presence
14 to be a used force option, the suspect or individual
15 whom it's being deployed against, I guess would have
16 to be aware that the officers were present, correct?
17    A.   Correct.
18    Q.   Okay.  And for the announcement of office
19 to be force option employed, the person who it's,
20 you know, quote/unquote, deployed against would have
21 to be aware of the announcing officer, correct?
22    A.   Correct.
23    Q.   So if someone were, you know, had their
24 back or didn't see the officers approaching their
25 uniform, that wouldn't be force employed, right?

Page 198

1    A.   Correct.
2    Q.   Or if they maybe had their headphones on
3 and were, you know, listening to some music and
4 didn't hear them say "hey, police," that use of
5 force would not be employed, correct?
6    A.   Correct.
7    Q.   So if Tony Robinson didn't see Officer
8 Kenny and if he didn't hear Officer Kenny or if
9 Officer Kenny didn't announce, then those first two
10 options wouldn't have been employed; is that right?
11    A.   If he didn't hear him, I would agree with
12 that, but when you punch a cop in the face, I would
13 think you saw him because you usually look at what
14 you're punching.  So that would be my only
15 qualification on that.
16    Q.   Okay.  So if Tony Robinson didn't see
17 Officer Kenny, then the officer presence, the
18 uniform wouldn't have been --
19    A.   Right.  If he didn't see him at all.
20    Q.   Now, if officer -- excuse me.  If Tony
21 Robinson didn't hear or Officer Kenny didn't
22 announce, then that force option wouldn't have been
23 deployed, correct?
24    A.   Correct.
25    Q.   Okay.

Page 199

1    A.   Let me just qualify that just for the
2 record.  It was still deployed, it just wasn't
3 effective.
4    Q.   So any time an officer walks around in a
5 uniform, they're deploying their presence force
6 option?
7    A.   I would hope so.
8    Q.   So we're sort of getting micro
9 aggressions from police officers any time they're
10 walking around?
11    A.   No, no, no.  If you're in uniform and I
12 see you're in uniform, I recognize you're present,
13 that's all.  If I'm blind, you could be two inches
14 in front of me and I don't know it.  All I'm saying
15 is if the officer is in uniform and is seen, that's
16 a recognition of presence.
17    Q.   Got it.  And they have to recognize that
18 the officer is an officer, right?
19    A.   Right.  If I'm in plain clothes or
20 dressed like we are, for instance, if I looked at
21 you, just a nice shirt and, you know, baseball cap
22 turned backwards and a beard and a mustache, I may
23 go "Hey, he's not a cop, I don't have to listen to
24 him."
25    Q.   You might even say he's not a lawyer.

Page 200

1    A.   And it may turn out just the opposite
2 that you were an undercover officer and yeah, I
3 better listen to you.  So yeah, that's right.
4    Q.   So what it requires from the suspect's
5 perspective is recognition that the Officer is an
6 officer in uniform, right?
7    A.   Well, for it to be effective.  The
8 officer may not know it, that it wasn't effective,
9 but it's like an officer yells at a person who is
10 deaf, as far as the Officer knows, now he or she may
11 have to consider maybe this guy is deaf.
12    Q.   Right.
13    A.   And you got to weigh that against the guy
14 is ignoring me or whatever.
15    Q.   Right.  So if the Officer had been told
16 when they were dispatched to the scene hey, you're
17 responding to a scene of a guy who is deaf, that
18 would be something that they should take into
19 account, right?
20    A.   That would be an important variable, yes.
21    Q.   And if the officer were told, hey, this
22 person may be impaired and isn't responding to our
23 talking to him, that would be something to consider
24 as well, right?
25    A.   Could be.



Case: 3:15-cv-00502-jdp   Document #: 84   Filed: 11/04/16   Page 51 of 63

JOHN PETERS, PH.D.                                    October 20, 2016
ROBINSON vs. The CITY OF MADISON                          201–204

Page 201

1    Q.   Now, focusing on page 11 of your report,
2  you talk about Officer Kenny's force options were
3  limited because of the doorway and the stair space,
4  right?
5    A.   Correct.
6    Q.   Now, I don't think there's any dispute
7  that Officer Kenny was not in the stairwell when he
8  fired the last shot, right?
9    A.   Correct.
10   Q.   So this wouldn't apply to that?
11   A.   Correct.
12   Q.   Okay.  Now, you didn't issue any opinions
13 specifically about shot No. 7, right?
14   A.   Correct.
15   Q.   But you would agree that you observed in
16 the video that, you know, at that point there was no
17 more chance of falling down the stairs?
18   A.   Correct.
19   Q.   And now, just a clarification on this
20 paragraph.  You said that the ECW is not recommended
21 because Mr. Robinson was in an elevated position?
22   A.   Correct.
23   Q.   And this is you're using elevated
24 position here as the above, not like a heightened
25 state; is that correct?

Page 202

1    A.   Correct.
2    Q.   Okay.  And you say "see TASER warnings,"
3  are those the same TASER warnings earlier in the
4  report?
5    A.   Yes.
6    Q.   Now, is there a different part of them
7  that you didn't put into the report itself?
8    A.   It probably was a different part that
9  this warns against elevated platforms.
10   Q.   Okay.  And the concern with elevated
11 platforms is people might fall off of them?
12   A.   Yes.
13   Q.   Now, Doctor, I know you have an extensive
14 educational background and I won't -- we won't go
15 through it all, but let's summarize it a little bit
16 for the record.
17        What was your undergraduate degree in?
18   A.   Criminal justice.
19   Q.   Okay.  And what was your first graduate
20 degree in after that?
21   A.   Public relations and communication.
22   Q.   And what level of degree was that?
23   A.   Master of science.
24   Q.   And then I think you have another master
25 of science; is that right?

Page 203

1    A.   No.  I have a master of business
2  administration.
3    Q.   And where is that from?
4    A.   That is from Babson College, B-a-b-s-o-n.
5    Q.   Where is that?
6    A.   Wellesley, Massachusetts.
7    Q.   And then what -- and so that was a
8  master's in business administration?
9    A.   Right.
10   Q.   And the MS was in what subject again, I'm
11 sorry?
12   A.   Public relations and communication.
13   Q.   Thank you.
14   A.   That was at Boston University.  And I
15 have a third master's, postdoctoral master's, master
16 of arts degree in career and technical education,
17 and that's from California State University, San
18 Bernardino.
19   Q.   Santa Barbara or San Bernardino?
20   A.   San Bernardino.
21   Q.   Oh, the desert.
22   A.   Yeah, wish it was Santa Barbara.
23   Q.   And you got your Ph.D.?
24   A.   At Walden University.
25   Q.   And that's in Minnesota?

Page 204

1    A.   Correct.
2    Q.   And what subject was that in?
3    A.   Applied management and decision sciences.
4    Q.   And Doctor, you're not a psychologist,
5  correct?
6    A.   Correct.
7    Q.   You're not an experimental psychologist,
8  right?
9    A.   Correct.
10   Q.   And are you an expert in memory
11 perception?
12   A.   Not from a psychological viewpoint, no.
13   Q.   Okay.
14   A.   More of literature, but I've not
15 conducted any scientific experiments.
16   Q.   But you don't hold yourself out as an
17 expert in memory and cognition perception, do you?
18   A.   No.
19   Q.   You haven't been trained formally in that
20 field?
21   A.   Correct.
22   Q.   Now, the last opinion you have in this
23 case concerns postincident; is that right?
24   A.   Yes.
25   Q.   Before we discuss your Opinion No. 8,



Case: 3:15-cv-00502-jdp   Document #: 84   Filed: 11/04/16   Page 52 of 63

JOHN PETERS, PH.D.                                    October 20, 2016
ROBINSON vs. The CITY OF MADISON                            205–208

Page 205

1 postincident opinion, you recall the discussion --
2 seems like a lifetime ago now.  Where we had a
3 discussion about reasonable degree of scientific
4 certainty and reasonable degree of professional
5 certainty?
6    A.   Correct.
7    Q.   Am I right that a reasonable degree of
8 scientific certainty is a greater level of
9 certainty?
10    A.   Compared to?
11    Q.   The reasonable degree of professional
12 certainty.
13    A.   I think scientific certainty has a
14 quantitative element to it that can be interpreted
15 as more higher level provided the research is
16 correct.  I mean, you can have scientific research
17 invalid, but if the scientific research meets the
18 criteria of say the theory of generalize ability and
19 a number of other statistical concepts and then
20 correct tests are done, yes.
21    Q.   Okay.  So Opinion 8 is that stressful
22 events, such as the use of deadly force, do have an
23 impact on witness recall.
24    A.   Correct.
25    Q.   And part of that is contrary to

Page 206

1 Mr. Waller's testimony.  But let's put Mr. Waller to
2 the side for now.  We will bring him back up later
3 if we have to.  Okay?
4    A.   That's fair.
5    Q.   And you have the basis for this decision
6 is the article here by Hope, Blocksidge, Gabbert
7 Sauer and others from 2015, correct?
8    A.   Correct.
9    Q.   Okay.  And you haven't, at least in your
10 report, identified any other support for this
11 opinion; is that right?
12    A.   I think I cited some other folks, I
13 thought.  Yeah, Heaton-Armstrong, Braidwood, so
14 there's some other people cited as well.
15    Q.   Those are the people that are cited
16 within the quote.  Is this not a quotation?
17    A.   They are cited within the quote, but I
18 also pulled those articles separately to make sure
19 that it was appropriate to put in there.
20    Q.   Do you have copies of those articles?
21    A.   I do.
22    Q.   Thanks.
23    A.   There's a disc for that.
24    Q.   Let's pause.  You brought some documents
25 here with you today, correct?

Page 207

1    A.   I didn't print out this whole --
2    Q.   I have it.
3    A.   -- article because I -- it's on there.
4 So I just brought that.
5    Q.   Got it.  Great.
6         What else is in the box, if you don't
7 mind me?
8         MR. HALL:  Let me.  There's some
9 correspondence.  We'll go off the record.
10    (A discussion was held off the record.)
11 BY MR. OWENS:
12    Q.   And so you got here the -- you got the
13 USBs which were sent to you from Mr. Hall, correct?
14    A.   Correct.
15    Q.   And I think these are nonprivileged
16 because all of the correspondence here identifies
17 the documents on which you based your opinions.
18    A.   All the correspondence -- excuse me.  All
19 the correspondence I got from Mr. Hall is contained
20 in that box.
21    Q.   Okay.
22    A.   And it identifies -- just so the record
23 is clear, one letter said here's what you're
24 getting, and the other letter that came had the
25 access code to access what was on the disc.

Page 208

1    Q.   Got it.
2    A.   Or on the jump drive.
3    Q.   Okay.  And these are -- there are some
4 handwritten notes here which is your summary of
5 Mr. Waller's deposition?
6    A.   Yeah, the summary of that -- there's no
7 other opinions or anything anywhere.
8    Q.   Okay.
9    A.   And all the highlighted things that you
10 see I had highlighted.
11    Q.   Okay.
12    A.   They didn't come that way.
13    Q.   Got it.
14    A.   Just so you're clear on that.
15    Q.   Was there a general -- do you have a
16 general process that you were following when you
17 were highlighting things?
18    A.   Most of the highlighting came as I was
19 writing the report.
20    Q.   Okay.
21    A.   As we all know in today's electronic
22 world, you can't flip pages on a deposition or go 30
23 documents deep very easily.  So I identified some of
24 the documents that I was going to be referring to on
25 a more regular basis and just printed those out.



Case: 3:15-cv-00502-jdp   Document #: 84   Filed: 11/04/16   Page 53 of 63

JOHN PETERS, PH.D.                                    October 20, 2016
ROBINSON vs. The CITY OF MADISON                          209–212

Page 209

1    Q.   Okay.

2    A.   Other ones I made hand notes about, and
3 that's about it.

4    Q.   Okay.  So here's a copy of DCI 35 to 37,
5 and you wrote "Kelly Austin Javier girlfriend" at
6 the top.

7    A.   Right.

8    Q.   That's your handwriting?

9         And you highlighted information here
10 about Mr. Robinson's drug use; is that right?

11   A.   Yeah.  And the reason that's highlighted
12 is that was in that report, but it wasn't
13 necessarily in the depositions.  So I had the
14 depositions on a separate screen that I could read,
15 but I only had two screens so I printed that out.
16 So that's the only reason for that.

17   Q.   Now, here I think it's a summary of
18 Officer Kenny's interview.  DCI 177 to 185, correct?

19   A.   Correct.

20   Q.   Okay.

21   A.   And on the back, Counsel, is just some
22 other notes as to where things are.  And, again,
23 page numbers, that type of thing that I just made a
24 notation of again for writing the report.

25   Q.   Got it.

Page 210

1    A.   No opinions, not anything else.

2    Q.   So why did you bring out knife 1, knife
3 2, sword, shotgun shells, why was that significant
4 to you?

5    A.   That was only significant in the sense
6 that those were the photographs and those --
7 whatever it is, DCS or whatever it is, those are
8 referring to the photographs that were taken.  As I
9 was going through the photographs, I just wrote
10 those down so I'd know where to go back and get them
11 if I needed them.

12   Q.   Right.  And why would those things be
13 relevant or important?

14   A.   Because that was just part of the scene
15 that they found upstairs.

16   Q.   Okay.  But there were hundreds of
17 pictures, right?

18   A.   There were lots of pictures.  There were
19 pictures of where Mr. Robinson allegedly punched the
20 wall.

21   Q.   Well, my question is:  Why were the
22 pictures of the knife, the sword, the shotgun shells
23 that Officer Kenny didn't know were in that
24 residence, why were those important to you?

25   A.   Because at the time, I hadn't read

Page 211

1 Officer Kenny's deposition.  So as I go through it,
2 I usually, if my memory is correct, on one of these
3 jump drives.  The DCI investigation was kind of
4 right up front so I read that first, looked at the
5 pictures because some of the -- my problem was when
6 I read the report, I couldn't figure out how the
7 stairway was.  In my mind, I couldn't figure out --
8 I thought it was somewhere else in the house at
9 first.

10        So I saw there were photos, I went to the
11 photos.  I started going through the photos.  And as
12 I came across this, I just wrote them down for
13 future reference because I thought it may be
14 important later on and as I read through everything.
15 That's the basis for it.

16   Q.   Now, this is general dimensions for the
17 side entrance; is that right?

18   A.   Yes.

19   Q.   And where did this come from?

20   A.   I printed that off something.  I think
21 it's a summary of Mr. Prenz, Prenz's report.  And I
22 printed that, so I just had a reference sheet.

23   Q.   Got it.  And then there's the incident
24 detail report --

25   A.   Correct.

Page 212

1    Q.   -- which you highlighted the time, and
2 you got the 48 seconds which we already discussed?

3    A.   Right.

4    Q.   And then you've got Danny Waller's
5 report, correct?

6    A.   Correct.

7    Q.   So here on -- well, there's no Bate stamp
8 for -- guess there wouldn't be for Waller's report.
9 Page 7, it's Opinion No. 4, and you've highlighted
10 part of it.

11        And do you see that, Doctor?

12   A.   Yes.

13   Q.   Okay.  And you wrote on the side of that
14 paragraph, "heard only one voice"?

15   A.   Correct.

16   Q.   Now, did you mention the fact that
17 Officer Kenny testified that he heard only one voice
18 in your report?

19   A.   I mentioned he heard -- let me look.  He
20 said he heard sound of incoherent yelling and
21 screaming.  And then I referenced after hearing,
22 quote, "What are you going to do now bitch," end
23 quote, coming from a person inside the building.  So
24 that would have been one person.

25   Q.   Yeah.  Okay.  Now, does -- you just read



JOHN PETERS, PH.D.                                    October 20, 2016
ROBINSON vs. The CITY OF MADISON                           213–216

Page 213

1 a portion of your report where you mentioned
2 incoherent screaming, does that -- you want to
3 include that in the "here" column, the "not here"
4 column instead of the "not here" column from Exhibit
5 20 -- 217?
6     A.   As I recall, Counsel, this exhibit was
7 about what he knew going to the call, not what he
8 learned after the call or during the call.  If we
9 are going to go with what he learned during the
10 call, we can add a lot of things in there.  But my
11 understanding was, and I could be wrong, but I
12 thought we were creating this based on what he knew
13 responding to the call.
14    Q.   Okay.
15    A.   This is different.
16    Q.   Okay.  So what he knew responding to the
17 call and what he learned once he got there is
18 different?
19    A.   Well, it's different in the calculus of
20 why he entered the building.
21    Q.   Okay.  So incoherent screaming was
22 present, right?
23    A.   He said he heard incoherent screaming.
24    Q.   Okay.
25    A.   And he also heard a question being asked.

Page 214

1     Q.   Okay.  So assuming that he heard
2 incoherent screaming, would that be a factor that is
3 associated with excited delirium events that is
4 actually present here or not present here?
5     A.   I don't think we can say anything about
6 incoherent screaming because it may have been that
7 he just couldn't hear it.  He said it was
8 incoherent, but then he heard the question that was
9 coherent.  So I don't think we can force fit that
10 into any one particular category.
11    Q.   So you're not crediting Officer Kenny
12 saying he heard incoherent screaming?
13    A.   Okay.  I think we're -- maybe it's late
14 in the day and I'm getting confused.
15    Q.   Okay.
16    A.   What I'm saying is what he heard when he
17 got there to the house, he heard incoherent
18 screaming and that could have been because he was
19 outside.  And then he heard the question that I read
20 that apparently wasn't incoherent because he could
21 hear it and maybe he was closer.  That's different
22 than what he knew going on that call.
23    Q.   Okay.
24    A.   So if something is incoherent, I don't
25 think we can say just because it's incoherent it's

Page 215

1 excited delirium or not excited delirium.  We all
2 have cell phones.  We all ask people could you
3 repeat that again because it was incoherent.  That
4 certainly doesn't say they're in excited delirium.
5     Q.   Are you reluctant to find that there were
6 factors that, you know, corroborated his -- Officer
7 Kenny's concern that this might have been an excited
8 delirium event?
9     A.   No, what I'm trying to be is objective in
10 this.
11    Q.   Okay.
12    A.   Because what he knew -- I mean, stripping
13 clothing, it can be a sign, it doesn't have to be a
14 sign.  A person could be hot for a number of other
15 reasons.  The monkey walking, that could be
16 drunkenness.  It's odd behavior.  I think we can all
17 pretty much agree with that unless he's showing off,
18 that might even become under bizarre behavior.
19 Making people feel uncomfortable.  His friend felt
20 uncomfortable.  It was reported that he felt
21 uncomfortable.  But Officer Kenny hadn't observed
22 any of those things yet.
23    Q.   So Officer Kenny reported incoherent
24 yelling, but you don't want to classify that as a
25 factor present as related to excited delirium

Page 216

1 because you think there could be other reasons why
2 it was incoherent?
3     A.   There could be other reasons why such as
4 he's outside.  The video shows when he got there he
5 kind of walked outside the -- outside the driveway
6 area.  Well, if the guy is inside and yelling or
7 maybe turned a different direction just because you
8 can't hear somebody, I certainly wouldn't jump to
9 the conclusion that that's mental illness, excited
10 delirium or a speech impediment.
11    Q.   What I'm asking is:  Are you reluctant to
12 count that factor as present here because you would
13 prefer for it to not be present?
14    A.   No.  Based on your previous question, it
15 wasn't there.
16    Q.   Okay.
17    A.   We're at a different time frame now.
18    Q.   Okay.  So the different time frame, now,
19 Officer Kenny was informed through dispatch that
20 Tony Robinson had been running wildly through the
21 streets, correct?
22    A.   He was running the streets, yes.
23    Q.   And Officer Kenny reported himself that
24 there was incoherent speech, correct?
25    A.   At a different point in time in the

JOHN PETERS, PH.D.                                    October 20, 2016
ROBINSON vs. The CITY OF MADISON                         217–220

Page 217

1 question when we developed this.
2     Q.   Okay.  So maybe we have different
3 memories about the time in which we developed this.
4 So let's start.
5          So in your report as referenced in your
6 2006 article, there are a number of factors that you
7 say -- or excuse me.  Excuse me.
8          There are a number of factors that you
9 identify -- excuse me -- that are physical
10 characteristics and other behavioral cues that
11 include, but are not limited to, a list that we went
12 through earlier?
13    A.   Correct.
14    Q.   Okay.  And in going through that list, my
15 question for you is which ones are present in this
16 overall situation?  So a combination of the things
17 that Officer Kenny was told via dispatch or through
18 his computer and those that based upon his account
19 he observed at the time.
20    A.   Okay.
21    Q.   Is that clear?
22    A.   Okay.
23    Q.   Okay.  And so in the -- I think the -- we
24 have extreme agitation.  Not here, right?
25    A.   Correct.

Page 218

1     Q.   Violent or bizarre behavior?
2     A.   I think we have that.  We have the
3 bizarre behavior.  And later if we hear -- or based
4 on what Officer Kenny said, it could have even been
5 violent behavior.
6     Q.   Running wildly?
7     A.   Running I would agree with, I'm not sure
8 about the wildly.  But running, there was a report
9 of him running.
10    Q.   He was running in the street, right?
11    A.   A lot of people run in the street.  That
12 says running wildly, that's the behavioral
13 difference.
14    Q.   Okay.
15    A.   I can jog down the street, I can run down
16 the street, but I'm not in a state of excited
17 delirium.  So I would agree that running would be
18 there but wildly, I don't know.  I don't think we
19 have words to that effect.
20    Q.   Okay.  Screaming?
21    A.   There was -- I think the word yelling was
22 used.
23    Q.   So screaming and yelling is synonymous?
24    A.   I don't count it as synonymous.  I count
25 yelling as yelling.  I can yell -- you can yell at

Page 219

1 your children, but I wouldn't say that is screaming,
2 they might.
3     Q.   Okay.  So in terms of the behavioral cues
4 with respect to identifying things that are
5 generally present in a person who is in an excited
6 delirium state, screaming, yes or no?
7     A.   I would say no.  But yelling, yes.
8     Q.   Incoherent speech?
9     A.   Somewhere after he exited the patrol car,
10 he did report that.
11    Q.   Naked or stripping off of clothing?
12    A.   Stripping off of some clothing was
13 reported.
14    Q.   Disorientation?
15    A.   Not present.
16    Q.   Superhuman strength?
17    A.   Not present.
18    Q.   Diminished sense of pain?
19    A.   (No response.)
20    Q.   Violent resistance during control and
21 restraint?
22    A.   At the top of the stairs, I would say
23 that was violent.
24    Q.   Delusions of grandeur?
25    A.   But when you put that down, put capture

Page 220

1 behind it.
2     Q.   Capture, is that in your article?
3     A.   Yeah, capture, control, restraints and
4 transport.  This is only control and restraint.
5 That's different than capture.  When he was at the
6 top of the steps, he was trying to capture
7 Mr. Robinson, that's different than control and
8 restraint.
9     Q.   Does violent resistance cover it?
10    A.   If you put capture behind it.
11    Q.   So Officer Kenny was trying to capture
12 him not control or restrain him, is that what you're
13 trying to --
14    A.   You can't control and restrain somebody
15 until you capture them.
16    Q.   Okay.
17    A.   That's the way the model works.
18    Q.   Okay.
19    A.   I just want to make it clear so it's
20 consistent.
21    Q.   Sure.  Delusions of grandeur?
22    A.   No, not aware of that.
23    Q.   Easily distracted?
24    A.   (Witness shakes head.)
25    Q.   Lack of focus, no, right?



JOHN PETERS, PH.D.                                    October 20, 2016
ROBINSON vs. The CITY OF MADISON                             221–224

Page 221

1    A.   Right.
2    Q.   Scattered ideas.
3    A.   (No response.)
4    Q.   Acute onset?
5    A.   Nobody knows or the officer didn't know.
6    Q.   And makes people feel uncomfortable?
7    A.   I think that's fair.  Made Mr. Limon and
8   his girlfriend feel uncomfortable.  So.
9    Q.   Okay.  So now we can mark this as
10  Exhibit 219, is that right?
11   A.   No, this is 214.  I don't know.
12   Q.   Is Exhibit 219 accurate reflection of the
13  discussion we just had?
14   A.   Yes.
15   Q.   Okay.  Thank you.
16        (Whereupon, Exhibit 219 was
17        marked for identification.)
18        (A recess was taken.)
19        (Whereupon, Exhibit 220 was
20        marked for identification.)
21  BY MR. OWENS:
22   Q.   Doctor, during the break we made copies
23  of some handwritten notes that you took.  Am I right
24  that these are three pages of notes from Danny
25  Waller's deposition?

Page 222

1    A.   Correct.
2    Q.   And here you've got them identified as
3   the "Summary"?
4    A.   Correct.
5    Q.   Now, is this intended to be a summary of
6   the entire things, the parts that you thought were
7   important?  How did you determine what went in this?
8    A.   It's not a summary of the entire
9   deposition.
10   Q.   Sure.
11   A.   Because parts of it were not relevant.
12   Q.   Yeah.
13   A.   And then just key things I read that
14  surfaced that I wrote down.
15   Q.   Okay.  Now, the -- if you could just help
16  me out, do you see where it's 35 and then colon 7 on
17  the first page?
18   A.   Yes.
19   Q.   Is that -- says "was a large knife or
20  sword upstairs"?
21   A.   Correct.
22   Q.   And then what does it say directly below
23  that?
24   A.   "Admits person," parentheses, "victim be
25  attacked and says nothing."

Page 223

1    Q.   Okay.
2    A.   Sorry about the handwriting.
3    Q.   No, mine is worse.  I can't read mine at
4   all.
5        So I just wanted to make these part of
6   the record that's -- this is just the stuff that you
7   considered important as you were going along for
8   your purposes in examining Mr. Waller's deposition;
9   is that right?
10   A.   Yes.  As I read it, I made those notes.
11  I may have gone back and pulled out other things
12  that I didn't write down as I wrote my report.
13   Q.   Okay.
14   A.   But generally I try to summarize.
15   Q.   Now, in report right -- excuse me,
16  Opinion No. 8 in your report, you discuss -- and
17  again, let's keep Mr. Waller's testimony out of this
18  and let's just talk about your opinion.
19        And what I'd like to understand is,
20  you've got the study here and then that itself cited
21  some other studies that you provided to us on disc
22  today, right?
23   A.   Right.
24   Q.   And then now, your opinion is that
25  stressful events such as the use of deadly force do

Page 224

1   have an impact on witness recall, correct?
2    A.   Correct.
3    Q.   And your final paragraph of your report
4   is that stressful events had been shown to have an
5   impact on memory.  There's no evidence that Officer
6   Kenny's inaccurate recall of some of the details of
7   his deadly force encounter with Mr. Robinson has
8   been intentional, even though he later qualified
9   some of the statements he made following the close
10  combat encounter, correct?
11   A.   Correct.
12   Q.   The first thing is what are -- can you
13  specifically identify for me what opinions or
14  statements that he made that you found that he later
15  qualified?
16   A.   I would have to go back and look, and I
17  didn't put those in there and that's my fault.  I
18  think there was some discussion he did a walkthrough
19  of the crime scene.  There was a period of time
20  between the interviews.  I remember that coming up.
21  And I think, as I recall, he just provided more
22  detail about certain aspects of what took place than
23  what he initially had reported.
24        I would have to go back and look
25  specifically.



JOHN PETERS, PH.D.                                          October 20, 2016
ROBINSON vs. The CITY OF MADISON                              225–228

Page 225

1    Q.   Okay.  So there's nothing that comes to
2  mind specifically you didn't think about?
3    A.   No.
4    Q.   Okay.  Now, is this opinion, are you
5  saying in this opinion that if there is some details
6  that Officer Kenny got that are inaccurate or
7  contradict objective evidence that we should say
8  that his memory should be -- is expected to be
9  infallible -- excuse me.  Let me back up and ask it
10  again.  Strike all of that.
11       Is it your opinion here that because this
12  was a stressful event that any inaccuracies in
13  Officer Kenny's account of the shooting event can be
14  accounted for by the stress of the incident?
15    A.   No.  What I'm saying is there's
16  scientific study that would show that stressful
17  events can impact memory recall.
18    Q.   Sure.
19    A.   That's all I'm saying.  And there seems
20  to have been some concern about that with
21  Mr. Waller, and I was just coming back to refute
22  that in the sense that there have been scientific
23  studies.  There have been several studies, as a
24  matter of fact.  I tried to only go with peer
25  reviewed publications that would reference that

Page 226

1  because there are some -- there has been some other
2  studies that have been done, but I'm not sure
3  they've been peer reviewed or published.
4    Q.   Okay.
5    A.   As peer-reviewed publications.
6    Q.   Got it.  And so stressful events can
7  impact memory which can affect a witness's or
8  participant's ability to accurately report details
9  about what happened during that event; is that
10  right?
11    A.   Sometimes, yes.
12    Q.   Okay.  And there is no way identified
13  here from discerning the accurate facts from the
14  inaccurate ones, correct?
15    A.   Well, I think we talked about that a
16  little earlier about what the video showed versus
17  what the officer recalled, and I think that's part
18  of that.  That would go to this.
19    Q.   Sure.  But let's say that there's no
20  video and you've got a stressful event here, and do
21  you have any mechanism for determining which facts
22  the officer got correct and which ones he got
23  incorrect about the incident?
24    A.   No, I don't think there's a way to really
25  do that in a vacuum.  I think you have to use the

Page 227

1  potential evidence or what was there found or
2  collected at the scene.  If you had -- for example,
3  if the Officer said well, my first shot was outside
4  on the sidewalk, and you had shell casings at the
5  sidewalk, that might indicate that he's right.  If
6  he said I fired my first shot in the basement and
7  nobody has been in the basement, there's no shell
8  casings, that might serve to bring that statement
9  into question.
10    Q.   So you would look to other objective
11  evidence to sort of determine whether it
12  corroborates or undermines or contradicts the
13  officer's account?
14    A.   Yeah, you would certainly use that.  Not
15  that any -- and it would depend on the evidence
16  itself.  If I said that I started shooting right
17  where I'm sitting now but the shell casings were in
18  the corner, well, that doesn't mean that I'm
19  inaccurate, it may mean somebody came in here and
20  kicked the shell casings as part of the scuffle or
21  part of the event.  So there's a lot of variables
22  you have to take into account.
23    Q.   Okay.  Could you also be lying if you
24  said that?
25    A.   Oh, sure.  I mean, it's always a

Page 228

1  possibility.
2    Q.   Right.  And the study that you cite
3  doesn't consider lying or deliberate fabrication,
4  right?  It's beyond the scope of their study, right?
5    A.   No, there were several studies listed
6  here and one of the studies -- and I'm trying to
7  think which one it was.  I think it was -- might
8  have been Hope, Gabbert, Fraser.  One of the
9  studies -- and it's on that disc I gave you.
10    Q.   Sure.
11    A.   Talked about letting officers talk, it
12  was something about the crossroads.  And if I talked
13  to you -- they had a scenario -- and then your side
14  of the table talked to my side of the table and then
15  we all wrote reports, and they found --
16    Q.   You're referring to crossroads in Counsel
17  Magazine?
18    A.   That's correct.
19    Q.   Okay.
20    A.   And basically they found that there
21  wasn't really much deviation from what I perceived
22  as I reported even though I may have heard things
23  from you.
24    Q.   Right.  But you agree that the quote you
25  put here and the standard that you're quoting from



Case: 3:15-cv-00502-jdp   Document #: 84   Filed: 11/04/16   Page 58 of 63

JOHN PETERS, PH.D.                                    October 20, 2016
ROBINSON vs. The CITY OF MADISON                             229–232

Page 229

1  most directly says that deliberate fabrications
2  outside the scope of that study, right?
3      A.   Correct.
4      Q.   And that study is, at least what I
5  thought from what you were saying, a significant
6  study because it was the first to document the
7  physiological difference between witnesses who have
8  different roles in responding to the same incident,
9  right?
10     A.   I don't know if it was the first, it was
11  one of the first.
12     Q.   That's what's in your report?
13     A.   Right.
14     Q.   Do you have any reason to doubt what is
15  in your report?
16     A.   No.  First of all, I didn't say that
17  Counsel.  And I'm going to take issue with that, and
18  I'm not being nasty.  It says at the bottom the
19  researchers noted this is the first study.  I didn't
20  note it, I'm reporting it.  I just want that for
21  clarification.
22     Q.   Okay.  Sure.
23     A.   They claim it was the first study.  I
24  have no way to validate that one way or the other.
25  But they said it was the first study.  I'm going to

Page 230

1  have to go along with that.  I think it was the
2  first published study.
3          I think for science did studies early on,
4  but those studies may not have been published until
5  this collaboration.  There's also studies,
6  independent of this one, on eyewitness accounts that
7  we're all familiar with of eyewitness inaccuracies
8  to accidents and what have you.  I think this is the
9  first one, as you cited correctly, a first
10  responder-type situations like this.
11     Q.   Got it.
12         So, I mean, you don't have any reason to
13  doubt that this article published in Law and Human
14  Nature is correct when they say that this is the
15  first study to document a physiological difference
16  between witnesses who have different roles in
17  responding to the same incident?
18     A.   No, I don't have anything to prove or
19  disprove that.
20     Q.   Well, you're relying on it --
21     A.   I'm relying on it.
22     Q.   -- in rendering opinions in this case,
23  correct?
24     A.   Yeah, I'm not relying on the fact that it
25  was a first, I'm relying on the fact that there were

Page 231

1  findings.
2      Q.   Well, you're relying on it because you
3  believe that this was a scientific valid study?
4      A.   The sample size was over 50, which is a
5  good thing.  I think the sample size was 75 or 6,
6  when I read the study, as much as you can read about
7  the methodology, it appeared to be fairly sound.  It
8  was done and published by several university
9  researchers.  So peer reviewed, while it doesn't
10  guarantee a hundred percent, certainly goes a long
11  way toward accuracy.
12     Q.   But you cited it because you believe it
13  to be reliable?
14     A.   Correct.
15     Q.   Is there a reason that you included the
16  number 76 even though not all 76 officers
17  participated in the study?
18     A.   Yeah.  It was reported at 76.  I put the
19  end down at 76, mostly for purposes to show the
20  size, the overall initial size of the study.
21     Q.   But wasn't the size really 64?
22     A.   It was sixty -- ultimately, they weaned
23  it out to 64, which is still over 50.  And that
24  becomes important under the -- what's a statistical
25  concept called the theory of generalizability, where

Page 232

1  you have to have a minimal sample size.  So this
2  certainly exceeded that minimal sample size.
3      Q.   Then the number of people that were
4  actually part of the study and participated in it
5  they got information from was not 76, right?
6      A.   Right.  They started out with 76.  They
7  weaned some of them out, so when you -- whenever you
8  do a study you always start with here's what we
9  started with, here's what we ended with.  I gave a
10  gross amount in the beginning.
11     Q.   You say weaned them out.  I thought that
12  some of them just couldn't do it for, you know,
13  scheduling reasons, they had other life conflicts?
14     A.   That's weaning them out.
15     Q.   Okay.
16     A.   Those are all variables as to why people
17  can't participate.  When I did research, I had some
18  people on vacation, so they weren't included because
19  they weren't around.
20     Q.   Sure.
21     A.   That just happens.
22     Q.   Now, the -- I think this is clear, but I
23  just want to make sure that you have no way of
24  determining whether or not if stress influenced
25  Officer Kenny's recall which facts he could have got



JOHN PETERS, PH.D.                                          October 20, 2016
ROBINSON vs. The CITY OF MADISON                              233–236

Page 233

1  right and which facts he could have got wrong,
2  correct?
3     A.   Don't know.
4     Q.   And in the study officers were mistaken
5  about significant facts about the force incident,
6  right?
7     A.   Correct.
8     Q.   That they thought the suspect had a
9  weapon when he didn't, right?
10    A.   Right.
11    Q.   So you don't have a way of distinguishing
12 whether or not Matt Kenny could have been right or
13 wrong about minor details or even very significant
14 ones, right?
15    A.   I don't know.
16       MR. OWENS:  Can you read that question
17 back?
18       (Record read.)
19 BY MR. OWENS:
20    Q.   So on Opinion No. 8, you're not
21 expressing an opinion here one way or the other
22 about whether or not doing a walkthrough could
23 improve recall or not, correct?
24    A.   No.  I didn't put that in here, although
25 there is scientific proof to show that that usually

Page 234

1  improves recall.
2     Q.   Okay.  And you're not opining one way or
3  the other whether or not the force science
4  literature on a cool off period improves recall one
5  way or the other, right?
6     A.   Well, I don't have it in here, but I'm
7  aware of the studies that say, you know, usually
8  wait a period of time to do your interviews and that
9  type of thing.
10    Q.   Right.  You're not offering those
11 opinions related to those topics in this case?
12    A.   No, this was strictly aimed at what your
13 expert wrote in his report.
14    Q.   And aside from being familiar with some
15 of these studies, do you have any particular
16 expertise in evaluating the effect of stress on
17 memory and recall?
18    A.   No, I don't do those types of studies.
19       MR. OWENS:  We'll just take two minutes.
20       (A recess was taken.)
21 BY MR. OWENS:
22    Q.   So the last paragraph in your report you
23 mentioned, "There's no evidence that Officer Kenny's
24 inaccurate recall of some of the details of his
25 deadly force encounter with Mr. Robinson has been

Page 235

1  intentional," right?
2     A.   (Witness nods head.)
3     Q.   Is there any evidence to show that it was
4  unintentional?
5     A.   No.
6     Q.   And officers, and I know you do a lot of
7  training, know that if they use deadly force in an
8  unjustified manner they could be subject to criminal
9  penalties, correct?
10    A.   Sure.
11    Q.   And they know that they could be possibly
12 sued in a lawsuit, correct?
13    A.   Correct.
14    Q.   And I just want to be clear that there's
15 no information that you're aware of, either way,
16 whether Officer Kenny's inaccurate recall of details
17 in the case was intentional or unintentional, right?
18    A.   I would have no way of knowing.
19    Q.   Okay.  But it is your opinion that
20 Officer Kenny did inaccurately report some of the
21 information in this case?
22    A.   I think initially, and then it was
23 clarified after, I think, the walkthrough and some
24 time.
25    Q.   So what details did Officer Kenny, in

Page 236

1  your opinion, misremember?
2        MR. HALL:  Objection to form.  Asked and
3  answered.
4        Go ahead.
5        THE WITNESS:  We kind of went over this
6  before.  I think probably the biggest one was what
7  the video showed versus what he reported.  I think
8  that was right at the end, at that end frame.  And I
9  think that was probably the one that stands out in
10 my mind.
11 BY MR. OWENS:
12    Q.   Okay.  Now, you're unaware of -- excuse
13 me.
14       Are you able to determine whether any of
15 the other details Officer Kenny provided are
16 accurate or inaccurate due to the stress of the
17 event?
18       MR. HALL:  Objection to form.  Asked and
19 answered.
20       THE WITNESS:  I'm not quite sure I follow
21 your question.  As I recall, it was some objective
22 evidence that he was punched.  But regarding
23 anything else that took place, I wouldn't know
24 whether stress impacted that or not.
25 ///



JOHN PETERS, PH.D.
ROBINSON vs. The CITY OF MADISON

October 20, 2016
237–240

Page 237

1  BY MR. OWENS:
2      Q.   So there was subjective evidence that he
3  had a cut on his head, is that what you're referring
4  to?
5      A.   Yes.
6      Q.   Now, is there any other evidence other
7  than that that would preclude him from being wrong
8  about whether he was punched and whether or not he
9  fell on the stairs?
10         MR. HALL:  Objection.  Foundation.
11         Go ahead.
12         THE WITNESS:  I wouldn't know.
13  BY MR. OWENS:
14     Q.   Okay.  Is there any way to know whether
15  Officer Kenny was right about being punched or
16  whether he fell or whether something else happened?
17     A.   Well, I think there is a way to describe
18  whether or not he fell because if he had fallen, he
19  would have been upside down, if you will, on the
20  steps or tumbled backward.  And I don't think he
21  would have had him exiting that doorway in the
22  manner that the video showed.
23     Q.   Could he have fallen forward?
24         MR. HALL:  Objection to form.
25  Foundation.

Page 238

1          THE WITNESS:  If he fell forward, it
2  would have been a trip and he would have fallen,
3  allegedly, into Mr. Robinson, which there is no
4  discussion about that taking place.
5  BY MR. OWENS:
6      Q.   Okay.  Now, you're aware that Officer
7  Kenny says that he hit his head into the wall,
8  correct?
9      A.   Correct.
10     Q.   Now, there was no drywall or anything
11  like that on Officer Kenny when his pictures were
12  taken, you didn't see anything like that, right?
13     A.   I didn't see anything in those, no.
14     Q.   Now, you don't have any way of knowing
15  whether Officer Kenny is accurate in his report of
16  how he got that cut on his head one way or the
17  other, correct?
18     A.   No, just how he described it.  I wasn't
19  there.
20     Q.   Right.  But in the context of your
21  opinions that stressful events can affect an
22  officer's ability to recall correctly, we don't know
23  whether or not he got that detail right or wrong,
24  correct?
25     A.   That's a fair statement.

Page 239

1      Q.   Now, you said that two-thirds of your
2  current income comes from -- I'm going to get the
3  acronym wrong.  Can you help me?
4      A.   IPICD.
5      Q.   IPICD?
6      A.   Correct.
7      Q.   And can you explain to me the
8  relationship between your work at IPICD and your
9  consulting work, are they related?
10     A.   They're related, I guess, in a sense.
11  IPICD is a corporation.  The consulting business is
12  a dba, so they're two separate entities.  The
13  training business and the program development and
14  instructional design that goes with that and in some
15  cases research that we do in the institute allows me
16  to gain insights in the specific issues that
17  ultimately may help me on the consulting side.
18  That's probably the best way to describe that.
19     Q.   Okay.  How do you determine whether or
20  not to be -- come involved in a case, so to be
21  retained?
22     A.   Generally the process I use is regardless
23  of who the counsel is, you get a phone call and
24  somebody says I got this case.  Generally, they'll
25  name the caption of the case and say do you have a

Page 240

1  conflict.  If I do, I say I do.  If I don't, I say I
2  don't.  And they'll give me what I call their
3  version of the facts.  And my usual practice is send
4  me a couple police reports or send me something and
5  I'll take a look at it and determine whether or not
6  I can be of assistance in the case.
7          That's usually how I work.  I may call
8  them back and say I can help you with this piece but
9  I can't help you with that piece, or I can't help
10  you at all or I can help you with everything, it
11  just depends.
12     Q.   Does it depend at all on whether or not
13  you're supporting an officer or opposing one?
14     A.   No.
15     Q.   Earlier we discussed the agitated chaotic
16  events trademark.
17     A.   Correct.
18     Q.   You said that was a common law trademark?
19     A.   Correct.
20     Q.   Was that for your consulting business or
21  is that the trademark for IPICD?
22     A.   For the IPICD.
23     Q.   Okay.  What's the purpose of having a
24  trademark?
25     A.   The purpose of having a trademark is



JOHN PETERS, PH.D.                                    October 20, 2016
ROBINSON vs. The CITY OF MADISON                          241–244

Page 241

1 basically to identify your intellectual property.
2 And we're in a process right now of securing some
3 federal marks so that they become ours so we can
4 brand that and move it forward.  I mean, that's just
5 part of the marketing branding process.
6     Q.   Got it.
7         And is part of that so that people would
8 have to pay you to be able to use your trademark?
9     A.   No.  When we have somebody go through our
10 program we license them at no cost.
11    Q.   They have to pay for the program?
12    A.   They have to pay for the program, sure.
13    Q.   Okay.  And having a trademark increases
14 the value of the program, right?
15    A.   I'm not sure if governmental entities really
16 understand that, that part of the process.  They're
17 more interested in what's the information, can I get
18 it and we got to teach our people.
19    Q.   Got it.
20        Now, the IPICD, the cases that you have
21 in your testimony history, is there a way to
22 determine which ones you did affiliated with them
23 and which ones you did affiliated with other
24 entities or is all of your testimony history related
25 to your consulting and expert --

Page 242

1     A.   It's all related to the consulting
2 business.
3     Q.   Okay.  So in your capacity as a IPID
4 [sic] founder and president, you don't consider that
5 part of your testimony experience?
6     A.   Not sure I understand that question.
7     Q.   Sure.  So IPICD has been involved in a
8 number of cases, right?
9     A.   No.
10    Q.   There are judicial decisions listed on
11 your website, right?
12    A.   Well, there's judicial decisions listed
13 on the website because we put them there.
14    Q.   Right.
15    A.   It doesn't mean that I was involved in
16 them.
17    Q.   So the judicial decisions listed on the
18 website aren't cases that you were involved in?
19    A.   Not necessarily, no.
20    Q.   Okay.
21    A.   If you have some examples --
22    Q.   No.  I'm just wondering how it works for
23 you.  So there's judicial decisions on the website
24 of the company that you are the president and
25 founder of, and I'm wondering how you determine

Page 243

1 which decisions go on that site?
2     A.   Most of the decisions on that site -- we
3 have a lawyer on our -- we have two lawyers on our
4 board of directors and many times they will send
5 me -- or not me, they'll send our Web guy analysis
6 or they may send a summary or they may send the case
7 and say this needs -- this is something that's
8 relevant for people who come to the website.
9 Because if you go under our articles and
10 publications and that link on our website, you'll
11 get a whole bunch of different things.
12        Sometimes Wayne Schmitt from the
13 Americans for Effective Law Enforcement will send us
14 stuff as well and we'll put that up.  And sometimes
15 people will write short summaries about a case and
16 we'll put those up, maybe with a hyperlink in the
17 case or to some other organization.
18        MR. OWENS:  Can we mark this as
19 Exhibit 220, please.
20        MR. HALL:  221.
21        MR. OWENS:  221.  Thanks.
22        (Whereupon, Exhibit 221 was
23         marked for identification.)
24 BY MR. OWENS:
25    Q.   So Exhibit 221, I'll represent to you is

Page 244

1 the judicial decisions portion of the website from
2 ICIPD, does that look familiar to you?
3     A.   Yes.
4     Q.   So I just want to be clear, the decisions
5 listed here are not necessarily cases that the ICIPD
6 has been involved in?
7     A.   If you look right there it says, "These
8 cases were compiled by the Americans for Fffective
9 Law Enforcement."
10    Q.   Is that a yes or a no?
11    A.   These came from AELE legal center.  I
12 didn't participate in putting these together, these
13 all came from AELE.
14    Q.   And what's AELE law enforcement legal
15 center?
16    A.   It's the Americas for Effective Law
17 Enforcement.  It's a legal center.  They're in Park
18 Ridge, Illinois right outside of Chicago, just west
19 of the city.  It's a group that provides legal
20 training for lawyers, police and others.  They write
21 amicus briefs on certain issues.  Everyone involved
22 at AELE, except administrative staff, are lawyers.
23 They put on seminars here in Las Vegas on a regular
24 basis.  I'm on the faculty of AELE for a couple
25 programs, not all of them.



JOHN PETERS, PH.D.
ROBINSON vs. The CITY OF MADISON

October 20, 2016
245–248

Page 245

1    And this was put together either by Wayne
2  Schmitt himself who was the executive director at
3  the time, now it's Judge Plitt, or this was put
4  together by one of their legal researchers. But I
5  didn't put any of this together.
6    Q.   Okay. So they put it together, and then
7  did you ask them to put it together so you could put
8  it on your website or how does that work?
9    A.   Wayne Schmitt, early on when we started
10  the institute, came to me and said, "You need to
11  have some court decisions on there. Could we send
12  you a few?" And when you click on the link it
13  should go to their website. So it was a way of
14  getting the word out about AELE as well. So we were
15  grateful to have it. And we said sure, we will put
16  it up there.
17    Q.   This may be an obvious question. When
18  you click the links to some of the cases and
19  portions of the cases are highlighted, you don't
20  know anything about that?
21    A.   I don't have anything to do with that.
22        MR. OWENS: Okay. I think that's all the
23  questions.
24        MR. HALL: I've got just a couple of
25  follow-up questions.

Page 246

1                EXAMINATION
2  BY MR. HALL:
3    Q.   Dr. Peters, can you briefly describe your
4  background with Tasers?
5        MR. OWENS: Object to the form. With
6  Taser themselves or with TASER the company?
7        MR. HALL: Tasers.
8        THE WITNESS: The device?
9  BY MR. HALL:
10    Q.   The device.
11    A.   I first became aware of what I call the
12  new Taser in 2005. I attended the 2005 TASER
13  conference on the devices that was here in Las
14  Vegas. Then I want through the master instructor
15  school. And then a couple years later when the X3
16  came out, I went back through the master instructor
17  school. I have, I believe, all the lesson plans
18  that TASER has which now can be downloaded off the
19  TASER website, believe it or not.
20        So I'm pretty familiar with the system as
21  it works. The contracts that are signed by
22  trainers, the bulletins that are issued. I call
23  them on a regular basis, more of an as needed basis
24  that is determined by the company. And then when
25  those bulletins -- the way that process works, every

Page 247

1  instructor signs a formal agreement with the company
2  that says, I believe it's 48 hours prior to teaching
3  a class you have to go to the TASER company website,
4  look at all the latest information, incorporate that
5  into your class. Any TASER bulletins, product
6  warnings or training information has to be passed on
7  to your students as it becomes available.
8        So, for example, in 2009 when the target
9  change took place everybody immediately -- all the
10  instructors had to immediately go tell their
11  students and their officers here's the target change
12  effective immediately, so that's how it works.
13    Q.   Now, when you say you went through the
14  master instructor school, does that mean you're
15  certified as a master instructor for TASER?
16    A.   No. The reason is, I went through the
17  master instructor school to gain the information,
18  but I did not want the certification even though I
19  was entitled to it. I took all the tests, passed
20  everything but on the fourth day of the program one
21  of the legal people came in and said we don't
22  consider master instructors experts.
23        So I went to the Legal, vice president of
24  Legal and said that doesn't make any sense. He
25  goes, "All a master instructor is is someone who can

Page 248

1  go out and train instructors." He said, "We don't
2  consider them experts."
3        So I went to the senior trainer and vice
4  president at that time and said, "Look, give me a
5  certificate. I went through it, but don't certify
6  me because I don't want that designation."
7        So that's why I did. But I've been
8  through the XREP training. I've been through the
9  TASER technicians course, the evidence course, the
10  X2, the X26, the M26, the XP, I've been through
11  those trainings.
12    Q.   Okay. I think in some of your testimony
13  just now and previously you had talked about how
14  warnings and protocols from TASER have changed over
15  the years; is that accurate?
16    A.   Yes.
17    Q.   Once an officer receives training, how,
18  if at all, are those changes in warnings or changes
19  in protocols coming from TASER, how are those
20  communicated to officers?
21        MR. OWENS: Object to the form of the
22  question and to the extent that this is possibly a
23  new opinion that is not contained in his report.
24        THE WITNESS: TASER International has a
25  software program, I'll use that, I don't know how



Page 249

1 else to describe it, that whenever a change comes
2 out it's communicated electronically with all
3 instructors. And that is timestamped and documented
4 on the software that it was sent to that instructor.
5      Because of the contract that you sign
6 with the company that says upon receipt of any new
7 information it becomes the instructor -- the
8 instructor's obligation at that point to open that
9 e-mail or letter, read it and then immediately pass
10 it on to everybody who he or she is trained.
11 Generally the officers are in a department, so they
12 pass it on to the department right away.
13      MR. HALL: That's all the questions I
14 have.
15
16      FURTHER EXAMINATION
17 BY MR. OWENS:
18   Q.   I want to be clear that you didn't get
19 the certification from TASER as a master instructor
20 because they told you during the course you wouldn't
21 be considered an expert by TASER?
22   A.   Correct.
23   Q.   And that mattered to you because it would
24 affect your ability to hold yourself out as an
25 expert and master instructor; is that right?

Page 250

1   A.   No, I didn't refuse it for that purpose.
2 I refused it because when you make a statement like
3 that to about 400 people and then you make it around
4 the country, I didn't want somebody coming in going,
5 TASER said they don't even consider you an expert.
6 So I took the knowledge, read the research, did all
7 of those things, conducted some of my own primary
8 research on Taser deployments and left it at that.
9   Q.   You didn't want TASER to undermine your
10 ability to hold yourself out as an expert in
11 consulting and providing expert testimony concerning
12 TASER; is that correct?
13   A.   No, I didn't want plaintiff or defense
14 counsel come in and say even the company doesn't
15 consider you an expert because you went through a
16 five-day training program. It's much bigger than
17 that. And I questioned them pretty hard about that,
18 but I didn't go to the training to become an expert,
19 I went to the training to understand how the device
20 worked and what it did. The basic instructors I had
21 no problem with, but the extra five days is where
22 the red flag went up.
23   Q.   Got it.
24      MR. OWENS: That's, I think.
25      MR. HALL: Kate, no questions?

Page 251

1      MS. HARRELL: None for me. Thank you.
2      MS. REPORTER: Kathryn, are you going to
3 need a copy of the transcript?
4      MS. HARRELL: Yeah. Can you do a
5 condensed and e-trans.
6      (Thereupon, the taking of the deposition
7           concluded at 4:47 p.m.)

Page 252

1         REPORTER'S DECLARATION
2 STATE OF NEVADA      )
                       ) ss
3 COUNTY OF CLARK      )
4      I, Jualitta Stewart, a duly commissioned
Notary Public, Clark County, State of Nevada, do
6 hereby certify:
7      I reported the taking of the deposition
8 of the witness, JOHN G. PETERS, JR., PH.D.,
9 commencing on Thursday, October 20, 2016, at the
10 hour of 9:13 a.m.
11      That prior to being examined, the witness
12 was by me duly sworn to testify to the truth, the
13 whole truth, and nothing but the truth.
14      That I thereafter transcribed my said
15 shorthand notes into typewriting and that the
16 transcript is a complete, true, and accurate
17 transcription of said shorthand notes.
18      I certify that I am not a relative or
19 employee of any party involved in said action, nor a
20 person financially interested in the action.
21      IN WITNESS WHEREOF, I have hereunto set
22 my hand and affixed my official seal in my office in
23 the County of Clark, State of Nevada, this 1st day
24 of October, 2016.
                              Jualitta Stewart
25
   JUALITTA STEWART, RPR, CCR No. 807