IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

THE ESTATE OF TONY ROBINSON, JR., *ex rel.*
PERSONAL REPRESENTATIVE ANDREA IRWIN,

                          Plaintiff,                              OPINION & ORDER

          v.
                                                                  15-cv-502-jdp
THE CITY OF MADISON, WISCONSIN, and
MATTHEW KENNY,

                          Defendants.

On March 6, 2015, Matthew Kenny, a Madison police officer, was sent to a residential address on Madison's east side to check on Tony Robinson after several 911 calls had reported Robinson's erratic behavior. Less than a minute after Kenny arrived, he shot and killed Robinson in the stairwell of the residence. Kenny was cleared by an internal investigation by the Madison Police Department, which determined that the shooting did not violate department policies concerning the use of force. The district attorney declined to bring criminal charges against Kenny.

Robinson's mother, Andrea Irwin, brings this civil lawsuit under 42 U.S.C. § 1983 in her capacity as the personal representative of Robinson's estate. Plaintiff alleges that Kenny violated Robinson's rights under the Fourth Amendment by using objectively unreasonable force against him. Kenny contends that his use of force was reasonable because he believed that Robinson was assaulting someone, and that when he entered the building to investigate, Robinson attacked him. Plaintiff alleges that the City of Madison is also responsible for Robinson's death because the police department conducts shoddy investigations that do not

hold officers accountable for shootings, thus encouraging officers to use deadly force with impunity.

Both Kenny and the City have moved for summary judgment, Dkt. 43 and Dkt. 47, contending that the material facts are undisputed and that plaintiff's claims must fail as a matter of legal principle. The parties have also filed a number of motions asking the court to exclude some of the other side's expert evidence. Dkt. 56; Dkt. 58; Dkt. 59; Dkt. 60; Dkt. 80; Dkt. 81; Dkt. 103; Dkt. 104; Dkt. 114; Dkt. 115. Expert evidence is critical to this case, because Kenny is the only remaining witness to what happened in the stairwell. Both sides rely on expert interpretation of the physical evidence to confirm or contradict Kenny's version of the events. Under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), the court must serve as a gatekeeper and decide whether the proffered expert evidence is reliable and relevant enough to be admitted. So, before considering the motions for summary judgment, the court must decide what evidence it will allow in the case.

As explained in this opinion, some of the opinions of the experts are too speculative to be admitted and some are legal conclusions that the court will disregard because those are matters for the court or the jury to decide. But, for the most part, the court concludes that the parties' expert evidence is admissible. And, based on this evidence, what happened in the stairwell on March 6, 2015, is sharply and genuinely disputed. Thus the court must deny Kenny's motion for summary judgment. Whether Kenny's use of force was objectively unreasonable is an issue that must be resolved at trial.

But the court will grant the City's motion for summary judgment. The City is not automatically liable for the unconstitutional acts of its employees. *Monell v. Dep't of Soc. Servs. of City of N.Y.*, 436 U.S. 658, 691 (1978). Rather, the City itself is liable only if the

constitutional violation can traced back to some City policy, widespread practice, or decision by a City policymaker. *Id*. As explained below, plaintiff's *Monell* claim fails because plaintiff cannot establish that there was a policy or widespread practice of shoddy investigation of officer-involved shootings, or that the City was aware of and deliberately indifferent to a problem with those investigations, or that the shoddy investigations were the "moving force" behind Kenny's use of force.

The bottom line is that plaintiff has not adduced evidence to show that Robinson died because the City turned a blind eye to obvious problems with the police department's investigation or response to officer-involved shootings. Accordingly, plaintiff's constitutional claim against the City fails. But the court's decision to grant summary judgment to the City is not an endorsement of the investigation of the Robinson shooting. The evidence plaintiff brings to this court raises a genuine dispute whether Kenny's use of force in this case was objectively unreasonable, and that is an issue for jury to decide.

## FACTS

Except where noted, the following facts are undisputed for purposes of summary judgment.

### A. March 6, 2015

On March 6, 2015, Tony Robinson and a friend, Anthony Limon, had planned to take psilocybin mushrooms (commonly referred to as 'shrooms). Anthony got called into work, but at some point, Robinson took the mushrooms on his own. Around 4:00 p.m., Javier Limon and his girlfriend, Kelly Austin, were at the second-floor apartment that Javier shared with Anthony at 1125 Williamson Street. Robinson showed up a short time later, but Javier

and Austin stayed in Javier's bedroom with the door closed. After about an hour, Javier had not heard anything from Robinson. Javier went to check on him, and he found Robinson in Anthony's bedroom, "balled up on the bed in the corner." Dkt. 41-2, at 2. Robinson began shouting at people who were not there. At some point, Javier's cousin arrived. Robinson continued to yell, and he and Javier's cousin pushed each other around. Eventually Javier told Robinson to leave. But Robinson continued to behave erratically, and Javier was unable to get Robinson out of the apartment. Javier and Austin left; Robinson followed. Javier and Austin got in her truck to leave, but not before Javier saw Robinson leap out in front of traffic. At that point, Javier called 911.

At 6:28 p.m., Javier reported to the 911 operator that he was at a gas station on Williamson Street and that a "guy's tweakin. He's chasing everbody [sic] and fuckin yellin, and I don't know. He's tweakin on some shit . . . he's really outrageous right now. He fuckin scared me and my girlfriend." Dkt. 41-1, at 1. Javier said that he lived across the street from the gas station, gave his address, and described Robinson's appearance. The 911 operator asked Javier whether Robinson had any weapons; Javier responded, "I don't think so, no." *Id.* Javier told the operator that he had left the scene. Javier explained that Robinson was his friend and that he may have taken mushrooms, although he was not sure. Javier then reiterated that Robinson did not have a weapon and that he does not normally carry weapons. The operator told Javier that she was sending officers to check on Robinson, and the call concluded.

Kenny was on patrol that evening. At 6:31 p.m., 911 dispatcher Jeremiah Chang asked for the locations of officers D8 (Kenny) and D7 (MPD Officer John Christian). Kenny reported that he was on Wilson Street; Christian was in the police department property

4

room. The dispatcher radioed "[f]or a check person. 1125 Williamson. Look for a M/B, light skin, tan jacket and jeans. Outside yelling and jumping in front of cars. 19 years of age. Name is Tony Robinson. Apparently he lives in MaFarland [sic]." Dkt. 39-1, at 1. The dispatcher reported that the 911 caller was no longer at the scene and "no weapons seen." *Id.* The dispatcher then reported that another 911 caller—a "victim," Lei Yang—reported that Robinson was at the gas station in that area. A third call about Robinson indicated that he had gone back inside Javier's apartment and that he had "[t]ried to strangle another patron." *Id.*

By that point Kenny had arrived at 1125 Williamson Street. A witness at the scene flagged Kenny down and told him that Robinson had gone through the door at the side of the building to the upstairs apartment. Kenny had parked his squad in the driveway, with his dash cam pointed toward the door to the upstairs apartment. At 6:38 p.m., Kenny radioed, "I'm going to have to enter," *id.*, drew his weapon, and went through the door to the stairway that led to the upstairs apartment. Seconds later, MPD Sergeant Jamar Gary radioed, "Shots fired." *Id.*

Kenny's dash cam video[1] provides objective evidence of a general factual outline that the parties do not dispute. The video shows Kenny pulling into the driveway at 1125 Williamson Street, exiting his vehicle, and approaching the house. He looks around the back of the house and toward the upper apartment windows, climbs onto the porch near the door, appears to say something into his radio, and places his hand on his weapon. At this point, the

---

[1] The audio for the dash cam video is taken from Gary's body microphone; Kenny was not wearing his microphone during the incident, in violation of MPD policy. Gary arrived at 1125 Williamson just before Kenny went through the front door. None of the parties object to the synchronization of the video or to the court's consideration of it.

audio kicks in, presumably marking Gary's arrival. Just under 20 seconds pass from Kenny going through the door to the shooting. The shooting begins with a quick volley of three shots; Kenny begins to back out of the doorway between the first and second shots. After the first volley of three shots, Robinson's feet appear over the threshold of the door, pointed up, soles out, indicating that he is not standing up. Kenny appears to dodge or jump over Robinson's feet as he backs onto the porch. He then fires a second volley of three shots. Kenny fires a seventh and final shot from the far edge of the porch before he hops off and shouts, "Stop right there! Don't move!"

A few additional points are undisputed. The parties agree that Kenny entered the stairwell before backup arrived. Kenny did not radio that he saw or heard any signs of a disturbance or exigency. Kenny heard only once voice coming from the upstairs apartment. The parties agree, based on the results of the autopsy, that Kenny hit Robinson with three non-fatal shots—to the right hand, the left shoulder, and the chin. Because those wounds were not marked with stippling (i.e., gunpowder marks), Kenny fired them from more than three to four feet away. Kenny fired four fatal shots—all to Robinson's chest, through his heart and other vital organs—close to Robinson's body, well within three to four feet, as evidenced by stippling. One of the wounds showed evidence of searing, suggesting that the muzzle of Kenny's gun was against or very near Robinson's skin when he fired.

The factual outline is undisputed, but the parties sharply dispute the details, particularly what happened in the stairwell, outside the view of the dash cam. According to Kenny, he could hear sounds of "a disturbance" coming from the upstairs apartment when he arrived. Dkt. 131, ¶ 88. Kenny heard yelling and screaming, and he approached the stairwell to hear more clearly. He heard the sound of someone striking something or someone; he

heard someone yell, "What are you going to do now, bitch[?]" Dkt. 40 (Kenny Dep. 301:21). Kenny believed that Robinson was in the upstairs apartment assaulting someone. *See id.* at 321:11-23. From where he was standing at the bottom of the stairs, Kenny could see that the top of the stairs opened directly to the upstairs apartment; the upper landing did not appear to have a door. Kenny drew his gun, held it at the low ready position with both hands, and went up the stairs. According to Kenny, when he neared the top of the stairs, he announced "Madison Police." Kenny moved toward his right on the stairs, to see into the apartment. Suddenly, Robinson turned the corner and punched Kenny in the head with a closed fist. Robinson continued to swing at him, and Kenny lost his balance and fell down the stairs. Kenny admits that he cannot recall exactly how he and Robinson reached the bottom of the stairs, but Kenny began shooting. According to Kenny, Robinson continued to move or "aggress" toward Kenny during each of the seven shots he fired. When he fired his final shot, Kenny observed Robinson "sitting up and pushing himself forward." *Id.* at 364:18-19.

Plaintiff disputes Kenny's account and offers an alternative one, relying on the dash cam video and testimony by forensics experts. The dash cam video shows that Kenny fired all seven shots from the bottom of the stairs; if Robinson did attack Kenny at the top of the stairs, Kenny did not shoot him then or there. According to plaintiff's forensics experts, Kenny likely fired three shots at Robinson from the bottom of the stairs, as Robinson came down the stairs. Kenny likely hit Robinson with three non-fatal shots first, from more than three to four feet away. According to plaintiff, the dash cam video demonstrates that Kenny was not flailing or falling down the stairs as he fired his weapon; he was perfectly controlled and on his feet, until he lunges to avoid tripping on Robinson as Robinson falls. Kenny fired his fourth, fifth, and sixth shots close to Robinson's body, within three to four feet. Kenny

continued to back out of the door and fired his seventh and final shot from the front porch, as Robinson was lying on the stairs.

So that is the central dispute in the case. According to Kenny, he believed that Robinson was assaulting someone in the second-floor apartment, and he went in to stop it. Kenny encountered an aggressive Robinson, who punched Kenny in the head, causing Kenny to sustain a concussion. Kenny feared for his life and fatally shot Robinson to protect himself. In plaintiff's version, Kenny was dispatched to a "check person" call, knew that he should wait for backup, but entered the building with his weapon drawn anyway. Then, as he stood near the bottom of the stairwell, Robinson appeared at the top, and Kenny fired unnecessarily. Robinson fell down the stairs and Kenny fired the fatal shots as he lay helpless at the bottom of the stairs.

Immediately following the shooting, Gary went upstairs and cleared the apartment; he did not find anyone. Kenny went to the hospital; photographs indicate that he cut the left side of his head, near his hairline. Medical personnel cleaned the cut and did not need to bandage it. Kenny denied having pain, nausea, vomiting, dizziness, or visual changes. According to Kenny, he was diagnosed with a concussion about a month after the incident. But Kenny adduces no medical records or other objective evidence of a concussion. *See* Dkt. 149, ¶ 144 ("Officer Kenny was diagnosed with a concussion after the March 6, 2015 incident with Robinson." (citing Dkt. 40 (Kenny Dep. 20-22, 215))). The medical records in the record note that Kenny sustained a "head injury" on March 6, 2015. *See* Dkt. 95-1. And worker's compensation forms indicate that Kenny had been diagnosed with a concussion. *See* Dkt. 95, at 3 and Dkt. 95-1, at 6. Kenny's medical expert, Andrew Dennis, DO,

acknowledged that there is no objective evidence in the record that Kenny suffered a concussion.

Within a few minutes after the shooting, Kenny gave Gary a "snapshot" account of what happened. At the time, Kenny stated that: (1) he had heard more than one voice upstairs; (2) Robinson was yelling and had come at him swinging and punching; and (3) he did not draw his weapon until he was falling down the stairs after Robinson had punched him. Kenny's later testimony contradicted these early, on-the-scene statements, and Kenny now concedes that none of these initial statements were accurate.

Kenny gave a formal statement to investigators on Monday, March 9, 2015, three days after the shooting. Before giving the formal statement, Kenny was allowed to do a walkthrough of the scene of the shooting and review the dash cam video and body microphone audio with his counsel.

## B. Madison Police Department policies and practices

Plaintiff's *Monell* claim against the City has two components. First, plaintiff contends that MPD investigations of officer-involved shootings are, as a matter of unstated practice and custom, unfairly biased in favor of the officer. Second, MPD officer training is deficient, in that MPD does not appropriately retrain officers after officer-involved shootings. Accordingly, the court here summarizes the facts pertinent to MPD training and investigation of officer-involved shootings.

### 1. MPD training generally

Plaintiff does not challenge the MPD's training programs generally. In fact, plaintiff concedes that the MPD provides training that exceeds state standards and that the MPD

keeps up with national, state, and local law enforcement trends and incorporates up-to-date best practices.

Kenny received and successfully completed significantly more pre-service training and ongoing in-service training than is required by the Wisconsin Law Enforcement Standards Board (LESB). Since 2009, Kenny has received advanced tactical training as a member of the MPD Special Weapons and Tactics (SWAT) Team.

MPD has not amended or revised its policies, practices, or training specifically in response to incidents of officer-involved shootings.

### 2. Officer-involved critical incidents investigations

In Madison, a police officer-involved shooting involving a civilian prompts two investigations: an internal police department investigation and a criminal investigation.

The internal investigation is conducted by the MPD, according to a Standard Operating Procedure (SOP) governing such investigations. The objective of the internal investigation is to determine whether the officer violated MPD policy during the incident. The internal investigation process has remained substantially the same from 2007 to 2015. The lieutenant in charge of Professional Standards and Internal Affairs (PSIA) leads the internal investigation.

The objective of the criminal investigation is to determine whether criminal charges should be filed against the officer. Historically, the criminal investigation would, like the internal investigation, be conducted by officers of the MPD. But after the enactment of Wis. Stat. § 175.47 (effective April 25, 2014), state law required that the criminal investigation be conducted by at least two investigators neither of whom are employed by the law enforcement agency that employs the officer being investigated. In response to Wis. Stat.

§ 175.47, the MPD adopted a new SOP for the investigation of officer-involved shootings as of July 15, 2014. Under the new SOP, an outside agency handles the criminal investigation; the handling of internal investigations did not substantially change.

Between 2000 and 2016, every MPD officer who has shot a civilian on-duty has been exonerated.

### 3.  The Robinson investigation

At approximately 7:15 p.m. on March 6, 2015, MPD Lieutenant Cory Nelson, the PSIA lieutenant at the time, learned that Kenny had been involved in a shooting. Nelson would complete the MPD internal investigation and administrative review of the incident and determine whether Kenny acted in compliance with MPD policies and procedures.

As required under § 175.47, the MPD did not lead the criminal investigation; the Wisconsin Department of Justice Division of Criminal Investigation (DCI) did. DCI Special Agent Rafael De La Rosa served as lead investigator, and Special Agent Lourdes Fernandez served as De La Rosa's second in command. Although MPD personnel were involved in the criminal investigation, DCI, via De La Rosa, was in charge.

As is typical in DCI criminal investigations of officer-involved shootings, DCI investigators had Kenny walk through the scene on March 9, according to De La Rosa "because it helps the investigators process the scene more thoroughly and helps the officer provide a more thorough statement of what occurred." Dkt. 158, ¶ 35. De La Rosa also had Kenny view dash cam footage and listen to audio of the incident, in private with his attorney. (Plaintiff contends that allowing the officer access to the scene and other evidence before he testifies betrays the fact that the entire system favors the officer: the process is purportedly designed to help the officers prepare their testimony in light of the evidence at the scene.)

Later on March 9, De La Rosa formally interviewed Kenny about the incident. On March 23, De La Rosa followed up with a phone interview with Kenny. Interview transcripts and summaries, and the rest of the DCI investigative file, were available to Nelson when he conducted his internal investigation for the MPD.

In conducting the internal investigation, Nelson evaluated Kenny's decisions to (1) enter the stairway with his gun drawn; and (2) use deadly force. Nelson spoke with Kenny on April 6 to clarify a few points, but he did not fully interview Kenny because he had the benefit of the DCI interviews. Nelson had Kipp Harman, a MPD training officer, write a use-of-force report on the incident. Nelson incorporated Hartman's report into his own.

On May 12, 2015, Dane County District Attorney Ismael R. Ozanne announced that Kenny was not criminally liable for the events of March 6, 2015.

Nelson prepared a final report, dated May 26, 2015, for MPD Chief Michael Koval's review. Nelson's report concluded that Kenny had complied with the MPD SOP on "Police Weaponry" when he entered the stairwell with his weapon drawn and that Kenny had complied with the MPD policy regarding "The Use of Deadly Force" when he shot Robinson. Koval had final authority to determine whether Kenny had complied with MPD policy and procedure, and on June 3, 2015, Koval determined that he had.

### 4. The Brandon incident and investigation

Two other officer-involved shootings and their investigations are relevant to plaintiff's *Monell* claim. On July 15, 2007, Kenny was involved in a shooting that resulted in the death of Ronald Brandon. Officers were dispatched to a residential address after a 911 caller reported that a man was sitting on his porch with a gun and threatening the neighbors. The man (Brandon) pointed the gun at the first officer who arrived at the scene. As Kenny arrived

at the scene, he heard the first officer radio, "He's pointing a gun at me." Kenny got out of his squad, charged his rifle, issued verbal commands to Brandon to drop the gun, and when Brandon turned the gun toward Kenny, Kenny shot him. Approximately 19 seconds passed between Kenny's arrival and the shooting. As it turned out, a second 911 caller had reported that Brandon had only a *pellet* gun, and that it was Brandon himself who had called 911 while intoxicated. The second caller proved correct; whether Kenny had access to and should have known this information was disputed.

MPD Captain Kristen Roman served as PSIA lieutenant at that time and completed the internal investigation and administrative review. The MPD also handled the criminal investigation, under the direction of the Dane County District Attorney, as § 175.47 had not yet been enacted. Roman reviewed the criminal investigation file, viewed dash cam footage of the incident, and spoke with other officers, and she determined that she did not need to conduct additional interviews or any follow-up investigation; she did not formally interview Kenny. Roman concluded that Kenny's actions were reasonable, appropriate, and in compliance with the MPD's use of force policy. MPD Chief Noble Wray accepted Roman's findings and exonerated Kenny. The Dane County District Attorney at that time, Brian Blanchard, determined that Kenny was not criminally liable for Brandon's death.

### 5. The Heenan incident and investigation

On November 9, 2012, MPD Officer Stephen Heimsness shot and killed Paul Heenan. The parties in this case concede that the many of the circumstances surrounding the Heenan incident are disputed. The parties appear to agree that Heenan was unarmed and intoxicated; that he had entered a neighbor's home; and that Heimsness was dispatched to investigate a possible breaking and entering. After he arrived at the scene, Heimsness believed

13

that Heenan and a neighbor were fighting. He drew his weapon, ordered Heenan and the neighbor to get down, and ended up in a struggle with Heenan that resulted in Heimsness shooting Heenan three times.

MPD Lieutenant Dan Olivas served as PSIA lieutenant at that time and completed the internal investigation. Again, as was the case during the Brandon investigation, the MPD also handled the criminal investigation, under the direction of the Dane County District Attorney, as § 175.47 had not yet been enacted. Olivas evaluated two decisions by Heimsness: his decision to confront Heenan at gunpoint, and his decision to deploy deadly force. Olivas relied on interviews and other information that the criminal investigators collected, interviewed Heimsness himself, and eventually concluded that Heimsness acted in accordance with all applicable MPD policies.

The MPD asked the Wisconsin Department of Justice Training and Standards Bureau to perform an independent review of the Heenan shooting. The DOJ determined that Heimsness's actions were consistent with training approved by the LESB.

MPD Chief Wray accepted Olivas's findings and exonerated Heimsness. District Attorney Ozanne determined that Heimsness was not criminally liable for Heenan's death.

## C. Jurisdiction

Plaintiff filed this case on August 12, 2015, alleging violations of Robinson's rights under the United States Constitution. The case is brought under the auspices of 42 U.S.C. § 1983, and the court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331, because plaintiff's claims arise under federal law.

ANALYSIS

Both Kenny and the City move for summary judgment. Summary judgment is appropriate if a moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In reviewing defendants' motions for summary judgment, the court construes all facts and draws all reasonable inferences in plaintiff's favor. *Id.* at 255. But "the non-moving party does not bear the burden of *proving* his case; the opponent of summary judgment need only point to evidence that can be put in an admissible form at trial, and that, if believed by the fact-finder, could support judgment in his favor." *Marr v. Bank of Am., N.A.*, 662 F.3d 963, 966 (7th Cir. 2011).

A fact is genuinely disputed if a party has admissible evidence to support its position. Before the court can determine whether genuine disputes of fact preclude summary judgment, it must determine what evidence is admissible. This is an expert-heavy case, so the court begins with the parties' *Daubert* motions. The focus in this opinion is the motions for summary judgment, but the decisions on the *Daubert* motions will also affect the evidence that the parties will be able to present at trial.

## A. *Daubert* motions

"Determining the true facts of a case often requires 'the application of some scientific, technical, or other specialized knowledge.'" *Lapsley v. Xtek, Inc.*, 689 F.3d 802, 808 (7th Cir. 2012) (quoting Fed. R. Evid. 702 advisory committee's note to 1972 proposed rules). Rule

702 of the Federal Rules of Evidence governs the admissibility of expert testimony. It provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. This rule has been interpreted by *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), and *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999), to require that the court serve as a gatekeeper to ensure that proffered expert testimony meets the requirements of Rule 702. Essentially, the gatekeeping function consists of a three-part test: the court must ensure that the expert is qualified, that the expert's opinions are based on reliable methods and reasoning, and that expert's opinions will assist the jury in deciding a relevant issue. *Myers v. Ill. Cent. R. R. Co.*, 629 F.3d 639, 644 (7th Cir. 2010). The proponent of expert evidence bears the burden of establishing that the expert's testimony is admissible. *Lewis v. CITGO Petroleum Corp.*, 561 F.3d 698, 705 (7th Cir. 2009).

As for qualifications, the question is not whether the expert is generally qualified in his or her field, but whether the expert has the necessary education and training to draw the conclusions he or she offers in the case at hand. *See Hall v. Flannery*, 840 F.3d 922, 926 (7th Cir. 2016). Experts may testify on the basis of practical experience as well as on the basis of

16

formal education. "While 'extensive academic and practical expertise' in an area is certainly sufficient to qualify a potential witness as an expert, *Bryant v. City of Chicago*, 200 F.3d 1092, 1098 (7th Cir. 2000), 'Rule 702 specifically contemplates the admission of testimony by experts whose knowledge is based on experience,' *Walker v. Soo Line R. Co.*, 208 F.3d 581, 591 (7th Cir. 2000)." *Smith v. Ford Motor Co.*, 215 F.3d 713, 718 (7th Cir. 2000).

The test for reliability is necessarily flexible. Although *Daubert* identifies factors the court may consider when determining whether an expert's testimony is reliable—whether the expert's technique has been tested, subjected to peer review and publication, analyzed for known or potential error rate, or is generally accepted—the "list of specific factors neither necessarily nor exclusively applies to all experts or in every case." *Kumho*, 526 U.S. at 141. The court enjoys broad discretion in evaluating reliability. *Id.* at 142. The admissibility inquiry "must be 'tied to the facts' of a particular case." *Id.* at 150 (quoting *Daubert*, 509 U.S. at 591). The reliability inquiry should "make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Id.* at 152. "A witness who invokes 'my expertise' rather than analytic strategies widely used by specialists is not an expert as Rule 702 defines that term." *Zenith Elecs. Corp. v. WH-TV Broad. Corp.*, 395 F.3d 416, 419 (7th Cir. 2005).

Finally, expert evidence is relevant if it helps the jury understand a matter beyond the knowledge and experience of a layperson. *Daubert*, 509 U.S. at 591-92 ("Rule 702's 'helpfulness' standard requires a valid scientific connection to the pertinent inquiry as a precondition to admissibility.").

But the *Daubert* inquiry does not authorize the court to decide issues of credibility. "A *Daubert* inquiry is not designed to have the district judge take the place of the jury to decide ultimate issues of credibility and accuracy." *Lapsley*, 689 F.3d at 805.

The court addresses each expert in turn.

### 1. Dennis Waller

Dennis Waller is plaintiff's police practices expert. Both Kenny and the City move to exclude Waller's opinions. Defendants attack his qualifications, and the reliability and relevance of his opinions. The court will deny Kenny's motion for the most part; it will grant the City's motion in part.

### a. Report

Waller offers five opinions regarding Kenny's conduct on March 6, 2015:

> (1) The intentional and reckless decision Officer Kenny made to enter the apartment without assistance was tactically unsound; contrary to law enforcement training concepts for handling disturbance calls; contrary to basic officer survival considerations; and inconsistent with, and counterproductive to, the protocol for successfully handling someone likely to be experiencing excited delirium.

> (2) Officer Kenny's stated necessity for entering the apartment without backup was contradicted by his actions upon entering and his subsequent statements.

> (3) Although all the responding officers recognized Tony's behavior as possibly resulting from Tony experiencing excited delirium and all were trained in considerations for handling excited delirium decisions to enhance the likelihood of a positive outcome, not one officer acted to attempt to resolve the situation in a manner consistent with their MPD training and mandated training from the LESB for encountering an excited delirium situation.

> (4) Officer Kenny's decision to draw his firearm and enter the stairway to the apartment without the presence of backup reduced his other force options and resulted in the use of

> deadly force in what was more appropriately a medical emergency. Officer Kenny's inappropriate choices and subsequent actions, in effect, determined the likelihood that Tony was going to die from being shot or from the inappropriate handling of an individual experiencing excited delirium.
>
> (5) Just as in the Brandon shooting in 2007, Officer Kenny acted in a manner that was not consistent with his training, ethical considerations, and the concept of using deadly force only as a last resort. In both cases Officer Kenny deliberately, but unnecessarily, escalated the encounter and was responsible for placing himself in officer-created jeopardy that resulted in the use of deadly force.

Dkt. 88, at 5-12. In Waller's report, each of these opinions includes a number of sub-opinions and supporting observations.

Waller offers one opinion pertinent to plaintiff's *Monell* claim:

> Through its failure to hold MPD officers accountable for not following policy and training, the practice of the City of Madison has led to, and/or caused, the shooting deaths of Tony Robinson and others.

*Id.* at 12.

### b. Kenny's *Daubert* motion

Kenny contends that none of Waller's opinions are admissible for several reasons. First, Kenny attacks Waller's "stale" qualifications. Dkt. 62, at 17. Kenny highlights the fact that Waller has not "published, instructed, or presented for 25 years," and that he "has not been a sworn police officer for almost 30 years." *Id.* at 19. Kenny would have a good argument if Waller were nothing but a "professional expert." Generally, expertise comes from training and experience, not from testifying in court. *Daubert v. Merrell Dow Pharm., Inc.*, 43 F.3d 1311, 1317 (9th Cir. 1995) ("[I]n determining whether proposed expert testimony amounts to good science, we may not ignore the fact that a scientist's normal workplace is

the lab or the field, not the courtroom or the lawyer's office.") But Waller has ample qualifications in police practices: he has degrees in police and public administration; he has received more than 3,600 hours of law enforcement training; he is a trained assessor for the Commission on Accreditation for Law Enforcement Agencies; he is a certified internal affairs investigator/supervisor; he has served as a police officer, a field training officer, a detective, a sergeant, a lieutenant, a department training officer, and chief of police; and he is a certified police training instructor and has trained hundreds of officers on use of force issues, handling disturbance calls, officer survival issues, arrest procedures, and other issues related to professional and ethical conduct. Dkt. 88, at 1-2 and Dkt. 88-1. As the Ninth Circuit recognized in its *Daubert* decision, "scientific endeavors closely tied to law enforcement may indeed have the courtroom as a principal theatre of operations." 43 F.3d at 1317 n.5. Waller is years removed from working as a sworn law enforcement officer, but that is a matter that goes to the weight of Waller's opinions, not their admissibility. Kenny will be free to explore whether Waller's credentials are so "stale" as to undermine his opinions on cross-examination.[2]

Second, Kenny moves to exclude Waller's opinions as unreliable. Kenny argues that Waller's opinions are based on "conjecture and speculation and are not the product of any reliable methodology or reasoning based on facts." Dkt. 62, at 16. An expert in professional practices is not a scientific expert that applies rigorously scientific methods. Such experts

---

[2] Kenny makes another qualifications-based argument: that Waller offers quasi-medical opinions regarding the effects of trauma on officer memory. The court did not see any medical opinions in Waller's report, and it will not consider any such opinions at summary judgment. In any case, plaintiff agrees that Waller will not opine on the effect of trauma on officer memory at trial, so the issue is moot.

describe professional standards and identify departures from those standards. *See W. By & Through Norris v. Waymire*, 114 F.3d 646, 652 (7th Cir. 1997). Waller applies the same methodology each time he examines police-related issues: he develops an understanding of the facts of a case, analyzes the officer's actions, compares that officer's actions to standard practices and training, and explains consistencies and/or inconsistencies between what the officer did and what applicable practices required or recommended. Waller's police practices opinions are sufficiently reliable.

Kenny also moves to exclude certain of Waller's opinions as irrelevant or otherwise improper. Kenny contends that Waller's report contains improper legal conclusions. Generally speaking, an expert cannot offer legal opinions or conclusions. *Jimenez v. City of Chicago*, 732 F.3d 710, 721 (7th Cir. 2013) ("It is the role of the judge, not an expert witness, to instruct the jury on the applicable principles of law, and it is the role of the jury to apply those principles of law to the facts in evidence. As a general rule, accordingly, an expert may not offer legal opinions."). "[I]n particular, the Seventh Circuit has upheld the exclusion of expert testimony regarding the reasonableness of force in excessive-force cases." *Thomas v. Landrum*, No. 11-cv-9275, 2014 WL 11370447, at *1 (N.D. Ill. Mar. 18, 2014) (collecting cases). Plaintiff appears to concede the issue and states that Waller will not testify that Kenny's use of force was objectively unreasonable. Dkt. 74, at 2. All agree that Waller may not offer opinions regarding the reasonableness of Kenny's force, and the court will not consider any legal conclusions as evidence for purposes of summary judgment. Similarly, although Waller may discuss the events of March 6, 2015, and Kenny's decisions that evening, Waller may not opine on other legal questions, including whether circumstances at the time constitute "exigent circumstances" under the law.

21

Kenny also moves to strike Waller's "pre-seizure" opinions—namely, his opinions regarding Kenny's decisions and actions prior to the moment he shot Robinson. Kenny's pre-seizure conduct cannot itself violate the Fourth Amendment. *See Marion v. City of Corydon*, 559 F.3d 700, 705 (7th Cir. 2009) ("Pre-seizure police conduct cannot serve as a basis for liability under the Fourth Amendment; we limit our analysis to force used when a seizure occurs."). But Kenny's conduct prior to his decision to shoot Robinson is properly considered as part of the totality of the circumstances: "[t]he sequence of events leading up to the seizure is relevant because the reasonableness of the seizure is evaluated in light of the totality of the circumstances." *Williams v. Ind. State Police Dep't*, 797 F.3d 468, 483 (7th Cir. 2015), *cert. denied*, 136 S. Ct. 1712 (2016)). The court will not strike Waller's opinions regarding Kenny's pre-seizure conduct simply because that conduct cannot itself give rise to a separate Fourth Amendment violation.

Finally, Kenny objects to parts of Waller's report as a critique of Kenny's credibility. Ordinarily, one witness may not testify about the credibility of another. But Waller's opinions are not directly about Kenny's credibility; he accepts Kenny's version of events and identifies departures from accepted police practices and training. At times, Waller points out discrepancies between Kenny's version of events and other information in the record. All of these observations are admissible. At trial, Waller may not directly opine on Kenny's credibility, but he is free to assume facts and discuss perceived deviations from training and practice, and to point out evidence that contradicts Kenny's version of the events.

The court agrees with Kenny that Waller may not offer legal conclusions or directly attack Kenny's credibility. But Kenny has not given the court any reason to exclude other

aspects of Waller's testimony. So, with the exception of improper legal conclusions, the court will consider Waller's opinions for purposes of summary judgment.

### c. The City's *Daubert* motion

Waller offers one opinion pertinent to plaintiff's *Monell* claim: he opines that a MPD *practice* exists and that it *caused* Robinson's death. But, as will be discussed in greater detail when the court reaches defendants' summary judgment motions, these are essentially legal conclusions, which the court will disregard. On summary judgment, the court will consider only his opinions that officers departed from acceptable practices during the Brandon, Heenan, and Robinson incidents and that the internal investigations "appear to have been highly friendly to the officers." Dkt. 88, at 13.

And given the court's decision on the City's motion for summary judgment, Waller's opinions about MPD investigations will be irrelevant at trial.

### 2. Jonathan L. Arden, MD

Jonathan L. Arden, MD, is plaintiff's forensic pathology expert. Kenny moves to exclude Arden's opinion that Kenny fired all seven shots from the bottom of the stairs. Kenny does not challenge Arden's other opinions or his qualifications as a forensic pathologist. The court will deny Kenny's motion.

### a. Report

Arden offers opinions based on Robinson's gunshot wounds and other forensic evidence, in particular, the bullets' trajectories and range of fire (i.e., the approximate distance between the muzzle of the gun and Robinson's body when Kenny fired his weapon).

Arden, like other experts in this case, begins with autopsy evidence, which the parties do not dispute. Three of the seven bullets that struck Robinson entered his left side and

followed trajectories to the right, back, and slightly downward (15-20 degrees from the horizontal). Dkt. 93, at 4. Two bullets entered Robinson's upper chest and shot more sharply downward (75-80 degrees from the horizontal). *Id.* A sixth bullet followed a similarly sharp downward trajectory, hitting Robinson in his lip before grazing his chin and entering his right shoulder/arm. *Id.* The seventh went through Robinson's right index finger, and, as a result, little can be said about its path. Four of the seven bullets were fatal.

Arden opines that the bullet trajectories undermine Kenny's account of what happened that evening. Kenny's version of events places him on the stairs just below Robinson when Robinson punches him, prompting Kenny to fire three bullets into Robinson at an upward angle. Arden opines that "all of the wounds to the torso [six of the seven shots fired] . . . have downward components to their trajectories, which would be very difficult to accomplish if [Kenny] were shooting from below unless Mr. Robinson's upper body was bent over to the point of being nearly horizontal or he was inverted from tumbling or falling forward." *Id.* If Kenny did fire at Robinson from below, Robinson could not have been standing upright. Arden offers several alternative scenarios, and none are consistent with Kenny's account.

Arden also offers opinions based on the range-of-fire evidence. Citing gunpowder stippling (unburned or partially burned gunpowder particles that embed just beneath the skin, forming a pattern of small red or brown dots), Arden opines that Kenny fired three of the four fatal shots from less than 24 inches away (but possibly from up to 36-40 inches away), and that it is unlikely that Kenny fired the shots from less than 12 inches away. The remaining fatal shot had stippling *and* made a muzzle imprint, indicating that the muzzle of the gun made contact with Robinson's skin when Kenny fired. The three non-fatal shots were

not contact, close-range, or intermediate-range wounds (no stippling or soot). Arden concludes that Kenny's account of the shooting is inconsistent with the gunpowder residue evidence because at least one of the wounds with a sharp downward trajectory was a tight contact wound, and at least three shots (the non-fatal shots) were fired from a distance beyond close or intermediate range.

Finally, Arden comments that the dash cam video with synchronized audio "demonstrated that the entire shooting sequence took about four seconds, and that Officer Kenny was backing out of the door during that interval (in the second between the three-shot volleys). This shows that he was at or near the bottom of the stairs during the entire shooting event." *Id.* at 5.

### b. *Daubert* motion

Kenny moves to exclude Arden's opinion that Kenny fired all seven shots from the bottom of the stairs because Arden did not employ any specialized knowledge in reaching this conclusion. Although Kenny couches his motion in terms of "reliability," Kenny's essential argument is that this conclusion is not admissible as expert testimony because the jury does not need Arden's help to understand the dash cam video.

The court will deny Kenny's motion because there is nothing wrong with Arden's reliance on factual information that is also available to the jury. It is common for experts to assume the existence of certain facts that have to be proven by other witnesses, and to render opinions based on those assumed facts. *See Williams v. Illinois*, 132 S. Ct. 2221, 2228 (2012) ("Under settled evidence law, an expert may express an opinion that is based on facts that the expert assumes, but does not know, to be true. It is then up to the party who calls the expert to introduce other evidence establishing the facts assumed by the expert."). The same

principle applies here: the dash cam video provides certain facts that the experts in this case can incorporate into their opinions about what happened in the stairwell. Arden's application of common sense to his interpretation of the dash cam video provides no reason to exclude any part of his opinion.

### 3. Samuel A. Marso

Samuel A. Marso is plaintiff's forensic science expert: he offers opinions that recreate the shooting and, plaintiff contends, undermine Kenny's account of what happened in the stairwell. Kenny moves to exclude Marso's opinions because: (1) Marso is not qualified to opine on scene reconstruction issues; (2) Marso's opinions are not reliable; and (3) Marso's opinions will not assist the jury. The court will deny Kenny's motion.

#### a. Report

Marso is a forensic scientist with training and certifications in firearm and tool mark identification, crime scene investigation, and footwear and tire track identification. He has also received training in crime scene reconstruction, bloodstain pattern analysis, and forensic shooting scene reconstruction. Marso reviewed the forensic evidence in this case, including autopsy records, the dash cam video, crime scene photographs, DCI scene diagrams, and firearm and bloodstain evidence.

Marso opines that Kenny fired all seven shots from the bottom of the stairs, for three reasons. First, a "low-angle perforating ricochet near the top of the stairs" indicates that Kenny fired at least one shot upward "likely from the bottom of the stairs." Dkt. 90, at 4. Second, all discharged cartridge cases were at the bottom of the stairs. Third, the dash cam video indicates that Kenny did not have enough time to fire his initial shots from the top of the stairs when he clearly completed his first volley from the bottom of the stairs.

26

Marso then opines that Kenny fired the three non-fatal shots first. Kenny fired the non-fatal shots from the greatest distance away (as evidenced by the lack of stippling). Again, Marso relies on the dash cam video, which shows that shots four, five, and six were fired "in very close proximity to" Robinson and, therefore, likely to cause stippling. *Id.* at 5. He further opines that the four fatal shots—fired closer to Robinson's upper chest—are more likely to have been fired "at someone standing or sitting still and not during the course of a dynamic event." *Id.* The dash cam video confirms that Kenny fired the final four shots from above Robinson, who appears to be lying on the floor or the stairs.

Marso then pulls everything together and provides a "most likely scenario": that Kenny fired upward at Robinson from the bottom of the stairs, that after the first shot, Robinson likely bent forward (because the bullets have downward trajectories) or began to fall, and that he landed at the bottom of the stairs where Kenny fired the four remaining shots (which would explain those bullets' sharp downward trajectories).

### b. *Daubert* motion

Kenny contends that Marso is not qualified to recreate the scene: he is primarily a firearm and tool mark identification expert, and he spends the majority of his time in a laboratory or gathering and preserving evidence. The court disagrees.

In addition to his other forensic science credentials, Marso is a crime scene reconstructionist with an emphasis on shooting scene and bloodstain pattern determinations. Dkt. 90-1, at 1. Marso's previous experience as an expert witness does not add much to his qualifications. But Marso's CV states that he has training in forensic shooting scene reconstruction. *Id.* at 2. He has taken evidence from shooting scenes, interpreted and evaluated it, and rendered opinions. Dkt. 37 (Marso Dep. 27:7-11). Marso's CV indicates

that he has received training in scene reconstruction, which satisfies *Daubert*'s threshold requirement and makes him qualified to offer the opinions in his report. The extent of his qualifications is a proper subject for cross-examination.

Kenny also contends that Marso's opinions rely on nothing more than the dash cam video, photographs of the scene, and Robinson's autopsy report. According to Kenny, Marso did not employ any reliable methodology or specialized knowledge to form his opinions, and his opinions about shot order, in particular, are speculative. For these same reasons, Kenny argues, Marso's opinions will not assist the jury: they are nothing more than lay observations that the jury will have to make themselves.

Marso, like Arden, uses the dash cam video to support a number of his conclusions. But he also explains the relevance of the dash cam video and its relationship to the forensic evidence. For example, Marso relies on the dash cam video when he explains that Kenny fired shots four, five, and six close to Robinson at the bottom of the stairs. He explains that this means that these shots would be expected to produce stippling, which explains why he believes that the non-fatal shots came in the initial volley, shot from the greater distance. As with Arden, the court will not exclude expert testimony because it includes common sense observations of evidence that the jury will also see. The bottom line here is that Marso is a qualified forensic scientist capable of reviewing forensic evidence and rendering opinions. The court will consider all of Marso's opinions for purposes of summary judgment.

### 4. Susan M. Skolly-Danziger

Susan M. Skolly-Danziger is Kenny's forensic toxicology expert. Skolly reviewed and interpreted Robinson's toxicology results. Skolly also reviewed reports and depositions describing Robinson's behavior the evening of March 6, 2015, and she offers opinions

regarding whether his actions were consistent with the toxicological results. Plaintiff contends that although Skolly is qualified to interpret Robinson's toxicology results, her testimony is not relevant or reliable, and it will not assist the jury.

Skolly's opinions are not material to the court's summary judgment decision. Even if the court were to fully credit her opinion that Robinson's aggressive behavior was consistent with his ingestion of mushrooms, it would still deny Kenny's motion for summary judgment. Her opinion might lend some credence to Kenny's account, but it would not resolve the factual disputes about what happened in the stairwell.

But, for trial purposes, the court will provisionally grant plaintiff's motion and exclude her testimony.

### a. Report

Skolly discusses and interprets Robinson's toxicology results and opines that his reported behavior the evening of March 6, 2015, is consistent with drug use. Robinson's urine tested positive for alprazolam (Xanax), its metabolite (alpha-hydroxyalprazolam), the inactive metabolite of cannabis, and psilocin (from psilocybin mushrooms). Robinson's blood tested positive for alprazolam, THC, the inactive metabolite of cannabis, psilocin, and an "undisclosed 'stimulant.'" Dkt. 77, at 14. Drug levels were consistent with witnesses' reports that Robinson had taken Xanax and smoked marijuana on March 6, 2015. Psilocin was present, consistent with recent ingestion of psilocybin mushrooms, but its levels were not quantified by lab testing.

Skolly qualifies a number of her observations and opinions, particularly about the effects of the psilocybin mushrooms. She concedes that "hallucinogens do not act

predictably" and that Robinson's reaction to substances would have depended "on many factors." *Id.* at 16. Skolly offers four opinions:

> (1) At or near the time of his death on March 6, 2015, Robinson had multiple drugs in his blood, including THC, alprazolam, and psilocin. THC levels were "high and impairing." Alprazolam levels were "relatively low," and Robinson would not be expected "to exhibit moderate or extreme central depressant effects." And the presence of psilocin indicated recent ingestion of psilocybin mushrooms, an "extremely potent hallucinogenic drug."

> (2) Drug levels in Robinson's urine shortly after his death indicate exposure to these agents within several days of his death. The urine toxicology report is consistent with Robinson's use of alprazolam, cannabis, and psilocin prior to his death.

> (3) Robinson's "aggressive, excessively violent and bizarre behaviors were consistent with his recent ingestion of psilocin-containing mushrooms." Robinson was experiencing a "bad trip." The perception of impending danger often associated with bad trips "can abnormally make a user react in a violent or aggressive manner."

> (4) Robinson's recent and frequent use of cannabis contributed to "heightened visual and perceptual distortions as well as uncharacteristic behavior."

*Id.* at 16-18.

### b. *Daubert* motion

Plaintiff contends that Skolly's opinions: (1) are irrelevant to plaintiff's claims; (2) are speculative; (3) address matters that lay people can understand without an expert's assistance; and (4) are unfairly prejudicial to plaintiff.

As the court will explain in greater detail when it reaches defendants' summary judgment motions, this case is about whether Kenny's use of deadly force was objectively reasonable. Information outside of the officer's knowledge at the time of the incident is not

relevant to whether the use of force was objectively reasonable. That said, information about Robinson's intoxication and, specifically, an opinion that drug levels in his system make it more or less likely that he behaved a certain way may be relevant. "Evidence of a plaintiff's intoxication . . . could be admissible under Fed. R. Evid. 403 because it 'tends to make more probable that the plaintiff acted as the defendant contended he did or that plaintiff otherwise conducted himself in such a manner as to place the defendant reasonably in fear of his life.'" *Common v. City of Chicago*, 661 F.3d 940, 945 (7th Cir. 2011) (quoting *Palmquist v. Selvik*, 111 F.3d 1332, 1342 (7th Cir. 1997)). Kenny did not know whether or to what extent Robinson was under the influence of intoxicating substances, so Robinson's drug use on March 6 is not directly relevant. But Skolly could be a relevant witness if she were to opine that drug levels in Robinson's system make it more or less likely that he behaved a certain way in the stairwell.

But Skolly offers no such opinion. She comes close: she opines that "Robinson's aggressive, excessively violent and bizarre behaviors were consistent with his recent ingestion of psilocin-containing mushrooms." Dkt. 77, at 17. But this opinion is not reliable: she assumes that Robinson acted a certain way based on witness statements, and opines that that behavior is consistent with taking mushrooms. But she does not establish a foundation for that opinion. She discusses the potential intoxicating effects of mushrooms, but nowhere does she attribute increased aggression or violence to mushrooms. Skolly has not demonstrated that she can reliably opine that Robinson's drug use on March 6 would have made it more likely that he behaved aggressively in the stairwell. If she cannot offer this opinion, none of her opinions are relevant.

Testimony about Robinson's drug use on March 6 is not relevant to any legal inquiry before this court because Skolly cannot reliably opine about Robinson's specific behavior or level of impairment. She does not know the concentration of active ingredient in the mushrooms that Robinson consumed, nor does she know the concentration of the active ingredient in his blood or urine. She acknowledges that "[t]he effects of mushrooms in a particular individual will vary in accordance with the dose, an individual's inherent tolerance or susceptibility, and the interaction of concurrent drugs." *Id.* at 13. By her own admissions, she cannot opine reliably about Robinson's specific experience on March 6.

Although the court is inclined to exclude Skolly, the court will hear further argument on plaintiff's motion at the final pretrial conference.

### 5. John G. Peters, Jr.

John G. Peters, Jr., is Kenny's police practices expert. Kenny offers Peters's report to rebut Waller's opinions. Plaintiff concedes that Peters is a qualified police practices expert, but plaintiff moves to exclude several specific opinions as unreliable or improper. The court will grant plaintiff's motion in part.

### a. Report

Peters offers opinions regarding Kenny's use of force and tactical decisions on the evening of March 6, 2015. Peters opines that:

> (1) No one could have known whether Robinson was in a state of excited delirium before or during his encounter with Kenny.
>
> (2) It was appropriate for Kenny to enter the building because he believed there were exigent circumstances that required such action.
>
> (3) Officers, such as Kenny, are trained to not use multiple TASER electronic control weapon applications on a human.

32

(4) Robinson actively resisted Kenny and engaged in assaultive behavior.

(5) Robinson posed an imminent threat to Kenny because they were engaged in close combat.

(6) Kenny's use of force on Robinson was consistent with his training, national use of force standards, and the totality of the circumstances.

(7) Stressful events, such as the use of deadly force, have an impact on witness recall, contrary to Waller's testimony.

Dkt. 67, at 4-13.

> **b.** *Daubert* **motion**

The parties agree on many of the issues that plaintiff raises in her motion. All agree that Peters will not opine that Kenny was a certified MPD officer; that experts (including Peters) may not offer opinions that amount to legal conclusions; and that Peters may assume a version of the facts supported by the record when he offers opinions (although he may not directly endorse Kenny's version of the events).

Three discrete substantive disputes remain: whether Peters offers improper legal conclusions; whether Peters's opinions regarding TASER training are admissible; and whether Peters may offer opinions regarding the effect of stress on officer memory.

First, several of Peters's opinions amount to legal conclusions, and the court will not consider them for purposes of summary judgment or allow them at trial. Peters opines that "Officer Kenny had several credible reasons to believe someone was being attacked inside the residence, which necessitated his immediate tactical response." *Id.* at 6. Peters may offer an opinion regarding whether, under assumed facts, it would be within an officer's training and established police practices to make certain decisions, including a decision to enter a residence without waiting for backup. But Peters may not opine that certain facts amount to

"exigent circumstances," as that term is used legally. Next, Peters opines that Robinson posed "an imminent threat to Officer Kenny because they were engaged in close combat," *id.* at 8, and that Kenny's use of force was justified and consistent with "the totality of the circumstances," *id.* at 9. Again, these are legal conclusions. He may opine that Kenny's decisions were consistent with his training and national standards regarding the use of force. But he may not opine that the totality of the circumstances justified the use of force. At trial, Peters may discuss applicable professional standards and identify compliance with or departures from those standards, but he may not offer legal conclusions.

Second, plaintiff takes issue with Peters's opinions regarding TASER training. Kenny offers Peters to rebut Waller's opinion that a TASER is "the preferred force option when dealing with someone believed to be experiencing excited delirium." Dkt. 88, at 6. Plaintiff does not object to Peters's discussion of TASER warnings or his opinion that officers are generally trained to limit the number of TASER applications; rather, she takes issue with his opinion that Kenny himself received this training and that the training amounts to a *prohibition* on multiple deployments. Peters's report does not establish a foundation that would allow him to opine on Kenny's training specifically, and the court will not consider this information for purposes of summary judgment or allow it at trial. The advisability of multiple TASER applications is an issue that both sides may explore at trial.

Finally, Peters does not have the requisite expertise to offer opinions regarding an officer's ability to recall events following a traumatic incident. Although Peters teaches "how to investigate arrest-related and sudden, in-custody deaths," he is not a medical professional. He has no expertise in the memory and recall issues he discusses; he only summarizes studies

34

he has read. The court will not consider these opinions for purposes of summary judgment or allow them at trial.

### 6.  Vincent J. M. Di Maio, MD

Vincent J. M. Di Maio, MD, is Kenny's forensic pathology expert. Plaintiff moves to exclude two of Di Maio's opinions: his opinion regarding the precise distance between Kenny's weapon and Robinson's body during three of the seven shots; and his opinion regarding Robinson's life expectancy. The court will grant plaintiff's motion.

### a.  Report

Like Arden, Di Maio offers opinions based on Robinson's gunshot wounds, the autopsy report, and other forensic evidence. Di Maio opines that the absence of soot and powder tattooing (what Arden refers to as stippling) indicates that Kenny fired three shots from a distance of more than three to four feet (non-fatal shots to Robinson's chin, left shoulder, and right index finger). The presence of powder tattooing (but no soot) indicates that Kenny fired three fatal shots from "a range of a foot or less." Dkt. 65, at 4, 5. The final gunshot wound was marked with powder tattooing and a "seared rim of tissue around the entrance." *Id.* at 5. Kenny fired this shot with either loose contact or from a quarter of an inch away. Di Maio states that "[t]he exact sequence of the 7 shots cannot be determined by autopsy." *Id.* at 9.

Di Maio opines that, assuming Kenny's version of events, Kenny likely fired the contact shot at the top of the stairs, as part of the first volley, "[s]ince physical contact occurred at the top of the stairs." *Id.* at 9. The remaining two shots in the first volley were likely two of the three remaining close-range shots.

35

Di Maio also offers opinions that reconcile the bullets' downward trajectories with Kenny's account. He opines that "it is normal to throw your full weight behind [a punch]," so it is entirely possible that Robinson's body lurched forward as he attacked Kenny, causing him to bend at the waist and, in turn, resulting in downward trajectories as Kenny fired his weapon from the steps below Robinson. *Id.* And "[a]s to the gunshots at the foot of the staircase, Mr. Robinson was down, his back on the staircase while the Officer was getting up. Thus his bullets are going down." *Id.*

Di Maio identifies the presence of numerous abrasions and contusions of the head, torso, upper and lower extremities, and hands on Robinson. He also comments that Robinson's "heart was markedly enlarged," and that it would have reduced Robinson's life expectancy. *Id.* at 6.

### b. *Daubert* motion

Kenny concedes that Di Maio will not offer opinions regarding Robinson's enlarged heart or corresponding decreased life expectancy. So the court need decide only whether to consider his opinions regarding the three shots fired from a range of less than one foot.

During his deposition, Di Maio testified that the presence of searing indicates that a shot was fired from less than a half inch away, and that the presence of powder tattooing indicates that the shot was fired from less than three to four feet away. This information creates three ranges: searing (less than a half inch); powder tattooing (more than a half inch but less than three to four feet); and no powder tattooing (more than three to four feet). Yet Di Maio opines that Kenny fired three shots (powder tattooing, no searing) from less than one foot away, without explaining how he narrowed the intermediate range. His report offers

36

these opinions in conclusory fashion, without explanation. The court will not consider them for purposes of summary judgment or allow them at trial.

Di Maio attempted to explain these opinions at his deposition: the range between a half inch and three to four feet is "determined by the size of the pattern and the density of the pattern." Dkt. 96 (Di Maio Dep. 84:10-11). But even if this explanation were sufficient to make these opinions reliable, he did not include it in his report. "Under Rule 26(a)(2), a party that intends to rely upon an expert witness's testimony is required to furnish by a date set by the district court a report containing, among other information, 'a complete statement of all opinions' the retained expert will provide, 'and the basis and reasons for them.'" *Ciomber v. Coop. Plus, Inc.*, 527 F.3d 635, 641 (7th Cir. 2008) (quoting Fed. R. Civ. P. 26(a)(2)(B)(I), (a)(2)(C)). Significantly, "Rule 26(a)(2) does not allow parties to cure deficient expert reports by supplementing them with later deposition testimony." *Id.* at 642. The opinions Di Maio disclosed in his report regarding the three intermediate shots are conclusory and unsupported, and the court will not consider them.

### 7.  Andrew Dennis, DO

Andrew Dennis, DO, is Kenny's trauma surgeon expert. Dennis will opine on Kenny's ability to recall the night in question. Although plaintiff concedes that Dennis has "disclosed a legitimate opinion about factors that impact memory and perception," Dkt. 115, at 2, plaintiff moves to exclude Dennis's opinions regarding Kenny's credibility as both unreliable and irrelevant. The court will grant plaintiff's motion in part.

#### a.  Report

Dennis offers opinions regarding "sustained head trauma and related stress of the encounter as it relates to Officer Kenny's recollection of the events on March 6, 2015."

Dkt. 118, at 1. Dennis opines that Kenny suffered a traumatic brain injury (a concussion) as a result of being attacked by Robinson, that he physically exerted himself during the incident, and that, as a result, he may not be able to remember the incident perfectly. Dennis offers two "final opinions":

> (1) Officer Kenny suffered both physical and emotional trauma in the form of a traumatic head injury and the elicited stress and exertional response associated with the event.

> (2) Any inconsistencies in Officer Kenny's recollection of the events, described by consulting experts, is not an intentional attempt to deceive or alter the events to better his position, but, in fact, they are attributable to the malleable and vulnerable nature of memories associated with this highly traumatic event.

*Id.* at 5.

### b. *Daubert* motion

Plaintiff concedes that Dennis is qualified to offer opinions regarding potential impairment of Kenny's memory following the incident. And Kenny represents that this is the only opinion that he will have Dennis offer. *See* Dkt. 144, at 1 ("The defendants acknowledge Dr. Dennis cannot testify as to whether Mr. Robinson punched Officer Kenny; Dr. Dennis was not there. Similarly, Dr. Dennis will not testify as to whether Officer Kenny is lying when he describes the events of March 6, 2015; that is for a fact finder to decide."). But several disputes about Dennis's testimony remain.

All agree that Dennis may opine that traumatic head injuries, physical exertion, and stress may impair one's recollection of events. From here, Dennis is free to assume versions of the underlying facts and offer opinions based on those facts. For example, Dennis may *assume* that Kenny physically exerted himself during his encounter with Robinson and that, were that the case, it may have impaired his ability to remember the events accurately.

38

But Dennis may not opine that any and all inconsistencies in Kenny's account are attributable to impaired recollection (as opposed to lying). Dennis provides no foundation for this opinion, and it amounts to a sweeping endorsement of Kenny's credibility. Dennis cannot offer opinions about whether Kenny is lying. Dennis cannot resolve factual disputes for the jury.

And the court will not allow Dennis to testify that, as a matter of fact, Kenny suffered a concussion on March 6, 2015. Dennis's report on this point is conclusory; he opines that Kenny suffered a concussion citing Kenny's say so and Kenny's medical records. But he does not explain what information in Kenny's medical records indicates that he did indeed suffer a concussion. The opinion is insufficiently supported.

In short, the court will not consider Dennis's opinions regarding Kenny's credibility or his opinion that Kenny suffered a concussion on March 6, 2015, for purposes of summary judgment, nor will these opinions be allowed at trial.

## B.  Summary judgment

Now that the court has identified the expert opinions that it will not consider for purposes of summary judgment, the court turns to defendants' motions.

### 1.  Kenny's motion for summary judgment on the Fourth Amendment claim

"A police officer's use of deadly force constitutes a seizure within the meaning of the Fourth Amendment, and therefore it must be reasonable." *Scott v. Edinburg*, 346 F.3d 752, 755 (7th Cir. 2003). More specifically, it must be *objectively* reasonable. *Graham v. Connor*, 490 U.S. 386, 388 (1989). "[I]t is reasonable to use deadly force if the officer, when exercising his or her reason and judgment, has probable cause to believe that the suspect poses a threat of death or serious physical harm to the officer or others and, whenever

possible, warns the suspect before firing." *Sherrod v. Berry*, 856 F.2d 802, 805 (7th Cir. 1988)

(citing *Tennessee v. Garner*, 471 U.S. 1, 11-12 (1985)).

Reasonableness is "judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396. "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.* at 396-97. The court weighs what the officer knew, the specific situation he encountered, and events leading up to the decision to use deadly force—in other words, the totality of the circumstances. "An officer's use of force is unreasonable if, judging from the totality of the circumstances at the time of the arrest, the officer uses greater force than was reasonably necessary to effectuate the arrest." *Phillips v. Cmty. Ins. Corp.*, 678 F.3d 513, 519 (7th Cir. 2012). And *objective* reasonableness does not take into account an officer's underlying intent or motivation: "[a]n officer's evil intentions will not make a Fourth Amendment violation out of an objectively reasonable use of force; nor will an officer's good intentions make an objectively unreasonable use of force constitutional." *Graham*, 490 U.S. at 397.

Typically, when considering the totality of the circumstances, courts balance "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* at 396. Here, Kenny was dispatched to a check person—not a crime in progress. Nor was Kenny attempting to arrest Robinson.

Accordingly, Kenny's summary judgment motion turns on whether plaintiff has adduced evidence sufficient to create a genuine dispute of material fact as to the objective

reasonableness of Kenny's purported belief that Robinson posed an imminent threat of death or serious bodily injury to himself or others at the time he fired his weapon. She has: as alluded to in the facts section, the evidence in this case reveals one core dispute regarding what happened between Kenny and Robinson in the stairwell that evening. For the reasons that follow, the court will deny Kenny's motion for summary judgment.

### a. Liability

In deadly force cases, "where the officer defendant is the only witness left alive to testify. . . . a court must undertake a fairly critical assessment of the forensic evidence, the officer's original reports or statements and the opinions of experts to decide whether the officer's testimony could reasonably be rejected at a trial." *Plakas v. Drinski*, 19 F.3d 1143, 1147 (7th Cir. 1994). Here, Kenny's version of events is far from unimpeachable.

The court need not identify each and every factual dispute of consequence in the record; it is sufficient to note that what happened in the stairwell between Robinson and Kenny is contested and that both sides have evidence to support their version of the events. Although Kenny, the sole eyewitness, has given his account of what happened, plaintiff has adduced experts that have opined that the forensic evidence—including bullet trajectories, gunpowder residue, and evidence at the scene—undermines Kenny's account. Robinson's gunshot wounds indicate that Kenny likely shot him as he was bent at the waist or falling down the stairs, not upright, controlled, and aggressing toward Kenny. Marso's opinions indicate that Kenny likely first fired at Robinson when he was a number of feet away. And the dash cam video itself is not totally in sync with Kenny's testimony that Robinson essentially threw him down the stairs: the jury will have to have the opportunity to consider the evidence and assess his credibility.

Kenny's motion depends on the court accepting his very specific version of events, in which Robinson attacks him with such force and persistence that any objective, reasonable officer in Kenny's position would have feared for his life. *See* Dkt. 63, at 13 ("Officer Kenny was violently attacked in a dangerously compromised position, which required a split second decision between life and death."). But evidence in the record offers an alternative story. This is not a case where the officer's version of events stands unchallenged. And Kenny's briefing does not conclusively rebut plaintiff's evidence. Without knowing what happened in the stairwell, the court cannot determine as a matter of law that Kenny's decision to use deadly force was objectively reasonable.

Factual disputes about what went on in the stairwell aside, Kenny's motion also depends on the court taking an overly narrow view of the relevant window of time. The events that occurred *around* the time of the shooting—in addition to what was actually happening in the moment Kenny pulled the trigger—are relevant to the totality of the circumstances analysis. *See Estate of Heenan ex rel. Heenan v. City of Madison*, 111 F. Supp. 3d 929, 944 (W.D. Wis. 2015) (citing *Deering v. Reich*, 183 F.3d 645, 652 (7th Cir. 1999)). Kenny's decision to enter the stairwell without waiting for backup, and his decision to enter the stairwell with his gun drawn, are not independent constitutional violations. But these decisions are still part of the totality of the circumstances calculus. *See Williams*, 797 F.3d at 483. Competing police practices experts and witness testimony create factual disputes about these pre-seizure events, too.

"The award of summary judgment to the defense in deadly force cases may be made only with particular care where the officer defendant is the only witness left alive to testify." *Plakas*, 19 F.3d at 1147. Here, Kenny offered the court only his version of events, without

42

rebutting the evidence in the record that undermines his account. Kenny's motion for summary judgment on plaintiff's Fourth Amendment claim is denied.

### b. Qualified immunity

The same factual disputes that preclude summary judgment on plaintiff's Fourth Amendment claim against Kenny also preclude summary judgment on Kenny's qualified immunity defense.

"The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan,* 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). Put a bit more bluntly, qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986). The doctrine translates into a two-part test: (1) whether the public official violated the plaintiff's constitutional rights; and (2) whether those rights were clearly established at the time of the alleged violation. *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011). A right is "clearly established" when a reasonable official would know that his "conduct was unlawful in the situation he confronted." *Hernandez v. Cook Cty. Sheriff's Office*, 634 F.3d 906, 915 (7th Cir. 2011) (quoting *Saucier v. Katz*, 533 U.S. 194, 202 (2001)).

But Kenny's motion for summary judgment on his qualified immunity defense depends on facts that are far from undisputed and asks the court to draw inferences in *his* favor. Kenny's qualified immunity defense depends on a version of events in which "he was responding to a situation in which another was in danger of bodily harm or worse." Dkt. 63, at 15-16. Kenny contends that it is not clearly established that "he could not use deadly force

43

in response to being attacked by Mr. Robinson in a narrow stairwell." *Id.* at 17. Put differently, Robinson had no clearly established right to be free from seizure via deadly force when he "suddenly and violently attacked" Kenny. *Id.* at 21. But whether Robinson had a clearly established Fourth Amendment right not to be seized through the use of deadly force depends on what happened between him and Kenny in the stairwell. Robinson had "a constitutional right not to be shot on sight if he did not put anyone else in imminent danger or attempt to resist arrest for a serious crime." *Weinmann v. McClone*, 787 F.3d 444, 448 (7th Cir. 2015). Factual disputes preclude a determination of whether a clearly established constitutional right was at stake at the time of the shooting. *See id.* at 451 (affirming denial of summary judgment on qualified immunity issue where there was "a factual dispute about the circumstances surrounding [the officer's] decision to fire on [the victim]"). The court must deny Kenny summary judgment on his qualified immunity defense.

### 2.   The City's motion for summary judgment on the *Monell* claim

Whether Kenny violated Robinson's Fourth Amendment rights is a question for the jury. If Kenny did not violate Robinson's rights, then there can be no claim against the City either. But even if Kenny violated Robinson's rights, under the facts of this case, the City was not responsible for Kenny's actions.

The City is not liable for Kenny's actions merely because Kenny is a city employee. *Monell*, 436 U.S. at 691 ("[A] municipality cannot be held liable under § 1983 on a *respondeat superior* theory."). The City is liable only if Kenny's actions can be somehow traced back to City action. *Id.* at 694. Under *Monell*, a municipality is responsible for the actions of its employees if and only if the violation was "caused by: (1) an official policy adopted and promulgated by [the City's] officers; (2) a governmental practice or custom that, although

44

not officially authorized, is widespread and well settled; or (3) an official with final policy-making authority." *Thomas v. Cook Cty. Sheriff's Dep't*, 604 F.3d 293, 303 (7th Cir. 2010).

Here, plaintiff concedes that neither an official policy nor a policymaker's decision is in play. Rather, plaintiff contends, primarily, that the City has a widespread, well-settled MPD practice of conducting biased investigations of officer-involved shootings. And this practice caused Kenny to believe that he could use deadly force with impunity, which led to his unreasonable use of deadly force against Robinson. To succeed on this claim, plaintiff must show that there was such a widespread practice, and that the City was deliberately indifferent to the practice's known or obvious consequences. "In other words, they must have been aware of the risk created by the custom or practice and must have failed to take appropriate steps to protect the plaintiff." *Id.* And, critically, the practice "must be the *moving force* behind the constitutional violation." *Id.* at 306. The causal connection is critical: without showing that the practice actually caused specific the violation, the municipality would effectively be vicariously liable for all the actions of its employees. *Id.* So the court will consider whether plaintiff is able to sustain her burden on three elements: (1) a widespread and well-settled practice or custom (2) to which City officials were deliberately indifferent (3) that caused a constitutional violation.

Plaintiff has a secondary *Monell* theory, based on the City's failure to appropriately train its officers after officer-involved shootings. In some circumstances, a municipality may be liable under § 1983 for constitutional violations caused by a failure to train its police officers. *Sallenger v. City of Springfield*, 630 F.3d 499, 504 (7th Cir. 2010) (citing *City of Canton v. Harris*, 489 U.S. 378, 387 (1989)). The court will address this theory separate from plaintiff's widespread practice theory.

### a. Widespread and well-settled practice

First, the court considers whether plaintiff has actually identified a widespread and well-settled practice or custom. A practice is not a random event, and isolated acts by individual employees are not sufficient to establish a widespread practice. *Thomas*, 604 F.3d at 303-04. A widespread practice is one "which, although unwritten, is so entrenched and well-known as to carry the force of policy." *Hahn v. Walsh*, 762 F.3d 617, 640 (7th Cir. 2014) (quoting *Rice ex rel. Rice v. Corr. Med. Servs.*, 675 F.3d 650, 675 (7th Cir. 2012)).

The practice at issue here is how officer-involved shootings are investigated. According to plaintiff, investigations of officer-involved shootings are so favorable to the officer being investigated that the MPD has a widespread, well-settled practice of not holding its officers accountable for using deadly force. According to plaintiff, this allows MPD officers to use deadly force "with impunity." Dkt. 136, at 2. Plaintiff falls short of showing an established practice.

Plaintiff primarily relies on the Robinson investigation itself to make her case, which she contends was fundamentally biased and deficient. According to plaintiff, Nelson, the PSIA lieutenant in charge of the internal investigation: (1) inappropriately predetermined that Kenny's use of deadly force was objectively reasonable; (2) refused to acknowledge that the dash cam video and forensic evidence undermined or even contradicted Kenny's version of events; (3) included irrelevant information in his report that painted Robinson in a bad light while ignoring Kenny's prejudicial history; and (4) ignored the fact that Kenny was not wearing his body microphone that evening, in violation of MPD policy. The bottom line, according to plaintiff, is that Nelson simply accepted Kenny's version of events, declined to

have certain forensic evidence examined, and otherwise padded his report to ensure Kenny's exoneration.

The first problem with using the Robinson investigation as an example of a widespread practice is that it did not happen until after Kenny shot Robinson. Thus, the Robinson investigation could not have had any effect on Kenny's decision to use deadly force. If a widespread pattern had any effect on Kenny's decision, it would have to have been established before he shot Robinson.

Plaintiff's answer to this criticism is that the Robinson investigation was conducted pursuant to the same practice that had been in place for years. MPD Captain Victor Wahl testified that the internal investigation process, generally speaking, has been "consistent" since 2007. Dkt. 112 (Wahl Dep. 26:21-27:14). Namely, the PSIA lieutenant reviews the criminal investigation's materials and reports "and then make[s] fact-finding conclusions based on the reports and then appl[ies] those to the policies that are relevant." *Id.* at 26:7-9. If the PSIA lieutenant needs additional information, he or she is free to "do some additional investigating or interviews." *Id.* at 26:13-14. Wahl testified that the practice of relying in large part on the criminal investigation's materials remained consistent between 2007 and the Robinson incident. Wahl later testified that the Robinson investigation was "consistent with the Madison Police Department's policies and practices for internal investigations." *Id.* at 61:6-10. Nelson himself testified that he was not aware of any changes to "how officer-involved shootings were investigated internally by the Madison Police Department" between 2010 and the Robinson investigation. Dkt. 106 (Nelson Dep. 19:1-5). According to plaintiff, this shows that all of the defects in Nelson's investigation of the Robinson shooting are the

result of enduring flaws in MPD's investigatory practices: *all* investigations are biased and flawed exactly as Nelson's was.

But plaintiff's logic is flawed. Even if Nelson made errors during the Robinson investigation, those errors do not show that MPD practices were defective, that Nelson's errors were attributable to those practices, or that investigating officers habitually committed those same errors. Certainly neither Nelson nor Wahl nor Chief Koval testified that MPD investigatory practices were designed to favor the officer. At most, plaintiff might show that Nelson did a questionable job during the Robinson investigation. But Nelson's individual errors or biases do not make a widespread practice.

Plaintiff also points out purported deficiencies in the Brandon and Heenan internal investigations. In the Brandon case, investigators chose not to interview Kenny at all. In the Heenan case, investigators did not consider previous complaints levied against Heimsness. The individual decisions that plaintiff criticizes are not similar enough to suggest a singular practice "so pervasive that acquiescence on the part of policymakers was apparent and amounted to a policy decision." *Dixon v. County of Cook*, 819 F.3d 343, 348 (7th Cir. 2016) (quoting *Phelan v. Cook County*, 463 F.3d 773, 790 (7th Cir. 2006), *overruled on other grounds by Ortiz v. Werner Enters., Inc.*, 834 F.3d 760 (7th Cir. 2016)). Plaintiff has individual criticisms of three investigations of officer-involved shootings. But these criticisms, even if valid, amount only to a set of individual errors.

Which leads to another problem with plaintiff's theory: there are not enough examples. The Seventh Circuit has not adopted "any bright-line rules defining a 'widespread custom or practice.'" *Thomas*, 604 F.3d at 303. But the complained-of conduct must have occurred more than once, if not more than three times. *Id.* ("[T]here is no clear consensus as

48

to how frequently such conduct must occur to impose *Monell* liability, 'except that it must be more than one instance,' or even three." (quoting *Cosby v. Ward*, 843 F.2d 967, 983 (7th Cir. 1988)). Again, a widespread practice is one "which, although unwritten, is so entrenched and well-known as to carry the force of policy." *Hahn,* 762 F.3d at 640 (quoting *Rice*, 675 F.3d at 675). Three examples, particularly when the individual errors are dissimilar, is not enough. And, at the time of the Robinson shooting, there were only two.

There is another point that plaintiff does not adequately explain. After April 2014, the criminal investigation of an officer-involved shooting was, by state law, conducted by investigators from an outside agency. Thus, although the *internal* investigation proceeded under essentially the same policy as it had previously, in the Robinson case, outside investigators did a criminal investigation first. Thus, in 2015 when Kenny shot Robinson, he could not count on MPD practices to protect him from the results of the DCI criminal investigation.

One final point. Waller's opinions cannot save plaintiff's *Monell* claim. As discussed, the court will not consider Waller's legal conclusions that a practice exists and that it caused Kenny to act as he did. So the court is left to consider Waller's opinions that the Brandon, Heenan, and Robinson investigations "appear to have been highly friendly to the officers." Dkt. 88, at 13. But, as discussed, the fact that the investigations may have suffered from individual officer errors and bias is not sufficient to establish a widespread and well-settled practice.

On the record submitted on summary judgment, no reasonable jury could find that a practice of conducting biased or otherwise flawed internal investigations guaranteed to exonerate officers was widespread and well settled as of March 6, 2015.

49

### b. Deliberate indifference

To survive summary judgment, plaintiff must also adduce evidence sufficient to allow a reasonable jury to find that the City acted with deliberate indifference. In other words, that "a repeated pattern of constitutional violations" made the deficiencies in the systems "plainly obvious to the city policymakers." *Jenkins v. Bartlett*, 487 F.3d 482, 492 (7th Cir. 2007) (quoting *City of Canton*, 489 U.S. at 390 n.10). "A plaintiff must show that municipal policymakers made a 'deliberate choice' among various alternatives and that the injury was caused by the policy." *Frake v. City of Chicago*, 210 F.3d 779, 781 (7th Cir. 2000) (quoting *Pembaur v. City of Cincinnati*, 475 U.S. 469, 483 (1986)). Plaintiff's weak showing on the existence of a widespread practice makes the showing of deliberate indifference particularly difficult, if not impossible.

Plaintiff has not adduced any evidence that MPD officials were aware, or should have been aware, that PSIA lieutenants were making biased decisions during internal investigations to ensure officer exoneration, much less that the internal investigations were causing constitutional violations. Plaintiff has not adduced any evidence of a "repeated pattern of constitutional violations." Nothing about the Brandon and Heenan investigations was so flawed that they were obviously poised to cause constitutional violations. Pointing out errors or imperfections in previous investigations is not enough to show that the City or the MPD was aware of a pattern of constitutional violation. *See Sims v. Mulcahy*, 902 F.2d 524, 544 (7th Cir. 1990) ("Although it is possible that the City could have conducted a more thorough investigation that would have included an interview with Sergeant Jerome Gartner, we are not of the opinion that a City investigation that included interviews with various relevant individuals over a three-month period constitutes the 'deliberate indifference or tacit

authorization of the offensive act,' necessary to establish municipal liability based upon inaction in response to the misconduct of its employees." (footnote omitted) (quoting *Jones v. City of Chicago*, 787 F.2d 200, 205 (7th Cir. 1986))). Plaintiff cannot sustain her burden on this element.

### c.   Moving force

Plaintiff must also adduce evidence sufficient to allow a reasonable jury to find that biased internal investigations caused Kenny to use deadly force. On the "moving force" prong, plaintiff must adduce evidence of "a direct causal link" between the purported practice and Kenny's conduct. *City of Canton*, 489 U.S. at 385. The practice must have caused or been responsible for Robinson's death. *Thomas*, 604 F.3d at 304. Courts distinguish between acts that *caused* the injury—the "moving force"—and "merely contributing factors." *Id.* at 306.

Again, the Robinson investigation itself is irrelevant here; it cannot have caused Kenny to act as he did. But even assuming that Kenny knew that PSIA lieutenants favored the officers during the investigation of two previous officer-involved shootings, the connection between the practice and Kenny's decision to use deadly force is too attenuated. It is simply too much of a stretch to say that knowledge that PSIA lieutenants favor officers *caused* or was *responsible* for Kenny's use of deadly force on March 6, 2015, such that it was *the* moving force behind his decision to shoot Robinson. Again, Wis. Stat. § 175.47 is important here, because the MPD investigation system underwent a major change in 2014. Post-Brandon and Heenan, the criminal investigation of officer-involved shootings was no longer in the control of the MPD. The MPD could not ensure Kenny's exoneration from criminal liability, no matter how it conducted its internal review.

Plaintiff's only evidence of a causal connection between the purported practice and Kenny's conduct is the fact that it was ostensibly in existence before March 6, 2015. *See* Dkt. 136, at 9 ("Plaintiff's claim is that the Robinson shooting investigation is indicative of the policies at the time of the shooting, and that prior instances illustrate that such a policy was in effect *before* the shooting which creates a causal link."). Waller is no help here: he summarily concludes that the MPD's failure to hold its officers accountable caused Robinson's death. That is a legal conclusion, and the court will not consider it. Even if the jury were persuaded that loose, favorable internal scrutiny might have *contributed* to Kenny's decisions that night, that is not enough to satisfy the causation element.

In sum, no reasonable jury could conclude that the prospect of a biased MPD internal investigation was the moving force behind Kenny's decision to use deadly force against Robinson.

### d.  Failure to train

As mentioned above, plaintiff offers a second *Monell* theory: the City failed to adequately retrain its officers or otherwise address departures from training following officer-involved shootings. Plaintiff's claim is narrow; plaintiff concedes that the MPD does not have a widespread training problem. Dkt. 136, at 28 ("To be clear: Plaintiff recognizes that the Madison Police Department *does* do a great deal of training and a claim that Madison has some sort of widespread training problem across the Department would likely be frivolous.").

"A municipality will be held liable for the violation of an individual's constitutional rights for failure to train adequately its officers only when the inadequacy in training amounts to deliberate indifference to the rights of the individuals with whom the officers come into contact." *Jenkins*, 487 F.3d at 492. "Only where a failure to train reflects a

'deliberate' or 'conscious' choice by a municipality—a 'policy' as defined by our prior cases—can a city be liable for such a failure under § 1983." *City of Canton*, 489 U.S. at 389. It is not enough to show that the violation "could have been avoided if an officer had had better or more training." *Id.* at 391.

But plaintiff cannot show how the City was deliberately indifferent. Plaintiff never contends that MPD officers did not receive adequate training on any particular issue; plaintiff simply contends that they did not receive targeted training specifically as a result of officer-involved shootings. But the record indicates that MPD officers received ongoing, evolving training in accordance with—and at times exceeding—state standards. Nothing in the record indicates that the MPD deliberately declined to address training deficiencies that were obviously causing otherwise avoidable officer-involved shootings. *See, e.g.*, *Tapia v. City of Greenwood*, 965 F.2d 336, 339 (7th Cir. 1992) ("The evidence established that the police officers received basic training at law enforcement academies and additional training regarding search warrants, and that the City requires officers to adhere to state law in executing warrantless searches. From this evidence, we cannot say that 'the need for enhanced training [was] so obvious, and the inadequacy of training [was] so likely to result in the violation of constitutional rights, that a jury could reasonably attribute to the policymakers a deliberate indifference to those training needs.'" (alterations in original) (quoting *Erwin v. County of Manitowoc*, 872 F.2d 1292, 1298 (7th Cir. 1989)).

Plaintiff has not adduced evidence sufficient to allow a reasonable jury to hold the City responsible for Kenny's actions under *Monell.* The court will grant the City's motion for summary judgment.

ORDER

IT IS ORDERED that:

1.  Defendant Matthew Kenny's motion for summary judgment, Dkt. 43, is DENIED.

2.  Defendant the City of Madison, Wisconsin's motion for summary judgment, Dkt. 47, is GRANTED.

3.  The City of Madison's motion to exclude opinion testimony by Dennis Waller, Dkt. 56, is GRANTED in part.

4.  Kenny's motion to exclude expert testimony by Jonathan Arden, Dkt. 58, is DENIED.

5.  Kenny's motion to exclude expert testimony by Samuel Marso, Dkt. 59, is DENIED.

6.  Kenny's motion to exclude expert testimony by Dennis Waller, Dkt. 60, is GRANTED in part and DENIED in part, consistent with this opinion.

7.  Plaintiff the Estate of Tony Robinson, Jr., *ex rel.* personal representative Andrea Irwin's motion to bar the proposed expert testimony of Susan M. Skolly-Danziger, Dkt. 80 and Dkt. 103, is provisionally GRANTED, subject to further consideration at the final pretrial conference.

8.  Plaintiff's motion to bar portions of the proposed expert testimony of John G. Peters, Dkt. 81 and Dkt. 104, is GRANTED in part and DENIED in part, consistent with this opinion.

9.  Plaintiff's motion to bar certain expert opinions by Vincent Di Maio, Dkt. 114, is GRANTED.

10. Plaintiff's motion to bar expert opinions by Andrew Dennis, Dkt. 115, is GRANTED in part and DENIED in part, consistent with this opinion.

11. Defendants' motion for bifurcation, Dkt. 173, is DENIED as moot.

Entered February 13, 2017.

BY THE COURT:

/s/

_____

JAMES D. PETERSON
District Judge

54